## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| BRITT MILLER AND BRET GOULD ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, | ) ) ) | Civil Action No. 14-cv-0708 |
| | ) | |
| Plaintiffs, | ) ) ) | CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF SECURITIES LAWS |
| v. | ) ) | |
| GLOBAL GEOPHYSICAL SERVICES, INC., RICHARD A. DEGNER, P. MATHEW VERGHESE, RICHARD C. WHITE, DAMIR SKERL, MICHAEL C. FORREST, GEORGE E. MATELICH, STANLEY DE JONGH OSBORNE, KARL F. KURZ, MIACHEL S. BABORICH, JOSEPH P. MCCOY, MLV & CO., NATIONAL SECURITIES CORPORATION and UHY LLP | ) ) ) ) ) ) ) ) ) ) ) | **CLASS ACTION**<br><br>**JURY TRIAL DEMANDED**<br><br><br>District Judge Vanessa D. Gilmore |
| Defendants. | ) ) ) | |

Lead Plaintiff Billy Rinn ("Lead Plaintiff") and named plaintiffs Bret Gould, David Norris, Walter Rink, and Bryan Stanley ("Named Plaintiffs", and with Lead Plaintiff, the "Plaintiffs") individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint, allege upon plaintiffs' personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, except where indicated otherwise.

## I.    NATURE OF THE ACTION

1.    This is a securities class action on behalf of two classes:

    a.    A class of persons who bought GGS common stock during the period beginning on February 22, 2012 through March 26, 2014 (the "Class Period"

and the "Open Market Class") bringing claims under the Securities and Exchange Act of 1934 (the "Exchange Act"); and

b.   A class of persons who bought GGS Series A preferred stock in or traceable to, GGS's December 3, 2013 registration statement (the "Registration Statement") for an underwritten offering (the "Offering" and the "Offering Class"), bringing claims under the Securities Act of 1933 (the "Securities Act").

## II.   <u>**THE OFFERING CLASS'S CLAIMS**</u>

2.      In December 2013, GGS raised $8 million by selling its 11.5% Series A preferred shares to investors in a public offering (the "Offering"). The Offering was conducted through a registration statement (the "Registration Statement") and a prospectus (the "Prospectus" and with the Registration Statement, the "Offering Materials").

3.      The Registration Statement and Prospectus each incorporated by reference GGS's 2012 10-K, which itself included GGS's annual financial statements going back to 2009. The Registration Statement and Prospectus each also incorporated by reference each of GGS's 2013 quarterly financial filings.

4.      Barely three months later, after trading closed on March 17, 2014, GGS announced that it would have to restate its annual financial statements for 2009 on – every annual financial statement it had ever filed as a public company. It would also restate every 2013 quarterly financial statement. The restatement showed that GGS's annual financial statements had understated its net losses attributable to shareholders for the years between 2009 and 2012 by between 6.16% and 1297.98%, and had understated net loss attributable to shareholders for the three quarters ending September 30, 2013, by 17.54%. GGS had previously claimed that its

internal controls over financial reporting had been adequate, but on March 17, it announced that at least as of December 31, 2013, that was not true. Finally, GGS announced that because of the restatement, it would not be able to file its 2013 annual financial statements, violating the covenants on its outstanding debt. As a result, a week later, GGS filed for bankruptcy protection.

5.      Thus, the Registration Statement and the Prospectus contained false and misleading statements: (a) overstating net income materially in its financial statements in the Offering Documents; (b) falsely stating that GGS's internal controls over financial reporting were effective.

6.      The Offering Documents also omitted to disclose material information that was required to be disclosed. From as far back as 2011, GGS had been unable to pay its vendors. Rather, other than for the most critical vendors, GGS would routinely violate contractual agreements by pushing off payments between 60 and 90 days past the date they were due. Between mid-2011 and January 2013, the head of finance of GGS's North American operations reports that he received between 20 and 40 calls a day from vendors demanding payment. The Vice President in charge of GGS's Gulf of Mexico operations says GGS was dependent on vendors' forbearance of their legal rights to continue their operations during his tenure from 2010 through late 2013, and that he would hand carry crucial vendors' past-due invoices to GGS's clerical staff, and attempt to cajole them into paying the invoices so that the operations he managed could continue. Thus, GGS was unable to pay its obligations as they came due; it was insolvent when it conducted the Offering.

7.      When GGS's true financial condition and performance was revealed in a series of news disclosures beginning March 18, 2014, Series A preferred shareholders lost nearly their entire investment, with the preferred stock losing 56% of its face value on March 18 alone.

### III. JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78b-1 and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77(o). Section 22 of the Securities Act provides for jurisdiction over Securities Act claims in this Court.

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22(a) of the Securities Act, 15 U.S.C. §77v(a).

10. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) and Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a). Defendants maintain their principal executive offices in this District and many of the acts, practices and transactions complained of herein occurred in substantial part in this District.

11. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

    a. Parties to the Offering Class Claims.

12. Plaintiff Bret Gould purchased GGS Series A preferred stock pursuant to, and traceable to the Registration Statement. His PSLRA certification was previously filed on the Court's docket and is incorporated by reference.

13. Plaintiff Walter Rink purchased Global Series A preferred stock pursuant to, and traceable to the Registration Statement. His PSLRA certification is attached hereto and

incorporated by reference. Rink and Gould are the "Offering Plaintiffs".

14.     Former Defendant GGS is a Delaware corporation with its principal place of business in Missouri City, Texas. GGS and its subsidiaries purport to provide an integrated suite of seismic data solutions to the oil and gas industry worldwide. The company's seismic data solutions primarily include seismic data acquisition, microseismic monitoring, data processing, and interpretation services, which deliver data that enables the creation of high resolution images of the Earth's subsurface, and reveal complex structural and stratigraphic details. During the Class Period, the Company was listed on NYSE and traded under ticker "GGS". Between December 16, 2013, and March 18, 2014, GGS's Series A preferred stock was also listed on the NYSE, and traded under ticker "GGS-PA". GGS is no longer a defendant in this action because it has filed for bankruptcy protection and Plaintiffs have filed proofs of claim against GGS in the bankruptcy proceedings.

15.     Defendant P. Mathew Verghese joined GGS in March 2009 as a Senior Vice President and its Chief Financial Officer, and remained in this position until January 2014, when he became its Executive Vice President and a Chief Operating Officer. Verghese signed the Registration Statement.

16.     Defendant Richard C. White is the President and Chief Executive Officer of the Company, and is Chairman of the Board of Directors.  He was appointed President and CEO in October 2012 and was elected Chairman of the Board of Directors in January 2013. White signed the Registration Statement.

17.     Defendant Damir S. Skerl joined GGS's Board of Directors in June 2005, and has been a director since then. Skerl is a member of the Audit Committee. Skerl was a director at the time of the Offering and signed the Registration Statement.

18.     Defendant Michael C. Forrest joined GGS's Board of Directors in June 2005, and has

been a director since then. Forrest was a director of GGS at the time of the Offering and signed the Registration Statement.

19.    Defendant George E. Matelich joined GGS's Board of Directors in December 2006, and has been a director since then. Matelich was a director of GGS at the time of the Offering and signed the Registration Statement.

20.    Defendant Stanley de Jongh Osborne joined GGS's Board of Directors in March 2007, and has served on its Board since then. Osborne was a director of GGS at the time of the Offering and signed the Registration Statement.

21.    Defendant Michael S. Bahorich joined GGS's Board of Directors in April 2011, and has served on its Board since then. Bahorich was a director of GGS at the time of the Offering and signed the Registration Statement.

22.    Defendant Karl F. Kurz joined GGS's Board of Directors in December 2010, and has been a director since then. Kurz was a director of GGS at the time of the Offering and signed the Registration Statement. Kurz is a member of the audit committee.

23.    Defendant Joseph P. McCoy joined GGS's board in April 2011, and served as a member of its Board and Directors and the Chairman of its Audit Committee since then. McCoy was a director of GGS at the time of the Offering and signed the Registration Statement.

24.    Collectively, Verghese, White, Skerl, Forrest, Matelich, Osborne, Kurz, Bahorich, and McCoy are the "Individual Offering Defendants."

25.    Defendant MLV & Co. ("MLV") is a financial services firm, concentrating on investment banking.

26.    Defendant National Securities Corporation ("National Securities") is an investment banking and financial advisory firm. MLV and National Securities are the "Underwriters." MLV and

National Securities were the Joint Book-Running Managers and Underwriters of GGS's December 13, 2013 Offering.

27.     Defendant UHY LLP ("UHY") is an audit firm with offices throughout the United States, including in Houston, Texas.  UHY was GGS's auditor from 2009 through 2014. UHY provided an audit certification for the Registration Statement, certifying GGS's financial statements for fiscal 2010 through 2012 were accurate and faithfully complied with generally accepted auditing standards. UHY also certified that GGS's internal controls over financial reporting were effective as of December 31, 2012. On November 15, 2013, UHY consented to having its audit certification and certification of internal controls over financial reporting included in the Registration Statement.  UHY was obligated to reevaluate its audit and internal controls certifications as of the date of its consent to including its certifications in the Registration Statement, November 15, 2013.

      b.  Background.

28.     GGS was founded in 2003, and held its Initial Public Offering ("IPO") in April 2010.

29.     Seismic surveys aim to provide an accurate graphical representation of subsurface geologic structure. Oil and gas companies employ such seismic surveys to evaluate prospects for potential drilling.

30.     GGS provides seismic data to the oil and gas industry through two segments. In its proprietary services segment, GGS will obtain seismic data for an individual client's use. The data will be provided to the client on an exclusive basis. In its multi-client services segment, GGS will obtain seismic data on its own initiative, and will sell licenses to use the data on a non-exclusive basis.GGS focuses on high end seismic data, and has experience in most of the world's oil and gas basins.

31.     The seismic data industry is highly competitive, with thin margins and high capital costs. The overwhelming challenge for seismic data providers is to eke out a profit from revenues which can be quite large. Thus, investors in seismic data companies consider net income attributable to shareholders – profit – an important financial metric.

32.     GGS had substantial international operations, including in parts of the world with quite different business climates than that of the U.S. For example, GGS's traditional mainstays in Latin America were Colombia and Brazil, and it had substantial operations in Iraq. Accordingly, whether GGS maintained adequate internal controls over financial reporting was crucial to investors.

33.     As shown by the restatement, the Registration Statement made two materially false statements: they understated net loss attributable to shareholders for each of the fiscal years from 2009 to 2012, and falsely stated that GGS's internal controls over financial reporting were effective as of December 31, 2012.

34.     The Registration Statement also omitted to disclose the severe cash flow shortage GGS was suffering at the time of the Offering that rendered it unable to meet its financial obligations as they became due.  GGS routinely could not pay its bills and survived only by the good graces of its vendors, which shortly thereafter ran out resulting in GGS's bankruptcy just three months after the Offering.

      c.   The Registration Statement and Prospectus Contained Inaccurate Statements of Material Fact.

35.     On December 3, 2013, GGS filed an Amended Registration Statement on Form S-3/A to sell up to $300,000,000 of common or preferred stock (the "Registration Statement"). The Registration Statement was declared effective on December 3, 2013. On December 10, 2010,

pursuant to the Registration Statement, GGS filed a Prospectus for the sale of 347,827 depositary shares each representing a 1/1000th interest in a share of GGS's 11.5% Series A Preferred Stock (the "Preferred Depositary Shares"), for $23.00 per depositary share, for an aggregate offering price of $8.0 million. Total underwriting fees were $560,000. On December 16, 2013, the Preferred Depositary Shares were listed on the New York Stock Exchange, where they traded under ticker GGS-PA.

36.     The Registration Statement contained inaccurate statements of material fact. It misrepresented the Company's true financial performance and condition which had the effect of artificially inflating the value of GGS's preferred stock.

37.     The Registration Statement incorporated by reference certain of GGS's financial statements, including its Annual report on Form 10-K for the fiscal year ended December 31, 2012 (the "2012 10-K"), which was filed with the SEC on March 5, 2013, and signed by Defendants White and Verghese. The 2012 10-K reported GGS's financial results and cash flows for the December 31, years ended, and assets and liabilities and equity as of, December 31 2009, 2010, 2011, and 2012, including the net income (loss) attributable to shareholders for each of these periods. The Registration Statement also incorporated by reference GGS's 10-Qs for each of the first three quarters of 2013. The 10-Qs reported GGS's financial results and cash flows for each of the three month periods ending, and the assets, liabilities and equity,  as of, March 31, June 30, and September 30, 2013 (the "Q3 2012 10-Q"), including the net income (loss) attributable to shareholders for each of these periods. As set out in Table I below, the 2009-2012 annual financial results incorporated into the Offering Materials each understated materially the net loss attributable to shareholders, and the Q3 2012 10-Q understated materially the net loss attributable to shareholders for the three months ended September 30, 2013.

38.     The 2012 10-K also falsely reported that GGS's internal controls over financial

reporting as of December 31, 2012, were effective:

**Report of management on internal control over financial reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. Internal control over financial reporting is a process to provide reasonable assurance regarding the reliability of our financial reporting for external purposes in accordance with accounting principles generally accepted in the United States of America. Internal control over financial reporting includes maintaining records that in reasonable detail accurately and fairly reflect our transactions; providing reasonable assurance that transactions are recorded as necessary for preparation of our financial statements; providing reasonable assurance that receipts and expenditures of Company's assets are made in accordance with management authorization; and providing reasonable assurance that unauthorized acquisition, use or disposition of company assets that could have a material effect on our financial statements would be prevented or detected on a timely basis. Because of its inherent limitations, internal control over financial reporting is not intended to provide absolute assurance that a misstatement of our financial statements would be prevented or detected.

Management conducted an evaluation of the effectiveness of our internal control over financial reporting based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). **Based on this evaluation, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2012.**

39.     These amounts are set out below in table 1. The 2013 10-Qs also reported that

there had been no changes in GGS's internal controls over financial reporting between the date

of its 2012 10-K and the Offering date, with each 10-Q stating

**Item 4. Controls and Procedures**

Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we have evaluated the effectiveness of the Company disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) as of [March 31, June 30, or September 30, 2013]. Based on that evaluation, the Company's principal executive and principal financial officer have concluded that these controls and procedures were effective as of [March 31, June 30, or September 30, 2013].

> *There were no changes in the Company's internal control over financial reporting that occurred during the Company's last fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.*

(Emphasis added).

40.     These financial statements and management's report on internal controls were false when made because the Company admitted that its financial statements were materially inaccurate and must be restated due to material accounting errors and should not be relied upon and that its internal controls over financial reporting were ineffective as of December 31, 2013.

41.     Generally Accepted Accounting Principles ("GAAP") constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

42.     GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

43.     The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board.

44.     The Registration Statement and Prospectus falsely stated that GGS's financial statements conformed to GAAP.

45.     SEC and NASDAQ rules and regulations require that financial statements included in a registration statement or prospectus must comply with GAAP. See §13 of the Exchange Act; Regulation S-X.

46.     SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

47.     Under GAAP "restatements" are required for material accounting errors that

existed at the time financial statements were prepared. See Statement of Financial Accounting Standards 154; Accounting Standards Codification ("ASC") 250.

48.    An accounting "error" is a term of art and results from, among other things, an error in recognition, measurement, or mistakes in the application of GAAP. SFAS 154; ASC 250.

49.    Errors result from (i) mathematical mistakes, (ii) mistakes in application of GAAP, or (iii) oversight or misuse of facts that existed at the time the financial statements were prepared. SFAS 154, ASC 250.

50.    On March 17, 2014, after close of trading, GGS reported that its financial statements, including those in the 2012 10-K, could no longer be relied upon, identifying numerous accounting errors that resulted in the restatement of GGS's financial statements for each fiscal year from 2010 through 2012, and each quarter of 2013:

1. misapplication of a method of revenue recognition for certain contracts in the Latin America region, resulting in misallocation of revenues and costs between periods;
2. research and development costs that were inappropriately capitalized rather than expensed;
3. unrecorded sales and use tax liabilities;
4. unrecorded gains associated with insurance proceeds received in excess of the net book value of the insured assets during the third quarter of 2013; and
5. unrecorded stock-based compensation expense associated with performance units granted during the third quarter of 2013.

51.    GGS's restatement was caused primarily by the oversight or misuse of facts and the failure to properly apply its accounting policies that complied with GAAP.

52.    GGS's restatement of its financial statements is an admission that its financial statements did not comply with GAAP and were therefore materially false and misleading.

53.    Citing the restatement, GGS also determined that its internal controls over

financial reporting were ineffective as of December 31, 2013, and that it was awaiting a final conclusion as to the effectiveness of its internal controls over financial reporting for earlier periods.

54.     Since GGS restated its financial statements for 2009 onwards, its internal controls over financial reporting were ineffective from 2009 onwards. Thus, GGS's statements in the Offering Materials that GGS's internal controls were effective as of each December 31, 2012, and March 31, June 30, and September 30, 2013, were false.

        d.  The Registration Statement also omitted to disclose that GGS was unable to meet its contractual and other financial obligations as they came due.

            a)  GGS had an obligation to disclose known trends and uncertainties that would have a material impact on its net sales, revenues, or income, or that was necessary to make statements made in the Registration Statement not misleading.

55.     Item 303(a) of SEC Regulation S-K required the Registration Statement to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   17 C.F.R. § 229.303. In addition to the identification of such trends or uncertainties, Item 303 requires disclosure of (i) whether those trends or uncertainties have had or are reasonably expected to have a material unfavorable impact on revenue; and (ii) the extent of any such impact on revenue.  Item 303 also requires disclosure of  "events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments)." *Id.*

56.     Moreover, pursuant to SEC Regulation C, Defendants had a duty to disclose

material information necessary to ensure that representations in the Registration Statement were not misleading. Specifically, Rule 408 states that, "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading." 17 C.F.R. § 230.408(a).

b) GGS was cash flow insolvent at the time of the Offering

57.    The 2012 10-K provided:

We believe that our current working capital, [sic] projected cash flow from operations will be sufficient to meet our capital requirements for our existing operations for the next 12 months. Although we expect to continue generating positive cash flow from our operations, events beyond our control may affect our financial condition or results of operations. These events include, but are not limited to, a significant drop in prices for oil and natural gas and a corresponding drop in demand for our services.

58.    Confidential Witness ("CW") 1 was hired by GGS as a consultant in February/March 2011, and was soon thereafter made the head of finance of GGS's North American operations.

59.    CW 1 was in charge of GGS's North American accounts payable department, and was personally involved in approving payments to vendors. CW 1 spoke with Defendant Verghese daily, regularly spoke with Defendant Degner, and regularly made presentations at GGS Board of Directors meetings.

60.    While he was at GGS, except for a two-month period immediately following a debt issuance in March 2012 with net proceeds to GGS of $45.5 million, GGS was not able to meet its obligations as they came due.

61.    GGS would separate its financial obligations into critical obligations such as debt and payroll and other financial obligations. GGS paid critical obligations as they came due, but

other financial obligations would not be paid according to the terms of GGS's contracts. Rather, GGS would push off paying vendors as long as it could – typically, about 100-110 days after invoiced – even though invoices called for payments in 30 or 60 days.

62.     At any given time, GGS would defer paying (i.e. pay late) about 60-75% of its currently due accounts payable of about $22-23 million per month. Thus, 60% to 75% of GGS's accounts payable was 70-80 days past due at all times. In the meantime, GGS would scramble to find money to pay the accounts payable, whether through collecting on accounts receivable, selling company assets, taking on additional debt, or selling GGS shares.

63.     CW 1 would receive between 20 and 40 calls per day from vendors demanding to be paid.

64.     In January 2013, Defendant Degner left GGS to make a bid to buy GGS assets, and CW 1 was fired alongside him, and joined Degner to found Geophysical Technology, Inc. ("GTI")

65.     In early 2013, GTI sought to buy certain assets of GGS, and reached a deal to buy them for $200 million, provided that GGS would buy $80 million of product from GTI over the next four years. GTI was backed by Silver Lake Partners, a well-known private equity firm.

66.     As part of the deal, GTI and Silver Lake were provided with non-public GGS two-year cash flow projections.

67.     GGS's cash flow projections made it obvious  to GTI (i.e. Degner and CW1) and Silver Lake that even with an additional $200 million, GGS would not be able to survive for four years to buy $80 million of product from GTI. Accordingly, GTI and Silver Lake brought this cash flow deficiency to GGS's and attention sought to renegotiate the deal for a lower purchase price without a four year revenue guarantee from GGS. GGS refused to negotiate, and the deal

fell apart in May 2013.

68.     For about five months after he left GGS, CW 1 continued to receive calls from GGS vendors, seeking to have him intercede with GGS to make them pay past due invoices.

69.     From September 2010 until August of 2013, CW 2 was a GGS Vice President who managed GGS's Gulf of Mexico project. CW 2 reported to Lawrence Wagner, a GGS Vice President in charge of Worldwide Marine operations.

70.     CW 2 commonly relied on vendors' forbearance in collecting past due invoices in order to conduct business. When an invoice had been pushed off for as long as possible, CW 2 or his staff would hand carry the invoice to GGS accounts payable, and would then cajole the accounts payable employees to pay the invoice.

71.     Without such a campaign, GGS could not continue to operate. For example, CW 2 recalls an instance where ships under his management needed refueling. The refueling company, however, refused to refuel GGS's ships until it paid outstanding invoices. Without the fuel, GGS's ships could not continue to operate.

72.     CW 2 reports that GGS typically paid invoices 60-90 days late (i.e., 90-120 days after the invoice date). Some vendors were kept waiting even longer than that for large amounts ($400,000, in one instance). CW 2 reports that GGS was lucky to make payroll each pay period.

73.     CW 2 continued as a consultant to GGS after August 2013. These cash flow problems persisted.

        e.  The Offering Class's losses.

74.      On March 18, GGS's Series A Preferred Shares price fell from $16.95 to $4.06, or 76%, damaging investors. The trading volume that day was about 141,000 Preferred Depositary Shares, or about 41% of all issued Preferred Depositary Shares. Similarly, GGS's

stock price fell from $1.17 to $0.46, or about 61%, also on heavy volume. The value of the

Series A Preferred Shares on the dated the Offering Plaintiffs filed suit was zero.

75. On April 29, 2014, GGS filed its 10-K for the year ended December 31, 2013 (the

"2013 10-K"). The 2013 10-K reported the final restated amounts:

**TABLE 1**

**NET INCOME (LOSS) ATTRIBUTABLE TO COMMON STOCKHOLDERS**

| $ in thousands | | | | |
|---|---|---|---|---|
| | | | Amount Overstated/ (Understated) | Percentage Overstated/(Understated) |
| PERIOD | AS REPORTED | AS RESTATED | | |
| | | | | |
| YEAR ENDED DEC. 31, 2012 | $ (13,331) | $ (15,586) | $ (2,255) | (16.92%) |
| YEAR ENDED DEC. 31, 2011 | $ 5,662 | $ 4,933 | $ (729) | (12.88%) |
| YEAR ENDED DEC. 31, 2010 | $ (39,716) | $(42,161) | $ (2,445) | (6.16%) |
| YEAR ENDED DEC. 31, 2009 | $ 445 | $ (5,331) | $ (5,776) | (1297.98%) |
| THREE MONTHS ENDED SEPTEMBER 30, 2013 | $ (24,199) | $ (28,443) | $ (4,244) | (17.54%) |
| THREE MONTHS ENDED JUNE 30, 2013 | $ (15,786) | $ (15,367) | $ 419 | 2.65% |
| THREE MONTHS ENDED MARCH 31, 2013 | $ (11,542) | $ (11,086) | $ 456 | 3.95% |

Sources: As reported data from 2012 10-K and 10-Qs for each of the first three quarters of 2013.

As restated data from 2013 10-K.

      f.   Plaintiffs' Class Action Allegations.

76. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise acquired the common stock of GGS during the Class Period and who suffered damages (the "Open Market Class"), or who acquired the Series A preferred stock of GGS (the "Offering Class"). Excluded from the Classes are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

77.     The members of the Classes are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Classes may be identified from records maintained by GGS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

78.     Plaintiffs' claims are typical of the claims of the members of the Classes as Mr. Rinn, Norris, and Stanley purchased GGS stock during the Class Period and Messrs. Gould and Rink purchased GGS stock traceable to the Registration Statement and all members of the Classes are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

79.     Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class and securities litigation.

80.     Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes.

Among the questions of law and fact common to the Classes are:

    a.   whether the federal securities laws were violated by defendants' acts as alleged herein;

    b.   whether defendants misrepresented material facts and omitted to state material facts necessary to prevent the statements made to the investing public from being misleading during the Class Period or in the Registration Statements concerning its financial statements;

    c.   whether defendants have proved their affirmative defenses;

    d.   whether the market prices of the Company's common stock was artificially inflated or distorted during the Class Period because of defendants' conduct complained of herein; and

    e.   whether the members of the Classes have sustained damages and the proper measure of such damages.

81. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Violation Of Section 11 Of The Securities Act**

**Against the Underwriters, UHY, and the Individual Offering Defendants**

82.     Offering Plaintiffs repeat and reallege each and every allegation contained above. This Count is asserted by Messrs. Gould and Rink on behalf of the Offering Class against the Underwriters, UHY and the Individual Offering Defendants.

83.     This count is predicated upon these Defendants' strict liability for making false statements of material fact in the Registration Statement and Prospectus.

84.     The Individual Offering Defendants, and the Underwriters were sellers, offerors, and/or solicitors of the purchasers of the common stock offered pursuant to Offering Materials. These defendants issued or caused to be issued the Offering Materials in connection with the Offering.

85.     The Offering Materials contained untrue statements of material fact.   These Defendants' actions included soliciting Offering Plaintiffs and the Class by means of these Defendants' participation in the preparation of the false Offering Materials.

86.     GGS is the registrant for the Offering.   The Individual Offering Defendants are responsible for the contents of the Registration Statement based upon their status as directors of the Company or because they signed or authorized the signing of the Registration Statement on their behalf pursuant to Sections 11(a)(1)-(3) of the Securities Act. The Underwriters are responsible for the contents of the Registration Statement pursuant to Section 11(a)(5) of the Securities Act.

87.     UHY consented to inclusion in the Registration Statement of its audit opinion covering fiscal years 2010 through 2012 and to the inclusion of its certification of GGS's internal controls over financial reporting as of December 31, 2012. .   Because UHY expertised these portions of the Registration Statement, UHY is liable under Section 11 for the false statements in

GGS's financial statements and for GGS's false statements that its internal controls over financial reporting were effective.

88. These Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Offering Materials to ensure that such statements were true and that there were no material omissions of facts required to be stated therein in order to make the statements contained therein not misleading. None of these Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete in all material respects.

89. Offering Plaintiffs and the other members of the Offering Class did not know, nor could they have known, of the untruths or omissions contained in the Offering Materials.

90. This claim is brought within one year after discovery of the untrue statements and omissions in the Offering Materials and within three years of the effective date of the Registration Statement.

91. By virtue of the foregoing, Offering Plaintiffs and the other members of the Class are entitled to damages from the Defendants and each of them, jointly and severally.

**COUNT II**

**Violations Of Section 15 Of The Securities Act
Against Individual Offering Defendants**

92. Plaintiff repeats and re-alleges each and every allegation contained above.

93. This count is asserted by Plaintiff Gould on behalf of the Offering Class against the Individual Offering Defendants, each of whom was a control person of Global at the time of the Offering.

94. For the reasons set forth above in the First Count, GGS is liable to Plaintiff and the members of the Offering Class who purchased GGS preferred shares in the Offering based on

the untrue statements of material fact contained in the Registration Statement and Prospectus, pursuant to Section 11 of the Securities Act, and were damaged thereby.

95. The Individual Offering Defendants were control persons of GGS by virtue of, among other things, their power and influence and exercised the same to cause GGS to engage in the acts described herein; their positions as senior officers of the Company; their day-to-day control of GGS's business affairs; their responsibility or control over the contents of the Registration Statement and Prospectus; and/or their control over the inaccurate statements of material fact contained in the Registration Statement and Prospectus.

96. None of the Individual Offering Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were accurate and complete in all material respects. Had they exercised reasonable care, they could have known of the material misstatements alleged herein.

97. This claim was brought within one year after the discovery of the untrue statements and omissions in the Registration Statement and Prospectus and within three years after Global preferred shares was sold to the Class in connection with the Offering.

98. By reason of the misconduct alleged herein for which GGS is primarily liable, as set forth above, the Individual Offering Defendants are jointly and severally liable with and to the same extent as GGS pursuant to Section 15 of the Securities Act.

## II.    THE OPEN MARKET CLASS'S CLAIMS

99. The Open Market Class consists of all persons who bought GGS stock between February 22, 2012, and March 18, 2014, and were damaged thereby.

100. For the reasons stated above, defendants Degner, White and Verghese (the "Section 10(b) Defendants") made false statements about GGS's net losses attributable to

shareholders, the effectiveness of its internal controls, and omitted to disclose information concerning GGS's cash flows that they were required to disclose.

101.     In addition to pleading that the Section 10(b) Defendants made these false statements, the Open Market Class must plead that the Section 10(b) Defendants made the false statements with scienter.

102.     During the Class Period, the Section 10(b) Defendants knew that GGS was unable to meet its obligations as they came due. GGS's officers received daily cash reports, which listed (among other things), the previous day's bank balances, as well as cash inflows and outflows.

103.     Armed with detailed knowledge of GGS's cash flows, the Section 10(b) Defendants knew that GGS was cash flow insolvent. Indeed, many of the strategic decisions these defendants made were in fact not made for the reasons the defendants provided at the time, but because of GGS's financial condition.

104.     For example, on October 26, 2012, GGS announced that its Chief Executive Officer Defendant Degner had "resigned". But Degner had been pushed out because the Board believed that Degner had incurred too much debt and that GGS would be unable to service it unless the Board appointed another CEO. Similarly, when GGS disclosed its two year projections to private equity firm Silver Lake Partners, the firm concluded that even with $200 million from Silver Lake, GGS could not survive long enough to make contractually obligated purchases. Indeed, GGS's credit in the U.S. was so poor that it resorted to having its foreign subsidiaries borrow funds locally to then transfer them to the U.S. parent for its use.

105.     Moreover, Defendant Verghese in particular had intimate knowledge of GGS's financial operations because his authorization was required to borrow any money under any of GGS's lines of credit.

106. Between 2010 and 2013, GGS had between 1200 and 1667 employees. Its operations spanned the globe, including many of the world's hot spots such as Iraq, Libya, and Venezuela.

107. During the Class Period, Defendants White, Verghese, and Degner regularly represented that (1) they had designed internal controls over financial reporting, (2) they had evaluated the controls, and (3) the controls were effective.

108. Defendants Verghese and Degner certified that GGS had adequate internal controls over financial reporting. In fact, GGS did not hire an internal audit director or create an internal audit department until late 2013. An email sent by Verghese informed GGS personnel that GGS had just implemented its first substantial internal controls. The email was sent in October 2013.

109. In its very first audit, GGS's new internal controls and internal audit department caught six separate significant errors in GGS's financial statements going back to 2009.

   a. Parties to the Open Market Class claims.

110. Plaintiff Billy Rinn purchased GGS common stock during the Class Period and was damaged thereby. His PSLRA was previously filed on the Court's docket and is incorporated by reference.

111. Plaintiff David Norris purchased GGS common stock during the Class Period and was damaged thereby. His PSLRA certification is attached hereto and incorporated by reference.

112. Plaintiff Bryan Stanley purchased GGS common stock during the Class Period and was damaged thereby. His PSLRA certification is attached hereto and incorporated by reference.

113.    Defendant Mathew Verghese joined GGS in March 2009 as its Senior Vice President and Chief Financial Officer. Between 1990 and 2010, Verghese worked in the Houston Office of Arthur Andersen LLP, a former Big Five accounting firm that audited the books of Enron Corporation through its Houston office. Verghese was made a partner. Between about 2000 and about 2003, Verghese was employed by Enron. Between April 2007 and September 2008, Verghese was a Senior Vice President at Lehman Brothers, where he served as Investment Manager and Chief Operating Officer of the Lehman Energy Fund.

114.    Defendant Degner was a founder of GGS, and was its President and CEO from 2003 to October 2012. He remained as non-executive Chairman until January 2013.

115.    Defendant White was a founder of GGS, was appointed its CEO and President in October 2012, and remains in these positions today.

      b.    Defendants' false and misleading statements.

116.    GGS's 10-K for the period ending December 31, 2011, (the "2011 10-K"), filed February 22, 2012, and signed by Defendants Degner and Verghese, provided:

> We believe that our current working capital and projected cash flow from operations will be sufficient to meet our capital requirements for our existing operations for the next 12 months. Although we expect to continue generating positive cash flow from our operations, events beyond our control may affect our financial condition or results of operations. These events include, but are not limited to, a significant drop in prices for oil and natural gas and a corresponding drop in demand for our services.

117.    The 2012 10-K provided:

> We believe that our current working capital, [sic] projected cash flow from operations will be sufficient to meet our capital requirements for our existing operations for the next 12 months. Although we expect to continue generating positive cash flow from our operations, events beyond our control may affect our financial condition or results of operations. These events include, but are not limited to, a significant drop in prices for oil and natural gas and a corresponding drop in demand for our services.

118.    The statements were false and misleading because, as set out herein, as of both

December 31, 2011, and December 31, 2012, GGS was unable to pay its obligations as they came due.

        c.    GGS executives knew of GGS's cash flow insolvency.

119.    A s alleged above, between at least December 2011 and August 2013, GGS was routinely unable to pay its obligations as they came due. It would push off vendor invoices in violation of contractual terms while it tried to find a way to pay them using one-time fixes.

120.    Both because those problems were pervasive and because GGS executives received detailed information concerning its financial condition, Defendants Verghese, Degner, and White knew that GGS was not able to pay its obligations as they came due.

121.    GGS circulated to its senior executives, including at least Verghese, daily cash reports that listed (among other things), the previous day's bank balances, as well as cash inflows and outflows.

122.    In 2010 and 2011, GGS had raised almost $167 million from financing activities, i.e., by selling debt securities, entering into credit facilities, or selling its stock.

123.    In December 2011 and January 2012, GGS decided to raise about $50 million.

124.    Degner sought to raise the funds by selling GGS stock, but the Board would not authorize the sale. Instead, the Board decided that GGS would raise cash by selling senior notes.

125.    At the time, the Board also delivered Degner an ultimatum. In a meeting attended by CW 1, whose attendees included at least Degner, Verghese, and board member George Matelich, GGS's board told Degner this was his last chance to raise money. Thus, they insisted, if GGS needed more cash, Degner must raise it now. Degner decided that GGS would raise only $50 million.

126.    GGS's sale of $50 million in senior notes, with net proceeds to it of $45.5 million,

closed on or about March 28, 2012.

127. The $45.5 million only lasted two months. By May 2012, GGS was living hand to mouth again – pushing off vendors while looking for more one-time fixes to its persistent cash flow problems.

128. In a board meeting taking place in June 2012 attended by CW 1, the Board informed Degner that GGS was spending too much money and that GGS needed a better solution than anything Degner had offered. GGS's Board eventually negotiated a "resignation" agreement that, among other things, prevented Degner from visiting GGS's offices unless invited. GGS circulated the "resignation" agreement to its executives, in an email that ordered these executives not to invite Degner to GGS's offices unless absolutely necessary. Degner remained as non-executive Chairman of GGS's Board, a position which he resigned from in January 2013. CW 1 was fired within hours of Degner's resignation.

129. In January 2013, Degner and CW 1 formed Geophysical Technology, Inc. ("GTI"), and sought to buy a GGS subsidiary, Autoseis, Inc. With backing from private equity fund Silver Lake Partners, GTI reached an agreement in principle with GGS to buy Autoseis for $200 million. The agreement also provided that GGS would buy at least $80 million of product from Autoseis in the next four years.

130. As part of assisting with the buyers' due diligence, GGS provided Silver Lake with non-public earnings projections for the next two years. Based on the projections, Silver Lake concluded that even with an additional $200 million, GGS would not be able to buy $80 million of product from Autoseis over four years because GGS would be pushed into bankruptcy before then as a result of its inability to fund its operations. Silver Lake drafted a letter to GGS lucidly informing it of Silver Lake's conclusion and the reasoning behind it, and sought a

meeting to renegotiate the contractual terms. GGS attended the meeting, which took place in April or May of 2013, but then stormed out.

> d.   The foreign borrowings.

131.   GGS had so stretched out its U.S. borrowing that it sought to obtain financing from its foreign subsidiaries. For example, CW 1 reports that GGS subsidiaries borrowed money locally in Brazil and Colombia, and would transfer the funds to GGS in the U.S. to pay U.S. expenses.

132.   GGS's operations did not raise enough cash to keep itself afloat, and it depended on its financing activities to stave off bankruptcy. Between 2010 and 2012, GGS raised net $214 million in debt, debt securities, and stock offerings.

> e.   The securities laws require companies like GGS to design a system of internal controls and to attest to whether they are effective.

133.   The Sarbanes-Oxley Act of 2002 and accompanying SEC rules mandate that management of public companies design and implement systems of internal control over financial reporting and, for every quarterly or annual report, evaluate whether the controls are effective, what material or important deficiencies exist, and whether any remedial actions should be or have been taken. Sarbanes-Oxley Act of 2002 ("SOX") Section 404; 17 CFR 240.13a-15. The responsibility for design and implementation falls on the issuer's Principal Executive and Principal Financial Officer. (*Id.*)

134.   The Principal Executive and Principal Financial Officer must also attest to the results of their evaluation. At a minimum, the attestation must include (1) a statement of whether internal controls were effective, and (2) what material deficiencies existed. Management's attestation must be filed in the issuer's annual reports on Form 10-K and quarterly reports on

Form 10-Q.

135.    The SEC does not mandate that management conclude that internal controls were effective. Instead, the rules treat poor internal controls as a matter that must be disclosed to investors. The SEC also provides a grace period for newly-public companies: the first annual report on Form 10-K a company files after its IPO need not include management's attestation on whether internal controls were effective.

136.    When it became a public company, GGS was required to develop and implement a system of internal controls over financial reporting. However, because of the SEC's grace period, GGS was not required to attest to its evaluation until the first period report after its 2011 10-K.

        f.    Defendants' actionable statements concerning internal controls.

137.    On May 4, 2012, when GGS filed its 10-Q for the first quarter of 2012 (the "Q1 2012 10-Q").

138.    Beginning with the Q1 2012 10-Q, Defendants were required to attest to the effectiveness of its internal controls.

139.    The Q1 2012 10-Q provided:

**Item 4. Controls and Procedures**

Under the supervision and with the participation of our management, including our principal executive officer, principal financial officer, and principal accounting officer, we have evaluated the effectiveness of the Company disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) as of March 31, 2012. **Based on that evaluation, the Company's principal executive, principal financial officer, and principal accounting officer have concluded that these controls and procedures were effective as of March 31, 2012.**

There were no changes in the Company's internal control over financial reporting that occurred during the Company's last fiscal quarter that have

materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

[Emphasis added].

140.    The Q1 2012 10-Q was signed by Defendants Verghese and Degner.

141.    The Q1 2012 10-Q was accompanied by SOX certifications filled out by Defendants Verghese (principal financial officer) and Degner (principal executive officer) which certified that:

3.

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

4.

The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

[…]

b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; [and]

[…]

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.

The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons

performing the equivalent functions):

a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

142.    Substantially identical statements were made in:

a. The Q2 2012 10-Q, filed August 3, 2012 (signed by Degner and Verghese, and certified by both) (stating that there were no changes in GGS's internal controls since the previous quarter, and thus that GGS's internal controls over financial reporting were effective);

b. The Q3 2012 10-Q, filed November 2, 2012 (signed by White and Verghese, and certified by both) (same);

c. The Q1 2013 10-Q, filed May 3, 2013 (signed by White and Verghese, and certified by both) (same);

d. The Q2 2013 10-Q, filed August 13, 2013 (signed by White and Verghese, and certified by both)(same); and

e. The Q3 2013 10-Q, filed November 12, 2013 (signed by White and Verghese, and certified by both)(same).

143.    In the 2012 10-K, GGS attested that it had maintained adequate internal controls over financial reporting:

**Report of management on internal control over financial reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. Internal control over financial reporting is a process to provide reasonable assurance regarding the reliability of our financial reporting for external purposes in accordance with accounting principles generally accepted in the United States of America. Internal control over financial reporting includes maintaining records that in reasonable detail accurately and fairly reflect our transactions; providing reasonable assurance that transactions are recorded as necessary for preparation of our financial statements; providing reasonable assurance that receipts and expenditures of Company's assets are made in accordance with management authorization; and providing reasonable assurance that unauthorized acquisition, use or disposition of company assets that could have a material effect on our financial statements would be prevented or detected on a timely basis. Because of its inherent limitations, internal control over financial reporting is not intended to provide absolute assurance that a misstatement of our financial statements would be prevented or detected.

Management conducted an evaluation of the effectiveness of our internal control over financial reporting based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). ***Based on this evaluation, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2012***. UHY LLP has audited our internal control over financial reporting as of December 31, 2012; their report is included in the "Report of Independent Registered Public Accounting Firm" on page F-3.

(Emphasis added).

144.    Defendants White and Verghese each also attested that GGS's internal controls

had been effective:

3.  Based on my knowledge, the consolidated financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

[…]
b) ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our***

*supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;* [and]

[…]

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

145.    The statements were false because, for the reasons outlined below, GGS did not develop and maintain adequate controls over financial reporting, in that it failed to enact any substantial internal controls until the second half of 2013.

146.    In addition, GGS voluntarily adopted a Code of Business Conduct and Ethics (the "Code"). The Code was an element of GGS's internal compliance program, as contemplated by the Federal Sentencing Guidelines for corporations. GGS required all employees to read and understand the Code, which provided in relevant part:

**RECORDING TRANSACTIONS**

The integrity of the Company's record-keeping and reporting systems is of the utmost importance. The Company shall make and keep books, invoices, records and accounts that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company. Each employee shall maintain accurate and fair records of transactions, time reports, expense accounts,

and other Company records. Employees, officers and directors must use special care to make sure that records are accurately and completely prepared and reviewed, whether they are intended for internal use or for an external party, including any governmental authorities. The Company shall devise and maintain a system of internal controls sufficient to provide reasonable assurances that transactions are properly authorized, executed, and recorded.

Company Records

All Company books, records, accounts, funds and assets must be maintained to reflect fairly and accurately the underlying transactions and disposition of Company business in reasonable detail. No entries will be made that intentionally conceal or disguise the true nature of any Company transaction.

In this respect, the following guidelines must be followed:

- No unrecorded or "off the books" funds or assets should be established for any purpose;

- No false, misleading or fictitious invoices should be paid or created;

- No false or artificial entries should be made or misleading reports issued;

- Assets and liabilities of the Company shall be recognized and stated in accordance with the Company's standard practices and GAAP;

- No material failure to make entries should be permitted; and

- The documentation evidencing each transaction and each payment on behalf of the Company shall fairly represent the nature of such transaction or the purpose of such payment.

If an employee believes that the Company's books and records are not being maintained in accordance with these requirements, the employee should immediately report the matter directly to their supervisor or to the Chief Financial Officer.

147.    The Code also provided that:

**WAIVER**

Waivers of any provision of this Code shall be made by the Audit Committee,

provided that such committee may defer such matters to the full board. Persons seeking a waiver should be prepared to disclose all relevant facts and circumstances, respond to inquiries for additional information, explain why a waiver is necessary, appropriate or in the best interest of the Company and comply with any procedures that may be required to protect the Company in connection with the waiver. ***If a waiver of this Code is granted for an executive officer or director, appropriate disclosure will promptly be made in accordance with applicable laws, rules and regulations (including the listing standards of the New York Stock Exchange).***

[Emphasis added].

148. The text of the Code represented that GGS's senior financial officers, including White and Verghese, were required to sign an undertaking that they read and agreed to comply with the Code.

149. CW 2 was the Vice President who was the project manager of GGS's Gulf of Mexico operations between September 2010 and August 2013.

150. CW 2 reports that nepotism, particularly around Defendant Degner, "ran rampant" at GGS. For example, CW 2 reports Degner's sister Heidi Brown was made VP of Corporate Systems. Brown managed the GGS employees responsible for its financial systems.

151. Similarly, CW 2 reports that Degner's brother was a GGS employee, with a GGS credit card with thousands of dollars in expenses with absolutely no oversight.

152. CW 2 reports that employees would be fearful of raising issues at high levels. If employees raised issues in meetings with Defendant Degner, he would immediately dress them down, "talk[ing] down" to them, during the meeting.

153. The results were predictable. Speaking of his own project, CW 2 reports that "we didn't get a lot accomplished, but we spent a lot of money".

g. GGS did not have substantial internal controls.

154. GGS's operations were substantial:

| As of December 31 | 2013 | 2012 | 2011 | 2010 |
|---|---|---|---|---|
| Number of employees | 1,500 | 1,200 | 1,300 | 1,667 |

155. GGS's internal controls over financial reporting and its compliance with its own code take on heightened importance because so much of GGS's operations are in far flung places. For example, the 2012 10-K lists twenty-two countries in which GGS did business, including some with business climates very different from that in the U.S.: Libya (according to Transparency International's 2013 World Corruption Perception Index, perceived to be the world's 172th most corrupt country, out of 175), Iraq (171), Venezuela (160), Nigeria (144), Russia (127), Argentina (106), Algeria (94, tied), Colombia (94, tied), and India (94, tied).

156. Notwithstanding these important risks, Defendants did not develop internal controls over financial reporting.

157. Because of the complexity of the financial complexity of their operations, public companies of GGS's size must have a well-developed internal audit function.

158. The Institute of Internal Auditors ("IIA"), an international professional organization with 170,000 members, has established detailed guidance on the necessary role of the internal audit function:

| Phase/Activity | Lead Responsibility | Recommended Internal Auditor Roles |
|---|---|---|
| | | |
| **Planning** | | |
| Plan | Project Sponsor | Provide advice and recommendations. Participate in project team planning. |
| Scope | Project Team | Provide advice and recommendations. Participate in project team planning. |
| **Execution** | | |
| Document | Line Managers; &/or Project Team; &/or Specialists | Advise management regarding processes to be used. Perform quality assurance reviews |
| Evaluation & Testing | Line Managers; Project Team; Specialists | Independent assessor of management's documentation and testing. Perform effectiveness testing (for highest reliance by external auditors). |
| Issues | Project Team and Line Managers | Identify control gaps. Facilitate management discussions |
| Corrective Action | Line Managers | Perform follow-up reviews |
| Monitoring Systems | Senior Management | Perform follow-up reviews |
| **Phase/Activity** | **Lead Responsibility** | **Recommended Internal Auditor Roles** |
| **Reporting** | | |
| Management Reporting | Senior Management and Line Managers | Facilitate determinations (to report). Provide advice |
| External Audit Reporting | External Auditor | Act as a coordinator between management and the external auditor |
| | | |
| **Monitoring** | | |
| Ongoing Monitoring | Senior Management | Perform follow-up services. |
| Periodic Assessment | Project Team &/or Line Managers | Perform periodic audits |

Source: Institute of Internal Auditors, Internal Auditing's Role in Sections 302 and 404

of the U.S. Sarbanes-Oxley Act of 2002, at 5-6, May 26, 2004.[1]

---

[1] Available at <https://na.theiia.org/standards-

159.     As the IIA observes, "[e]stablishing a professional internal audit activity should be a governance requirement for all organizations." IIA Position Paper: The Three Lines of Defense In Effective Risk Management and Control, at 5 (January 2013).[2] As the IIA explains, there is no substitute for the independence and specialization of a dedicated internal audit staff. Id. at 5.

160.     Unbeknownst to investors, for most of its existence – until late 2013, in fact – GGS did not have an Internal Audit Department. Nor did it have any dedicated internal audit staff.

161.     Investors did not learn the rudimentary nature of GGS's internal audit function until it restated its financial statements:

> **Changes in Internal Controls over Financial Reporting**
>
> ***During the last half of 2013, we hired an Internal Audit Director to establish the Internal Audit Department***.  Moreover, we intend to significantly upgrade the accounting and finance staff by hiring additional professionals with experience in designing, implementing and managing global accounting and finance organizations with effective policies, procedures and processes as described below under "Remediation of the Material Weakness in Internal Control over Financial Reporting."
>
> **Remediation of the Material Weaknesses in Internal Control over Financial Reporting**
>
> Management has already begun to implement a program to remediate the material weaknesses identified. In early 2014, we initiated role and responsibility changes in our accounting and finance group, commencing with the appointment of a new Chief Financial Officer.  In addition, ***during the last half of 2013, we hired an Internal Audit Director to begin to establish the Internal Audit Department.*** These personnel have extensive experience in the design, implementation and enforcement of an effective control environment. We also have plans to enhance our corporate accounting function by ***creating***

---

guidance/Public%20Documents/Act%20Internal_Auditings_Role_in_Sections_302__404__FIN
AL.pdf>.
[2] Available at < https://na.theiia.org/standards-
guidance/Public%20Documents/PP%20The%20Three%20Lines%20of%20Defense%20in%20Ef
fective%20Risk%20Management%20and%20Control.pdf>.

*and filling several positions to support our global business operations. This includes an industry sector Chief Accounting Officer, a Financial Reporting Manager, a Tax Director, and other supporting staff in various finance and/or accounting departments.*

In addition, we have plans to expand and strengthen our processes, procedures and controls surrounding various areas impacting financial reporting and which required adjustments to the 2013 Consolidated Financial Statements as further discussed in Note 21 to the Notes to Consolidated Financial Statements in Item 8. We are implementing and strengthening clear policies and procedures designed to improve transparency in global financial and operational transactions and also support business continuity to allow a sustainable and effective control environment.

Management believes that these actions and resulting improvement in controls will strengthen our disclosure controls and procedures and, over time, remediate the material weaknesses that the Company identified in its internal control over financial reporting as of December 31, 2013.

Source: 2013 10-K [emphasis added].

162. Similarly, GGS did not establish substantial internal controls until the last half of 2013. Indeed, on October 23, 2013, Defendant Verghese sent a firm-wide email noting that GGS had just established its substantive internal controls:

To all [GGS] Employees

To ensure adequate internal control over financial reporting and our financial statements are free of material misstatements, GGS has implemented a set of internal controls to help us accomplish this goal. The controls are designed to cover areas that are critical and can have significant impact on our financials, including but not limited to revenue, expenditures, assets, etc.

To facilitate execution and compliance of the internal controls. GGS has also established and distributed the delegation of authority (DOA) policy, which has been approved by Sr. management.  The DOA specifies the types of significant transactions affecting our financial statements that require management approval(s), as well as the personnel with the designated authority to approve those transactions.

*As part of the SEC reporting process, GGS Sr. management will need to certify that GGS has established and maintained adequate internal control over financial reporting. As a result, on an annual basis the controls will be tested to assist*

*management with the assessment on the effectiveness of internal controls.* Exceptions, if any, identified from the control testing will critically affect:

1. The conclusion made by GGS Management on whether the company has maintained adequate internal controls over financial reporting
2. The external auditor's overall opinion on the effectiveness of GGS internal control over financial reporting

Depending on the level of non-compliance, if the external auditor determines that GGS has a *material* weakness regarding any of the control or area affecting financial statements, it will be disclosed within the GGS annual SEC filing as part of the external auditor's opinion.

As such, it is critical for all of us to ensure that the established internal controls are being performed and more importantly, we have adequate supporting documentation to substantiate the performance of these controls. I strongly encourage each one of you to:

1. Understand the controls within your responsible process area(s)
2. Review and follow the DOA policy to obtain approvals on relevant transactions as applicable
3. Document the approvals obtained for the purpose of internal control testing by both internal and external auditors

If you have questions or require further interpretation regarding the DOA or other accounting policies, please contact Brett Lamensky. If you have questions or concerns regarding internal controls and the consequences /impact on the company due to non-compliance, please contact Betty Chi.

Your support and cooperation is very much appreciated in this important matter.

With regards,

Mathew Verghese

[Emphasis added].

163.     When GGS finally hired an Internal Audit Director, created an Internal Audit Department, and enacted internal controls, it quickly found a host of material errors in its financial statements, dating back its entire time as a public company:

    a.   In Latin America, GGS recognized revenues and expenses at times other than when performance of the seismic services. This revenue recognition violated not only GAAP but GGS's own revenue recognition policy.

b. Between 2010 and 2013, GGS capitalized costs totaling about $4.9 million, though the amounts should have been incurred as expenses in accordance with ASC 730 "Research and Development."

c. GGS did not accrue sales taxes due to the State of Texas totaling $1.9 million for the periods from 2008 to 2011.

d. GGS did not record a $1.2 million gain from excess insurance proceeds from a fire at a GGS warehouse in Colombia in May 2013.

e. Unsupported amounts were included in the balance of property and equipment, inflating GGS's pre-tax income by $0.1 million in each of 2011 and 2012, and by $0.3 million in the first nine months of 2013.

f. Capitalized costs relating to GGS's Multi-client library were not properly expensed, thus understating operating costs in 2011 and 2012 by $0.2 million in the aggregate.

164. GGS also conclude that its internal controls over financial reporting were materially deficient:

*Entity Level Controls (Control Environment)*

***Management concluded that during 2013, we did not maintain an effective control environment***. The control environment, which is the responsibility of management, sets the tone of the organization, influences the control consciousness of its employees, and is the foundation for all other components of internal control over financial reporting. The deficient control environment was reflected in our inability to properly account for certain operational processes and transactions which were not supportive of an effective and efficient internal control environment. Management has determined that this was primarily attributable to the following:

1. ***A financial reporting structure with clearly established responsibilities was not maintained to support the pursuit of business objectives.*** We experienced significant turnover in key accounting and finance positions during the year. Transition plans and clear business

processes and procedures were not in place to establish accountability and allow continuity.

2.        Our lack of resources, in terms of personnel, technical expertise and institutional knowledge to address certain of the financial and tax reporting aspects of our multi-national operations, was not assessed timely to address the resource shortages in certain areas requiring expertise.

[Emphasis added].

165.    Though GGS did not conclude that past periods' internal controls over financial reporting were materially deficient, it restated financial statements for every year from 2009 to 2013. Thus, there is no basis to conclude that internal control deficiencies only began in 2013.

166.    On March 17, 2014, after close of trading, GGS announced:

(1)  That its financial statements going back to 2009 would need to be restated;

(2) That its internal controls over financial reporting had been inadequate as of at least December 31, 2013;

(3) That it would be unable to timely file its annual report on Form 10-K, breaching a covenant in its debt agreements; and

(4) That it had retained "financial advisors to assist [it] in reviewing financial and strategic alternatives" and that it was "committed to exploring an orderly resolution of our liquidity situation, including any necessary restructuring", a thinly-veiled code that it would shortly declare bankruptcy.

167.     On March 18, 2014, GGS's common stock price fell from $1.17 to $0.46, or about 61%, on heavy volume, damaging investors.

168.    On March 25, 2014, GGS and certain of its subsidiaries filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas. On March 26, 2014, GGS's stock price fell

from $0.43 to $0.16, or 55.3%, damaging investors.

169. GGS's bankruptcy was the natural consequence of its ineffective internal controls, its inability to fund its operations and pays its obligations when due and its poor financial performance, which was much worse than represented to investors during the Class Period.

170. The SEC is conducting an investigation to determine whether GGS or its officers have violated the federal securities laws, and has issued a subpoena to a senior GGS executive.

171. During the Class Period, GGS sold over $150 million of debt and equity securities to investors as a means of funding its operations. In addition, GGS was motivated to misrepresent its financial condition and performance in order to obtain bank credit facilities allowing borrowings in excess of $50.0 million. This shows the Section 10(b) Defendants motivation to misrepresent and omit to state material facts to investors and creates a strong inference of their scienter.

h. Applicability Of Presumption Of Reliance Fraud-On-The-Market Doctrine

172. In advancing claims on behalf of the Open Market Class, Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. The omissions and misrepresentations were material;

c. The Company's common stock traded in an efficient market;

d. The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e. Plaintiffs and other members of the Open Market Class purchased GGS common

stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

173.    At all relevant times, the market for GGS common stock was efficient for the following reasons, among others:

i).     As a regulated issuer, GGS filed periodic public reports with the SEC;

ii).    GGS's stock was listed on the NYSE, creating a presumption that its stock trades on an efficient market;

iii).   GGS regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

iv).    On average, about 1.0 million GGS shares were traded publicly on a weekly basis, or 2.6% of GGS's shares outstanding as of April 23, 2014, demonstrating a strong presumption of an efficient market;

v).     GGS was eligible to file a short-form registration statements with the SEC on Form S-3 and did so on December 3, 2013;

vi).    GGS was followed by at least 4 analysts, including from Barrington Research, Dougherty & Co., MLV & Co., and Tudor Pickering, that issued reports about it;

vii).   New company specific information was rapidly reflected in GGS's stock price; and

viii).  A designated market maker made a market in GGS's stock.

## NO SAFE HARBOR

174. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The specific misrepresentations of defendants pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Global who knew that those statements were false when made.

## COUNT III

### Violation Of Section 10(b) Of The Exchange Act
### And Rule 10b-5 Promulgated Thereunder
### Against Verghese, White, and Degner

175. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

176. This claim is brought on behalf of all persons who bought GGS stock at artificially inflated prices, and suffered damages as a result, against Defendants Verghese, White, and Degner.

177. Throughout the Class Period, defendants Verghese, White, and Degner,

individually and in concert, directly or indirectly, engaged in a common plan, scheme and course of conduct described herein, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon plaintiff and the other members of the Class; made various false statements of material facts and omitted to state material facts to make the statements made not misleading to plaintiff and the other members of the Class; and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of GGS common stock.

178. The purpose and effect of these defendants' plan, scheme and course of conduct was to artificially inflate and maintain the price of GGS's common stock.

179. These defendants, who are the top officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other GGS personnel to members of the investing public, including Plaintiffs and the Class, and securities analysts.

180. As a result of the foregoing, the market price of GGS's securities was artificially inflated during the Class Period. In ignorance of the falsity of these defendants' statements plaintiff and the other members of the Class relied, to their damage, on the statements described above and/or the integrity of the market price of GGS securities during the Class Period in purchasing GGS common stock at prices which were artificially inflated as a result of these defendants' false and misleading statements.

181. Had Plaintiffs and the other members of the Class known of the material

adverse information which these defendants did not disclose, they would not have purchased GGS common stock at the artificially inflated prices that they did.

182. By virtue of the foregoing, these defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

183. As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

184. This action was brought within two years after the discovery of the untrue statements and omissions and within five years after their issuance.

## COUNT IV

### Violation Of Section 20(a) Of The Exchange Act
### Against Verghese, White and Degner

185. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

186. This second claim under §20(a) of the Exchange Act is alleged against Verghese, White, and Degner, only, based on the primary violation of §10b and Rule 10b-5 by GGS.

187. These defendants acted as controlling persons of GGS within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading information disseminated to the investing public, these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-

making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. These defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

188.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same,

189.    As set forth above, GGS violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of GGS, these defendants are liable pursuant to Section 20(a) of the Exchange Act.

190.    As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

191.    This action is being brought within two years after the discovery of the untrue statements and omissions and within five years after their issuance.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(A)    Determining that this action is a proper class action, certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(B)     Awarding compensatory damages in favor of Plaintiffs and the other

Class members against all defendants, jointly and severally, for all damages sustained as a

result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(C)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred

in this action, including counsel fees and expert fees; and

(D)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: October 8, 2014                    **THE ROSEN LAW FIRM, P.A.**

/s/ Phillip Kim
Phillip Kim, Esq. (pro hac vice)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com

-and-

PAYNE MITCHELL LAW GROUP
R. Dean Gresham, Esq. (State Bar No. 24027215)
2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
Tel: (214) 252-1888
Fax: (214) 252-1889
Email: dean@paynemithcell.com

*Counsel for Lead Plaintiff and Named Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on this on the 8th day of October, 2014 a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.


                                            _____/s/ Phillip Kim_____

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Global Geophysical Services, Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Global Geophysical Services, Inc.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

**First name:** David
**Middle initial:** Walter
**Last name:** Norris
**Address:**
**City:**
**State:**
**Zip:**
**Country:**
**Facsimile:**
**Phone:**
**Email:**

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | February 19, 2013 | 23,000 | 4.50 |

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | Mar 18, 2014 | 23,000 | .52 |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate:　　　　**YES**

By clicking on the button below, I intend to sign and execute this agreement and retain the Rosen Law Firm, P.A. to proceed on Plaintiff's behalf, on a contingent fee basis.　　　　**YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 03/18/2014

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Global Geophysical Services, Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Global Geophysical Services, Inc.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

**First name:** Walter
**Middle initial:**
**Last name:** Rink
**Address:**
**City:**
**State:**
**Zip:**
**Country:**
**Facsimile:**
**Phone:**
**Email:**

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Preferred Stock | 12/17/2013 | 1600 | 21.50 |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate:          **YES**

**Certification for Walter Rink (cont.)**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.          **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic
Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 03/26/2014

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Global Geophysical Services, Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Global Geophysical Services, Inc.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

**First name:** Bryan
**Middle initial:** A
**Last name:** Stanley
**Address:**
**City:**
**State:**
**Zip:**
**Country:**
**Facsimile:**
**Phone:**
**Email:**

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 3/17/2014 | 10000 | 1.28 |
| Common Stock | 3/18/2014 | 10000 | .52 |
| Common Stock | 3/18/2014 | 10000 | .57 |
| Common Stock | 3/13/2014 | 5000 | 1.35 |
| Common Stock | 2/7/2014 | 15500 | 1.4 |
| Common Stock | 7/7/2010 | 1250 | 7.157992 |
| Common Stock | 10/3/2011 | 500 | 7.86998 |
| Common Stock | 12/22/2011 | 750 | 7.36332 |
| Common Stock | 12/29/2011 | 500 | 6.6494 |
| Common Stock | 12/29/2011 | 1000 | 6.65999 |
| Common Stock | 6/1/2012 | 1000 | 6.50949 |

## Certification for Bryan Stanley (cont.)

| | | |
|---|---|---|
| Common Stock6/27/2012 | 1500 | 5.20666 |
| Common Stock6/27/2012 | 2500 | 5.353996 |
| Common Stock8/3/2012 | 5000 | 4.461998 |
| Common Stock11/16/2012 | 1500 | 4.01053333 |
| Common Stock12/19/2013 | 2000 | 1.39085 |
| Common Stock2/28/2013 | 8000 | 2.38 |
| Common Stock4/18/2013 | 16000 | 1.95 |
| Common Stock1/13/2014 | 7000 | 1.45 |
| Common Stock4/22/2010 | 500 | 12.05948 |

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock12/19/2012 | 2000 | 1.3382 | |
| Common Stock12/19/2012 | 2000 | 1.3382 | |
| Common Stock12/20/2012 | 14000 | 1.38314357 | |
| Common Stock5/10/2013 | 8000 | 2.38 | |
| Common Stock5/10/2013 | 2000 | 1.950625 | |
| Common Stock5/22/2013 | 41 | 1.95073171 | |
| Common Stock5/22/2013 | 100 | 1.9506 | |
| Common Stock5/22/2013 | 141 | 1.9506383 | |
| Common Stock5/22/2013 | 200 | 1.9506 | |
| Common Stock5/22/2013 | 241 | 1.95062241 | |
| Common Stock5/22/2013 | 541 | 1.95062847 | |
| Common Stock5/22/2013 | 551 | 1.95061706 | |
| Common Stock5/22/2013 | 736 | 1.950625 | |
| Common Stock5/22/2013 | 1141 | 1.95062226 | |
| Common Stock5/22/2013 | 3100 | 1.5062581 | |
| Common Stock5/22/2013 | 3208 | 1.95062344 | |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate:     **YES**

By clicking on the button below, I intend to sign and execute this agreement and retain the Rosen Law Firm, P.A. to proceed on Plaintiff's behalf, on a contingent fee basis.     **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 03/27/2014