## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| BRITT MILLER AND BRET GOULD ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, | ) ) ) | Civil Action No. 14-cv-0708 |
| | ) | |
| Plaintiffs, | ) ) ) | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECURITIES LAWS** |
| v. | ) ) | |
| GLOBAL GEOPHYSICAL SERVICES, INC., RICHARD A. DEGNER, P. MATHEW VERGHESE, RICHARD C. WHITE, JESSE PEREZ, III, DAMIR SKERL, MICHAEL C. FORREST, GEORGE E. MATELICH, STANLEY DE JONGH OSBORNE, KARL F. KURZ, MIACHEL S. BABORICH, and JOSEPH P. MCCOY. | ) ) ) ) ) ) ) ) ) ) ) | **CLASS ACTION**<br><br>**JURY TRIAL DEMANDED**<br><br>District Judge Vanessa D. Gilmore |
| Defendants. | ) ) ) ) | |

1

Lead Plaintiff Billy Rinn ("Lead Plaintiff") and named plaintiffs Bret Gould, David Norris, Walter Rink, and Bryan Stanley ("Named Plaintiffs", and with Lead Plaintiff, the "Plaintiffs") individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint, allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

## I.    NATURE OF THE ACTION

1.      This is a securities class action on behalf of:

    a.  All persons who bought GGS common stock during the period beginning on February 22, 2012 through March 26, 2014 (the "Class Period" and the "Open Market Class") bringing claims under the Securities and Exchange Act of 1934 (the "Exchange Act") (the "Exchange Act Class"); and

    b.  All persons who bought GGS Series A preferred stock (the "Preferred Stock") in or traceable to GGS's December 3, 2013 registration statement (the "Registration Statement") for an underwritten offering (the "Offering" and the "Offering Class"), bringing claims under the Securities Act of 1933 (the "Securities Act") (the "Offering Class").

2.      GGS provides geological surveying services and data to oil and gas companies. Its two segments are proprietary, single-client information, usually made at the client's request, and a non-proprietary multi-client geological library, to which it sells licenses.

3.      GGS's persistent mismanagement left it chronically out of cash, and unable to pay its obligations as they came due. Highly-placed GGS executives Todd Smith, Marc Lawrence, and Bill Menger, confirm that since 2011, GGS has suffered acute cash flow problems and has been unable to pay its debts as they came due. GGS consistently paid its vendors late, typically 60-120 days beyond the 30 day due date. Mr. Menger adds that GGS's difficulties were so severe that Staples, Inc., cut it off.

4.      Indeed, according to Mr. Smith, who as Finance Manager for GGS's North American operations had supervisory responsibility over all of GGS's North American accounts

payable and spoke with its CFO every day, GGS just could not afford to pay vendors when their bills came due, at almost every time from 2011 onward.

5.     GGS's bankruptcy has revealed some of these creditors, whose debts date back to 2008. Not the least of these, the State of Texas is owed some $7.5 million. GGS's debts to Texas went back so far that as of June 2014, it had accrued more than $1.3 million in interest and penalties. One creditor sent 197 separate emails to GGS, mostly about unpaid invoices, and spoke with a GGS executive by phone about her invoices at least once a month for several years.

6.     The extent of GGS's cash troubles only became clear to investors through GGS's bankruptcy, and the admissions it and its officers made in its court.

7.     Since early 2012, GGS has employed a series of increasingly desperate undisclosed one-time tricks – at least seven – to resolve its liquidity deficiencies. *First*, in March 2012, GGS's board told its CEO he had one last chance to raise capital, and it raised $50 million in debt financing. The funds only lasted two months. *Second*, in early 2013, GGS tried to sell one of its subsidiaries to its former CEO and a venture capital firm. Part of the consideration was GGS's agreement to buy from the former subsidiary after transfer. Upon being shown non-public information about GGS's finances, the venture capital firm concluded that given its poor financial condition GGS would be bankrupt before it could buy services from the former subsidiary *even after receiving $200 million from the subsidiary's sale*, and bowed out when GGS refused to negotiate. *Third*, at about the same time, GGS was so desperate it agreed to sell 43% of its future revenues from about half of its Multi-Client Library, its most valuable asset, in which it had invested $176 million in just 2012, for $25 million in cash, so long as the cash could be delivered by March 29, 2013. GGS concealed its desperation to the market by claiming this deal was really a licensing deal to market and sell the asset, never disclosing the commission rate or filing the agreement itself in its SEC filings though it was required to, and falsely claiming that it was only paying a market rate. *Fourth*, beginning in summer 2013, GGS tried to buy a competitor's unprofitable division, not to turn it around, but because the competitor was willing to extend loans to finance the sale. Thus, GGS could double-dip on financing – receiving the

loans to buy the subsidiary from the third party, and also raising money, purportedly to buy the subsidiary, but really to provide desperately needed cash for its operations. *Fifth*, in September 2013, GGS provided misleading cash projections to a lender to persuade that lender to extend it a substantial loan facility needed that very month to refinance GGS's expiring revolving loan facility. *Sixth*, in October 2013, GGS gave away valuable assets to *advance* $5 million against accounts payable which would in any case be due to GGS shortly. GGS's CFO has testified under oath that GGS sought the advance for one purpose: to avoid an impending covenant breach under the September 2013 loan facility on November 1, 2013.

8.      *Seventh*, in December 2013, GGS raised $8 million by selling its 11.5% Series A preferred shares to investors (the "Offering"). GGS's bankruptcy followed just three months later. The Offering's purpose was to allow GGS to avoid an immediate breach of covenants, but GGS told investors the money would be spent on general corporate purposes.

9.      If an issuer knows that it is facing, or will soon face, material liquidity deficiencies, it must disclose both the deficiencies and any proposed solution in its 10-K. GGS made no such disclosure in its 10-K for the year ended December 31, 2012, filed in March 2013. Instead, GGS claimed that current working capital and projected cash flows would suffice for the next 12 months of its operations. The statement was incorporated, without any corrections, into the Registration Statement. Both GGS's historical inability to pay its debts as they came due and its contemporaneous desperate attempts to secure financing show that the statement was false when made.

10.     These were not the only false statements made by defendants. Throughout the class period, GGS's controls over its financial reporting were materially deficient. GGS's CFO has testified that when it made bids, GGS did not conduct analysis to determine whether it would have enough capital to complete the contract if its bid was successful. This meant GGS frequently committed itself to capital intensive projects not knowing whether it would have the capital to complete project. And GGS's poor internal controls meant that its financial statements contained numerous false statements, understating its cumulative net loss since 2009 by about

9.78%.

11.     GGS investors were harmed by a series of partial disclosures of GGS's fraud. On August 5, after close of trading, GGS revealed that it had paid $5.9 million in commissions for sales from its now-encumbered multi-client services library, suggesting that the rate it paid was well above market. Over the next two trading days, its stock price fell from $4.21 to $3.41, or about 19%.

12.     On September 30, 2013, during trading hours, GGS announced that it had negotiated a new loan facility, providing financing to retire its revolving credit facility and fund new acquisitions. But less than two months later, on November 18, 2013, GGS filed a registration statement to sell, from time to time, up to $300 million of its securities. GGS's stock price fell from $1.91 to $1.50 as investors were dismayed by GGS's announcement that it would need new funding so soon after raising the old.

13.     On March 17, 2014, after close of trading, GGS announced both that it would need to restate every annual financial statement it had ever filed and every quarterly financial statement it had filed in 2013, and that it would seek an "orderly" solution to its liquidity deficiency, which could include "restructuring." The next day, its stock price fell from $1.17 to $0.46.

14.     Then on March 25, after close of trading, GGS announced that it had filed for bankruptcy. On March 26, its stock price fell from $0.47 to $0.21.

15.     Soon thereafter, GGS's stock price drifted to $0. GGS investors have lost nearly their entire investment.

## II.     JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78b-1 and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C.  §§ 77k and 77(o).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22(a) of the Securities Act, 15 U.S.C. §77v(a).

18. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 28 U.S.C. § 1391(b) and Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a). Defendants maintain their principal executive offices in this District and many of the acts, practices and transactions complained of herein occurred in substantial part in this District.

19. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### III.   <u>PARTIES</u>

20. Plaintiff Bret Gould purchased GGS Series A preferred stock pursuant and/or traceable to the Registration Statement. His PSLRA certification was previously filed on the Court's docket and is incorporated by reference.

21. Plaintiff Walter Rink purchased GGS Series A preferred stock pursuant and/or traceable to the Registration Statement. His PSLRA certification was previously filed on the Court's docket and is incorporated by reference.

22. Plaintiff Billy Rinn purchased GGS common stock during the Class Period and was damaged thereby. His PSLRA certification was previously filed on the Court's docket and is incorporated by reference.

23. Plaintiff David Norris purchased GGS common stock during the Class Period and was damaged thereby. His PSLRA certification was previously filed on the Court's docket and is incorporated by reference.

24. Plaintiff Bryan Stanley purchased GGS common stock during the Class Period and was damaged thereby. His PSLRA certification was previously filed on the Court's docket and is incorporated by reference.

25. Defendant GGS is a Delaware corporation with its principal place of business in

Missouri City, Texas. GGS and its subsidiaries purport to provide an integrated suite of seismic data solutions to the oil and gas industry worldwide. The company's seismic data solutions primarily include seismic data acquisition, microseismic monitoring, data processing, and interpretation services, which deliver data that enables the creation of high resolution images of the Earth's subsurface, and reveal complex structural and stratigraphic details. During the Class Period, the Company was listed on NYSE and traded under ticker "GGS". Between December 16, 2013, and March 18, 2014, GGS's Series A preferred stock was also listed on the NYSE, and traded under ticker "GGS-PA". Defendant GGS is named as a defendant to the extent of its available insurance.

      26.     Defendant P. Mathew Verghese joined GGS in March 2009 as its Senior Vice President and Chief Financial Officer, and became its Executive Vice President and Chief Operating Officer in January 2014.Between 1990 and 2010, Verghese worked in the Houston Office of Arthur Andersen LLP, a former Big Five accounting firm. Arthur Andersen audited the books of Enron Corporation through its Houston office, and later collapsed after being convicted of obstruction of justice for shredding documents related to Enron's fraud. Verghese was made an Arthur Andersen partner. Between about 2000 and about 2003, Verghese was employed by Enron. Between April 2007 and September 2008, Verghese was a Senior Vice President at Lehman Brothers, where he served as Investment Manager and Chief Operating Officer of the Lehman Energy Fund. In or around September 2010, Verghese borrowed $200,000 from Degner because the IRS was about to take action against him for unpaid taxes. In or around April 2012, Verghese sought a personal loan from GGS, which Verghese surely knew was improper, for Congress outlawed personal loans from a public company to its officers as a result of revelations in Enron's collapse.

      27.     Defendant Richard C. White is the President and Chief Executive Officer of the Company, and is Chairman of the Board of Directors. He was appointed President and CEO in October 2012 and was elected Chairman of the Board of Directors in January 2013. White signed the Registration Statement.

28.     Collectively, Verghese and White are the "Officer Defendants".

29.     Defendant Richard A. Degner founded GGS and was its CEO until he was forced out on October 25, 2012.

30.     Collectively, the Officer Defendants, Degner, and GGS, are the "Section 10(b) Defendants".

31.     Defendant Damir S. Skerl joined GGS's Board of Directors in June 2005, and has been a director since then. Skerl is a member of the Audit Committee. Skerl was a director of GGS at the time of the Offering and signed the Registration Statement.

32.     Defendant Michael C. Forrest joined GGS's Board of Directors in June 2005, and has been a director since then. Forrest was a director of GGS at the time of the Offering and signed the Registration Statement.

33.     Defendant George E. Matelich joined GGS's Board of Directors in December 2006, and has been a director since then. Matelich was a director of GGS at the time of the Offering and signed the Registration Statement.

34.     Defendant Stanley de Jongh Osborne ("Osborne") joined GGS's Board of Directors in March 2007, and has served on its Board since then. Osborne was a director of GGS at the time of the Offering and signed the Registration Statement.

35.     Defendant Michael S. Bahorich joined GGS's Board of Directors in April 2011, and has served on its Board since then. Bahorich was a director of GGS at the time of the Offering and signed the Registration Statement.

36.     Defendant Karl F. Kurz joined GGS's Board of Directors in December 2010, and has been a director since then. Kurz was a director of GGS at the time of the Offering and signed the Registration Statement. Kurz is a member of the audit committee.

37.     Defendant Joseph P. McCoy joined GGS's board in April 2011, and served as a member of its Board and Directors and the Chairman of its Audit Committee since then. McCoy was a director of GGS at the time of the Offering and signed the Registration Statement.

38.     Collectively, Verghese, White, Skerl, Forrest, Matelich, Osborne, Kurz, Bahorich, and

McCoy are the "Individual Offering Defendants."

39.     Defendant UHY LLP ("UHY") is an audit firm with offices throughout the United States, including in Houston, Texas. UHY was GGS's auditor from 2009 through 2014. UHY provided an audit certification for the Registration Statement, certifying GGS's financial statements for fiscal 2010 through 2012 were accurate and were presented in accordance with generally accepted auditing standards. UHY also certified that GGS's internal controls over financial reporting were effective as of December 31, 2012. On November 15, 2013, UHY consented to having its audit certification and certification of internal controls over financial reporting included in the Registration Statement. UHY was obligated to reevaluate its audit and internal controls certifications as of the date of its consent, November 15, 2013.

## A.  Background.

40.     Seismic surveys are among the tools oil and gas companies employ. They provide an accurate graphical representation of subsurface geologic structure, which allows prospectors to identify propitious geologic formations. GGS focuses on high end seismic data, and has experience in most of the world's oil and gas basins.

41.     GGS provides seismic data to the oil and gas industry through two segments. In its proprietary services segment, GGS will obtain seismic data as requested for an individual client's use. The data GGS acquires will then be provided exclusively to the client. In its multi-client services segment, GGS will obtain seismic data that it retains ownership of, either on its own initiative or from third parties, and will sell non-exclusive licenses to use the data.

42.     GGS had substantial international operations, including in parts of the world with quite different business climates than that of the U.S. For example, GGS's traditional mainstays in Latin America were Colombia and Brazil, and it had substantial operations in Iraq. Accordingly, whether GGS maintained adequate internal controls over financial reporting was crucial to investors.

43.     GGS conducted its Initial Public Offering ("IPO") on April 21, 2010, raising $78.12 million from selling its shares, and $200 million from selling its $10^{1/2}$% senior notes due 2017 (the "Notes").

44.     The Class Period begins on February 22, 2012, with GGS's filing of its annual report on Form 10-K for the year ended December 31, 2011 (the "2011 10-K"). The 2011 10-K was signed by Defendants Degner and Verghese.

45.     On March 5, 2013, GGS filed its annual report on Form 10-K for the year ended December 31, 2012 (the "2012 10-K"). The 2012 10-K was signed by Defendants White, Verghese, Skerl, Forrest, Matelich, de Jongh Osborne, Kurz, Bahorich, and McCoy.

46.     On November 18, 2013, GGS filed a registration statement on Form S-3 for the Offering (the "Registration Statement"). The Registration Statement incorporated by reference the 2012 10-K, and each of GGS's financial statements for the first three quarters of 2013 (the "Q1 2013 10-Q", "Q2 2013 10-Q", "Q3 2013 10-Q", and collectively the "2013 10-Qs"). The Registration Statement was signed by all Defendants except UHY and Degner. UHY certified the financial statements contained in or incorporated by reference into the Registration Statement, as well as its report on GGS's internal control over financial reporting as of December 31, 2012.Pursuant to the Registration Statement, GGS sold 347,827 depositary shares each representing a 1/1000th interest in a share of GGS's 11.5% Series A Preferred Stock (the "Preferred Depositary Shares"), for $23.00 per depositary share, for an aggregate offering price of $8.0 million. On December 16, 2013, the Preferred Depositary Shares were listed on the New York Stock Exchange, where they traded under ticker GGS-PA.

**B. The Defendants made false statements.**

47.     Defendants made three categories of false statements: false statements about GGS's liquidity and capital resources, false statements about its net income, and false statements about its internal controls over financial reporting.

*1) False statements and omissions about liquidity and capital resources.*

i.     GGS had an obligation to disclose liquidity trends and deficiencies, specifically its dire cash shortage, and also had an obligation to disclose information necessary to make other statements made not misleading.

48.     Item 303(a) of SEC Regulation S-K required GGS to disclose in the Registration

Statement, the 2011 10-K, the 2012 10-K, and each of the 2013 10-Qs all liquidity trends and

deficiencies and capital resources.  Item 303 states in relevant part:

> (1)  Liquidity.  Identify any known trends or any known demands,
> commitments, events or uncertainties that will result in or that are reasonably
> likely to result in the registrant's liquidity increasing or decreasing in any
> material way.  *If a material deficiency is identified, indicate the course of
> action that the registrant has taken or proposes to take to remedy the
> deficiency. Also identify and separately describe internal and external
> sources of liquidity, and briefly discuss any material unused sources of
> liquid assets.*
> (2) Capital resources.
>> *(i)  Describe the registrant's material commitments for capital
>> expenditures as of the end of the latest fiscal period, and indicate the
>> general purpose of such commitments and the anticipated source of
>> funds needed to fulfill such commitments.*

Regulation S-K Item 303(a) [17 C.F.R. § 229.303(a)] (emphasis added).

49.     The SEC's instructions to Item 303 provide:

2. The purpose of the discussion and analysis shall be to provide to investors and
other users information relevant to an assessment of the financial condition and
results of operations of the *registrant as determined by evaluating the amounts
and certainty of cash flows from operations and from outside sources*.
[]
5. The term 'liquidity' as used in this Item refers to the ability of an enterprise to
generate adequate amounts of cash to meet the enterprise's needs for cash. Except
where it is otherwise clear from the discussion, the registrant shall indicate those
balance sheet conditions or income or cash flow items which the registrant
believes may be indicators of its liquidity condition. *Liquidity generally shall be
discussed on both a long-term and short-term basis.*

(Emphasis added).

50.     The SEC further explained that when a company is aware of a material deficiency

in its liquidity it should disclose both the deficiency and proposed remedy, if any:

> Where a material deficiency in short or long-term liquidity has been identified,
> *the registrant should disclose the deficiency, as well as disclosing either its
> proposed remedy, that it has not decided on a remedy, or that it is currently
> unable to address the deficiency*. [footnote omitted]. In the following example,

a financially troubled registrant d i s c u s s e s the material effects of its cash flow problems on its business, and its efforts to remedy those problems.

*Managements Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv.*

*Co. Disclosures*, Release No. 6835 (May 18, 1989) (emphasis added).

51.     In the example of necessary disclosure the SEC provides, the company discloses:

The Company frequently has not been able to make timely payments to its trade and other creditors. As of year-end and as of February 29, 1988, the Company had past due payables in the amount of $525,000 and $705,000, respectively. Deferred payment terms have been negotiated with most of these vendors. However, certain vendors have suspended parts deliveries to the Company. As a result, the Company was not always able to make all shipments on time, although no orders have been cancelled to date. Were significant volumes of orders to be cancelled, the Company's ability to continue to operate would be jeopardized. The Company is currently seeking sources of working capital financing sufficient to fund delinquent balances and meet ongoing trade obligations.

*Id.*

51.     Regulation S-K applies to, among other things, annual reports on Form 10-K, registration statements issued pursuant to the Securities Act, and all items required to be filed under SEC rules, including quarterly financial reports on forms 10-Q. Regulation S-K Item 10(a)(1)-(2) [17 C.F.R. § 229.10(a)(1)-(2)].[1]

52.     The 2011 10-K, which was signed by Defendants Degner and Verghese, provided:

We believe that our current working capital and projected cash flow from operations will be sufficient to meet our capital requirements for our existing operations for the next 12 months.

52.     The 2012 10-K, which was signed by Defendants White and Verghese, provided:

We believe that our current working capital, [sic] projected cash flow from operations will be sufficient to meet our capital requirements for our existing operations for the next 12 months.

---

[1] While SEC rules permit companies to omit such information from 10-Qs if there has been no material change, GGS's 10-K itself did not disclose its liquidity deficiencies. Accordingly, even had GGS only discovered its cash flow deficiencies as 2013 progressed, it would still have been required to disclose them in its 10-Qs.

53.     None of the 2011 10-K, the 2012 10-K, the Q1-Q3 2013 10-Qs, or the Registration Statement disclosed that GGS had material liquidity deficiencies

54.     These statements were false and omitted information necessary to make them non-misleading, for the following reasons: (a) GGS had experienced persistent but worsening cash flow deficiencies and GGS had a consistent historical pattern of not being able to pay its creditors when its payments were due; (b) management had identified the deficiencies and made increasingly desperate distressed one-time schemes to raise cash; and (c) Defendants White and Verghese had no reasonable basis to believe, and did not believe, their statement in the 2012 10-K that GGS's cash flows from operations would be sufficient to meet its capital requirements for the following year.

> 1.   GGS had experienced persistent but worsening cash flow deficiencies and had a consistent historical pattern of not being able to pay its creditors when payments were due.

55.     Todd Smith was hired by GGS as a full-time consultant in February/March 2011, and was soon thereafter made Finance Manager of North American operations. Plaintiffs spoke with Mr. Smith. Mr. Smith reported directly to Defendant Verghese, and was identified by name as a Senior Financial Officer in GGS's Code of Ethics.

56.     Mr. Smith's responsibilities included GGS's North American accounts payable department, and he was personally involved in approving payments to vendors. Mr. Smith spoke with Defendant Verghese daily, regularly spoke with Defendant Degner, and regularly made presentations at GGS Board of Directors meetings. Mr. Smith remained at GGS until January 2013.

57.     While Mr. Smith worked for GGS, except for a two-month period immediately following a debt issuance in March 2012 with net proceeds to GGS of $45.5 million, GGS was not able to meet its financial obligations as they came due.

58.     During Mr. Smith's tenure, GGS separated its financial obligations into (a) critical obligations such as debt and payroll, and (b) all other financial obligations, including

virtually all vendors. GGS paid critical obligations more or less as they came due, but all other financial obligations would not be paid according to the terms of GGS's contracts. Rather, GGS would push off paying vendors while it scrambled to find the cash to do so. According to Mr. Smith, vendors were typically paid only 100-110 days after GGS was invoiced – even though GGS's contracts with the vendors called for payments in 30 or 60 days. GGS did not have enough cash to pay its obligations as they came due.

59.     Throughout his tenure at GGS, Mr. Smith would receive between 20 and 40 calls per day from vendors demanding to be paid. Indeed, for about five months after he left GGS in January 2013, Mr. Smith continued to receive calls from GGS vendors, seeking to have him intercede with GGS to make them pay past due invoices.

60.     At all times throughout the Class Period, GGS would defer paying (i.e., pay late) about 60-75% of its currently due accounts payable, or about $22-23 million per month. In the meantime, GGS would scramble to find money to pay the accounts payable, whether through collecting on accounts receivable, selling company assets, taking on additional debt, or selling GGS securities.

61.     Indeed, GGS had so stretched out its U.S. borrowing that it sought to obtain financing through its foreign subsidiaries. For example, Mr. Smith reports that during his tenure, GGS subsidiaries borrowed money locally in Brazil and Colombia, and would transfer the funds to GGS in the U.S. to pay U.S. expenses, because GGS could obtain no more credit in the U.S.

62.     Mr. Smith further reports that GGS's officers, including Verghese, White, and Degner, received daily cash reports, which listed (among other things), the previous day's bank balances, and balances on all accounts, such as accounts payable and accounts receivable, as well as all cash inflows and outflows for the previous day. This daily cash report alerted GGS's officers to GGS's obvious inability to fund its operations to keep current on its obligations from available cash.

63.     Neither Mr. Smith nor GGS's chief accounting officer Jesse Perez was allowed to withdraw money from GGS's revolving credit facility, because all withdrawals had to be

authorized by Defendant Verghese. Accordingly, Messrs. Smith and Perez kept Verghese well-informed of all financial developments, including GGS's inability to meet its obligations as they came due. Messrs. Smith and Perez would drop by Verghese's office at least daily.

64.     From September 2010 until August of 2013, Marc Lawrence was a GGS Vice President who managed GGS's Gulf of Mexico project. Mr. Lawrence reported to Lawrence Wagner, a GGS Vice President in charge of Worldwide Marine operations.

65.     Mr. Lawrence reports that GGS relied on vendors' forbearance in collecting past due invoices in order to conduct business and fund operations, as did Mr. Lawrence himself. When an invoice had been pushed off for as long as possible, Mr. Lawrence or his staff would hand carry the invoice to GGS accounts payable, and would then try to cajole or beg the accounts payable employees to pay the invoice.

66.     If its vendors ceased allowing GGS to delay payment in violation of its contractual obligations, GGS could not continue to operate. For example, Mr. Lawrence reports that at one time, he needed to refuel GGS's ships under his management. He contacted the refueling company, but it refused to refuel GGS's ships until it paid an overdue invoice. Without the fuel, GGS's ships could not continue to operate.

67.     Mr. Lawrence reports that throughout his tenure, GGS typically paid invoices 60-90 days late (i.e., 90-120 days after the invoice date). Some vendors were kept waiting even longer than that for large amounts (Mr. Lawrence recalls $400,000, in one instance). Mr. Lawrence reports that GGS was lucky to make payroll each pay period.

68.     Mr. Lawrence continued as a consultant to GGS after August 2013. The cash flow problems persisted.

69.     Bill Menger was the Director of High Performance Computing with GGS from November 2010 to May 2013.

70.     Bill Menger reports that "vendors were typically paid late" – typically about 90-100 days after invoicing GGS, or about 30-40 days late based on a typical 60 day payment plan. According to Mr. Menger, several vendors stopped providing goods or services to GGS –

including Staples, Inc. in 2010-2011. Mr. Menger further adds that Defendant White was the driving force behind the SEI-GPI Agreement, announced April 2013, which Mr. Menger reports was a "creative" agreement designed to give GGS liquidity.

71.     According to an internal firmwide email sent by Defendant White on January 8, 2013, "[GGS's] primary focus for 2013 will be to improve our cash management by increasing our cash flow which will enable us to begin to reduce our long term debt." According to the same email, the top priority was to "[e]liminate all unnecessary spending and delay necessary spending until required."

72.     Jody Radulic is the owner of Radulic, Inc. ("RI"), a GGS creditor, with claim no. 27. RI provides guard/chase vessel services for seismic ships.

73.     RI started business with GGS in May 2012. In that time, GGS typically paid RI 3-5 months after her 60 day deadline.

74.     Radulic spoke with GGS executive Norm Pedersen every month from May 2012 until its bankruptcy to discuss GGS's overdue bills. Pedersen headed GGS's marine division, and was a GGS named executive officer. Radulic exchange 197 emails with GGS, mostly about unpaid invoices.

75.     David A. Swain, a GGS creditor, claim no. 389, was owed $1,125,000 since GGS's IPO in 2010.

76.     R.A.M. Dozer Work, LLC, a GGS creditor, claim no. 97 was owed $235,975, more than half of it for work performed in 2012.

77.     Greyco Seismic Personnel Services, LLC, a GGS creditor, claim no. 71, was owed $766,515.65, about $350,000 of which was due since December 2013.

78.     OMNI Energy Services Corp, a GGS creditor, claim no. 163, was owed $688,866 which had been owed since September 2013 at the latest.

79.     Big Lake Corporation, a GGS creditor, claim no. 415, was owed $360,000 for work completed by April 2010.

80.     The State of Texas, a GGS creditor, claims no. 442, 444, and 467, was owed over

$7.5 million for back taxes owed dating to 2008, including about $1.3 million in interest and penalties:

| Tax type | Dating back | Total owed | Penalties | Interest |
|---|---|---|---|---|
| Franchise | 2009 | $ 6,962,645.62 | $ 580,828.21 | $ 572,535.27 |
| Sales and use tax | 2008 | $ 584,055.49 | $ 49,109.09 | $ 22,949.72 |
| Diesel fuel tax | 2010 | $ 188,057.35 | $ 8,717.34 | $ 14,564.81 |

81.     Vercet LLC, a creditor, claim no. 344, was owed $234,290.32 dating back to December 2012 at the latest.

> 2.     Defendants had identified material liquidity deficiencies and made plans to address them one-time fixes, belying their claim that GGS did not have material liquidity deficiencies.

82.     From the beginning of the Class Period, GGS executives had identified material liquidity deficiencies, and had addressed them using a series of one-time tricks.

> 01. First one-time trick: "last chance" offering

83.     In late 2011 and early 2012, because GGS was continually unable to pay its obligations as they came due, Defendants formed a plan to raise $50 million. Overruling Defendant Degner, GGS's board required that GGS raise the money by selling debt rather than equity. Mr. Smith reports that at a meeting he attended in early 2012 one of whose purposes was to discuss GGS's persistent cash flow deficiencies, GGS's board told Defendant Degner that he could raise money, but that this would be "his last chance". Also present at the meeting, among others, were Defendants Matelich and Verghese. Defendant Degner assented to the Board's demand, and GGS raised $50 million through senior notes which it announced on March 30, 2012. The purpose of the March 2012 Offering was to address GGS's material cash flow deficiencies.

84.     Accordingly, the 2011 10-K was required to disclose both that GGS had discovered material cash flow deficiencies and the steps it planned to take to address it.

02. GGS obtains Degner's resignation.

85.     The capital raise was woefully insufficient.  According to Mr. Smith, by late May or early June 2012, GGS had spent the whole $50 million it had raised in Degner's last chance offering, and was back to chronic inability to pay its debts as they came due. In June 2012, GGS's Board held a meeting whose purpose was to arrive at an alternate plan to address GGS's persistent liquidity deficiency. Mr. Smith attended the meeting, but not the executive session. Mr. Smith reports that the Board appeared ready to fire Defendant Degner.

86.     Instead of firing Defendant Degner, the Board retained Defendant White, a past President and CEO of GGS, to draft a report explaining why and how GGS had dug itself into such a deep hole. Based on numerous employee interviews, Defendant White's report concluded that Degner had spent too much money and had lost control over GGS, and that the Board itself had lost control over Defendant Degner. At the meeting where Defendant White's report was presented, which occurred in or around September 2012, the Board decided to fire Defendant Degner.

87.     Shortly thereafter, Degner, Smith, and GGS's general counsel held a meeting to discuss how Mr. Degner could separate from GGS. At the meeting GGS reached a settlement with Defendant Degner. He would retain his GGS Board seat and be appointed CEO of a GGS subsidiary, Autoseis, Inc.. But he would resign as GGS's CEO, and would be permitted in GGS's offices only if he was invited, effective October 25, 2012. This last requirement was not pro forma, as shortly after the termination, an intercompany memorandum was circulated to management instructing recipients not to talk with Defendant Degner and not to invite him into GGS's offices "unless absolutely necessary".

88.     Mr. Smith was fired alongside Defendant Degner. Mr. Smith chose his own replacement, Wade Hopwood.

03. Second one-time trick: attempted sale of a
subsidiary.

89.     One of the purposes of Defendant Degner's termination was to allow him to place

a bid for the GGS subsidiary he headed, Autoseis that would provide much needed cash to GGS. To prepare for the bid, Mr. Smith and Degner founded Geophysical Technology, Inc. ("GTI"), which would be the purchaser. As requested by GGS's board, Defendant Degner also resigned his board seat. GTI and GGS signed a Non-Disclosure Agreement ("NDA"). GTI also obtained backing from prominent private equity firm Silver Lake, which has more than $23 billion in assets under management. Neither the negotiations, nor any of their details nor even that GGS was in negotiations to sell Autoseis was ever disclosed to investors before GGS's bankruptcy.

90.     The parties negotiated a sale price of $200 million. But the agreement also provided that GGS would buy $80 million of equipment from Autoseis staggered over the next four years. The agreement was set to close in May 2013. For GGS, the main purpose of the agreement was to provide it with enough money to fund its operations, particularly over the next year.

91.     As part of the final due diligence, GGS provided Silver Lake and GTI with non-public information about GGS's actual cash flows and liquidity, and cash flow projections until the end of 2015. This non-public information made it obvious that GGS would not survive for much of the next four years, and would thus not buy anything close to $80 million from GGS– even with the $200 million capital infusion from the sale of Autoseis.

92.     Silver Lake provided a letter to GGS explaining that even with its $200 million, GGS could not stay in business anywhere near four years. Silver Lake and GGS's board, including Defendant White, held a meeting to discuss Silver Lake's concerns. After explaining them, Silver Lake sought to open negotiations. The board refused to discuss anything with Silver Lake, walking out of the meeting instead.

04. Third one-time trick: $25 million in financing from sale of interest in Multi-Client Library disguised as partnership.

93.     On or about April 1, 2013, GGS announced a purported licensing agreement (the "SEI-GPI Agreement") with a joint venture created by third parties Seismic Exchange, Inc.

("SEI") and Geophysical Pursuit, Inc. ("GPI"). According to GGS's press release, the SEI-GPI

joint venture aimed to provide marketing and distribution services for a substantial portion of

GGS's Multi-Client Library:

> HOUSTON, April 1, 2013 (GLOBE NEWSWIRE) -- Global Geophysical
> Services, Inc. (NYSE:GGS) (Global) today announced a strategic licensing,
> marketing and data distribution relationship with a joint venture created by
> Seismic Exchange, Inc. (SEI) and Geophysical Pursuit, Inc. (GPI). Under the
> terms of the relationship, the SEI-GPI joint venture will provide exclusive
> marketing and distribution services for a substantial portion of Global's North
> American onshore data library assets.
>
> The parties also intend to collaborate on future data acquisition program
> opportunities for which Global will become a preferential services provider to
> both GPI and SEI.
>
> "We are very enthusiastic about the unique opportunities created by this
> relationship," observed Richard White, CEO of Global. "Our high-quality RG-3D
> Reservoir Grade® data library offers significant value to a broad array of E&P
> companies. Leveraging the relationship breadth and customer networks of both
> SEI and GPI creates a broad opportunity to expand the license base of these data
> sets."
>
> "The geographic areas covered by Global's seismic data sets are highly
> complementary to GPI's library," noted Jeff Springmeyer, President of GPI. "We
> are enthusiastic about leveraging our successful track record in marketing data
> library assets to create value for Global and our customers."
>
> As part of the transaction, a subsidiary of SEI will provide certain data
> management services for Global's library assets subject to this strategic
> relationship. "We are excited to be working with the Global Geophysical team,"
> said John Havens, President of SEI. "Since our founding in 1975, we have been
> key partners to the upstream oil and gas industry. This relationship extends that
> opportunity by bringing decision critical sub-surface information across a number
> of developing plays to each of our respective customers."
>
> The parties have started collaborating on various projects and licensing
> opportunities and expect to complete most marketing transition activities and data
> management responsibilities during the second quarter.

94.     The Multi-Client Library is GGS's single most valuable asset. GGS invested more

than $700 million in it, including $179.6 million in 2012.

95.     In a conference call taking place on April 15, 2013, Defendant Verghese added

that the SEI-GPI deal "fundamentally [is] a licensing and distribution deal, kind of combining

their network with our assets." Defendant Verghese was also asked "[W]as there an upfront cash

payment that was received? Or is it just the associated sales from the relationship?" Defendant

Verghese responded, falsely, "No, just the revenue accompanied cash."

96.     In fact, as Todd Smith recounts from conversations with Mr. Hopwood, and as revealed in the testimony of GGS CFO Sean Gore in its bankruptcy, the joint venture was a thinly disguised secured loan financing secured by the future revenue stream from the Multi-Client Library. Indeed, in its bankruptcy, GGS admitted that it "entered into the SEI-GPI Agreement to, among other things, raise cash necessary to meet maturing borrowing commitments." *In re Global Geophysical Services, Inc.*, Dkt. # 752-1, Second Amended Disclosure Statement, at page 39.

97.     The agreement had three material terms that were not disclosed at the time that confirm that the undisclosed true purpose of the joint venture was to provide GGS with desperately needed cash through an upfront payment. ***First***, on March 28, the SEI-GPI joint venture made an immediate $25 million payment to GGS, despite Defendant Verghese's false statement to the contrary. ***Second***, the SEI-GPI joint venture would receive 43% of all proceeds from sales of GGS data covered by the agreement, consisting of a 25% commission plus an 18% administration fee. Market rates are between 10 and 15 percent, according to both Mr. Smith and lenders who later provided GGS's loan facility. ***Third***, the "license" was for 40 years, survived bankruptcy, and could not be terminated. Thus, the SEI-GPI Agreement was a mortgage financing revenue streams from GGS's most valuable assets at fire-sale prices to obtain immediate cash.

98.     Indeed, notwithstanding the press release, GGS was utterly unconcerned about whether SEI-GPI was a suitable counterparty. According to Mr. Smith, in or around March 2013, GGS offered Silver Lake the same deal, even though Silver Lake was not in the brokerage business, had no need of a license, and didn't want to be a broker. The only condition was that Silver Lake would have to pay a large amount of money by March 28 or 29, 2013. GGS's interest was in securing SEI-GPI's money by March 29, rather than its assistance in marketing and distributing rights to the data.

99.     SEC regulations require issuers to file material contracts that are outside of the

issuer's normal course of business. Regulation S-K, Item 601(10)(i) [17 C.F.R. § 229.601(a)(10)].

100.    In GGS's bankruptcy, GGS CFO Sean Gore provided testimony concerning GGS's historical financial condition.

101.    When asked whether the SEI-GPI Agreement and two other agreements were outside of the ordinary course, Gore tacitly admitted that it was, disputing only that another agreement was outside the normal course of business:

> Q So when you add the [$]25 [million from the SEI-GPI Agreement], the five, the six and a half and the seven, you get to about $43 million of cash that was brought into the company from the sales of what I would call "outside the ordinary course"; isn't that right?
> A Well, I don't know that the SES transaction [i.e., the "six and a half"] is outside the normal course.

102.    Accordingly, GGS was required to file the SEI-GPI Agreement with the SEC and disclose it to investors, but never did. Had it filed the agreement, investors would have realized that the agreement was in truth a fire-sale financing induced by GGS's desperate need for cash.

103.    Mr. Smith received a call from UHY partner Conrad Johnson, relaying the alarm of another UHY partner at the SEI-GPI Agreement. According to Mr. Smith, UHY was alarmed that the SEI-GPI Agreement did not seem to have an economic purpose as a licensing agreement, since the customer had no need for the data.

05. Fourth one-time trick: attempted purchase of competitor's unprofitable division to covertly refinance debt.

104.    CGG, which competes with GGS in the seismic imaging business, had for years maintained an unprofitable land division. CGG was seeking a buyer for the division.

105.    CGG and GGS discussed selling CGG's land division to GGS. The discussions began at the same time as GGS sought to sell Autoseis to GTI and Silver Lake.

106.    GGS was not interested in buying CGG's land division for its operations. Indeed, Mr. Smith was told by Mr. Hopwood that GGS did not believe that it could profitably manage

CGG's land division. Rather, GGS's interest in the deal was that (a) CGG would finance the acquisition of the land division, and (b) at the same time, GGS would issue $120 million of new debt, purportedly to finance the same acquisition. GGS would thus raise $120 million more than it needed to buy the division. GGS would then use CGG's financing to purchase CGG's land division, and would use the $120 million to retire its short-term debt. Negotiations fell apart in December 2013/January 2014.

06. Fifth one-time trick: obtaining debt facility through misleading statements.

107.    On April 30, 2010, GGS had entered into a revolving credit facility with Bank of America, N.A., as administrative agent (the "Revolver"), secured by a first priority lien on substantially all of GGS's assets. Under the latest amendment dated April 24, 2013, GGS was permitted to withdraw $80 million under the Revolver, and the maturity date was September 30, 2013, after which its limit fell to $67.5 million. The Revolver was fully drawn, and GGS sought to refinance it.

108.    On September 30, 2013, GGS entered into a financing agreement with certain lenders led by Tennenbaum Capital Partners, LLC, a sophisticated provider of debt financing with about $5 billion in assets under management.

109.    The financing agreement provided GGS (a) a senior secured first lien term loan in the amount of $82.8 million, which was spent paying off the Revolver, and (b) a senior secured first lien delayed-draw term loan in the amount of $22.2 million (the "Tennenbaum Facility"). The Tennenbaum Facility was secured by substantially all of GGS's assets.

110.    According to a pleading filed by Tennenbaum in GGS's bankruptcy, GGS made misrepresentations to Tennenbaum to obtain the financing:

a.   GGS told Tennenbaum that the SEI-GPI Agreement provided SEI-GPI with market rate licensing fees. But market rates are 10-15% - far below the true 43% rate GGS was paying under the SEI-GPI Agreement. Further, GGS falsely told Tennenbaum that the Licensing Agreement was not material, and

refused to provide a copy.[2]

b.  Tennenbaum was provided with cash flow projections that showed GGS with sufficient liquidity to operate, pay debt service, and comply with the minimum liquidity covenant, through and including Fiscal Year 2016. In particular, the projections showed a positive cash balance of $16.5 million as of June 30, 2014, against an actual negative cash balance of $34.6 million. *Id.* at ¶¶ 12, 13, 21, and n.11. These projections given to Tennenbaum appear to differ materially from and were much more optimistic than those GGS had provided to Silver Lake.

07. Sixth one-time trick: $5 million cash advance to avoid event of default.

111.   In October 2013, GGS committed more assets to the SEI-GPI Agreement in exchange for a $5 million advance on receivables.

112.   Without the additional $5 million, GGS would not have had enough cash to make interest payments on November 1 and still retain enough cash to comply with its liquidity covenants under the Tennenbaum Facility. It would thus have violated a covenant on the Tennenbaum Facility. Presented with this fact, Sean Gore admitted in open court that the purpose of the transaction was to avoid a breach of covenants:

> Q So you raised the capital in advance of the receivables [i.e., the $5 million payment] effectively so you could make the bond payment; isn't that right?
> A Yes.[3]

113.   Until its bankruptcy, GGS did not disclose either the advance or what it had to pay to get it, neither to investors nor even to Tennenbaum.

08. Seventh one-time trick: the Offering.

114.   GGS completed the sale of $8.0 million of Series A Preferred Stock on December

---

[2] Objection of Prepetition Agent and Prepetition Lenders to Debtors' Emergency Motion for Entry of Interim and Final Orders, Dkt. # 39, at ¶15 a.
[3] Motions Hearing Dated March 27, 2014, testimony of Sean Gore, at 93.

16, 2013, pursuant to a Registration Statement dated December 3, 2013, raising net proceeds of about $7.1 million. The Registration Statement stated that the Offering was to be use for "general corporate purposes". But  the true undisclosed purpose of the Offering was to keep GGS afloat and to meet a covenant under the Tennenbaum Facility to maintain at least $10 million in "consolidated liquidity".[4]

      ii.  Officer Defendants had no reasonable basis to believe, and did not believe, that GGS would obtain sufficient cash flow from its operations to meet its 2013 needs.

115.   The 2012 10-K was filed March 5, 2013, and represented that "[w]e believe that our current working capital, projected cash flow from operations will be sufficient to meet our capital requirements for our existing operations for the next 12 months."

116.   Even as GGS filed its 2012 10-K, it was negotiating agreements to supplement its liquidity because it knew that it did not have enough cash on hand and from operations to make it through the next year. Accordingly, the Officer Defendants subjectively disbelieved their claim that GGS's operating cash flows would be sufficient to meet its obligation in the coming year.

117.   As 2013 progressed, the evidence that GGS's operating cash flows were not sufficient to meet its needs continued to accumulate. The Officer Defendants engaged in the additional four one-time tricks. In particular, the purpose of the fifth one-time trick was to avoid a default. If there has been a change in liquidity since the most recent 10-K, issuers must disclose it in the relevant 10-Q. Accordingly, by not making any disclosure about liquidity deficiencies in the 2013 10-Qs, the Officer Defendants implicitly stated that the disclosure from the 2012 10-K was still accurate – i.e., GGS did not face a liquidity deficiency.

*2)  False statements concerning net income.*

118.   Each of the 10-Ks included financial statements for the previous three years.

---

[4]  Consolidated Liquidity is defined in the loan agreement as unrestricted cash minus trade payables more than 30 days past due and certain other immediate payment obligations. According to the 2013 10-K, GGS had only $18.9 million in cash and cash equivalents on December 31, 2013, perilously close to a covenant violation.

Thus, the 2011 10-K included financial statements for years ended December 31, 2009, 2010 and 2011, and the 2012 10-K included financial statements for years ended December 31, 2010, 2011 and 2012. Similarly, each quarterly report on Form 10-Q included financial statements for the previous quarter. The Registration Statement incorporated by reference certain of GGS's filings, including the 2012 10-K, and each of the 2013 10-Qs. Each financial statement included the net income (loss) attributable to shareholders for each of these periods.

119.   The 2012 10-K included an audit report from UHY certifying GGS's financial statements:

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of Global Geophysical Services, Inc. and Subsidiaries
Houston, Texas

We have audited the accompanying consolidated balance sheets of Global Geophysical Services, Inc. and Subsidiaries (the "Company") as of December 31, 2012 and 2011, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2012.  The Company's management is responsible for these consolidated financial statements.  Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall consolidated financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

*In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Global Geophysical Services, Inc. and Subsidiaries as of December 31, 2012 and 2011, and the consolidated results of their operations and their cash*

*flows for each of the years in the three-year period ended December 31, 2012, in conformity with accounting principles generally accepted in the United States of America*.

[]
*/s/ UHY LLP*

Houston, Texas
March 4, 2013

120.    As set out in Table I below, the 2009-2012 annual financial results incorporated into the Registration Statement each materially understated the net loss attributable to shareholders, and the Q3 2013 10-Q materially understated the net loss attributable to shareholders for the three quarters ended September 30, 2013.

121.    Generally Accepted Accounting Principles ("GAAP") constitute those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

122.    GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

123.    The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board.

124.    The Registration Statement and Prospectus falsely stated that GGS's financial statements conformed to GAAP.

125.    SEC and NASDAQ rules and regulations require that financial statements included in a registration statement or prospectus must comply with GAAP. See §13 of the Exchange Act; Regulation S-X.

126.    SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

127.    Moreover, pursuant to SEC Regulation C, Defendants had a duty to disclose material information necessary to ensure that representations in the Registration Statement were

not misleading. Specifically, Rule 408 states that, "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading." 17 C.F.R. § 230.408(a).

128.   Under GAAP "restatements" are required for material accounting errors that existed at the time financial statements were prepared.  See Statement of Financial Accounting Standards 154; Accounting Standards Codification ("ASC") 250.

129.   An accounting "error" is a term of art and results from, among other things, an error in recognition, measurement, or mistakes in the application of GAAP.  SFAS 154; ASC 250.

130.   Errors result from (i) mathematical mistakes, (ii) mistakes in application of GAAP, or (iii) oversight or misuse of facts that existed at the time the financial statements were prepared.  SFAS 154, ASC 250.

131.   On March 17, 2014, after close of trading, GGS reported that its financial statements, including those in the 2012 10-K, could no longer be relied upon, identifying numerous accounting errors that resulted in the restatement of GGS's financial statements for each fiscal year from 2010 through 2012, and each quarter of 2013:

    a.  Misapplication of a method of revenue recognition for certain contracts in the Latin America region, resulting in misallocation of revenues and costs between periods;

    b.  Research and development costs that were inappropriately capitalized rather than expensed;

    c.  Unrecorded sales and use tax liabilities;

    d.  Unrecorded gains associated with insurance proceeds received in excess of the net book value of the insured assets during the third quarter of 2013; and

    e.  Unrecorded stock-based compensation expense associated with performance units granted during the third quarter of 2013.

132.    GGS's restatement was caused primarily by the oversight or misuse of facts and the failure to properly apply its accounting policies that complied with GAAP.

133.    GGS's restatement of its financial statements is an admission that its financial statements were not presented in accordance with GAAP and were therefore materially false and misleading. Accordingly, GGS's financial statements included the following errors:

**TABLE 1**

**NET INCOME (LOSS) ATTRIBUTABLE TO COMMON STOCKHOLDERS**

| PERIOD | AS REPORTED | AS RESTATED | Amount Overstated/ (Understated) | Percentage Overstated/(Understated) |
|---|---|---|---|---|
| YEAR ENDED DEC. 31, 2012 | $ (13,331) | $ (15,586) | $ (2,255) | (16.92%) |
| YEAR ENDED DEC. 31, 2011 | $ 5,662 | $ 4,933 | $ (729) | (12.88%) |
| YEAR ENDED DEC. 31, 2010 | $ (39,716) | $(42,161) | $ (2,445) | (6.16%) |
| YEAR ENDED DEC. 31, 2009 | $ 445 | $ (5,331) | $ (5,776) | (1297.98%) |
| THREE MONTHS ENDED SEPTEMBER 30, 2013 | $ (24,199) | $ (28,443) | $ (4,244) | (17.54%) |
| THREE MONTHS ENDED JUNE 30, 2013 | $ (15,786) | $ (15,367) | $ 419 | 2.65% |
| THREE MONTHS ENDED MARCH 31, 2013 | $ (11,542) | $ (11,086) | $ 456 | 3.95% |
| Cumulative | $ (98,192) | $ (107,710) | $ (9,673) | (9.78%) |

*Dollars in thousands*
*Source for as reported data is originally filed financial statements*
*Source for as restated data is Form 10-K for the year ended December 31, 2013*

   3)  *False statements about internal controls over financial reporting.*

1. The securities laws require companies like GGS to design a system of internal controls and to attest to whether they are effective.

134.    The Sarbanes-Oxley Act of 2002 and accompanying SEC rules mandate that management of public companies design and implement systems of internal control over financial reporting. They also require that, for every quarterly or annual report, management evaluate whether the controls are effective, what material or important deficiencies exist, and whether any remedial actions should be or have been taken. Sarbanes-Oxley Act of 2002 ("SOX") Section 404; 17 CFR 240.13a-15. The responsibility for design and implementation falls on the issuer's Principal Executive and Principal Financial Officer. (*Id.*)

135.    The Principal Executive and Principal Financial Officer must also attest to the results of their evaluation. At a minimum, the attestation must include (1) a statement of whether internal controls were effective, and (2) what material deficiencies existed. Management's attestation must be filed in the issuer's annual reports on Form 10-K and quarterly reports on Form 10-Q.

136.    The SEC does not mandate that management conclude that internal controls were effective. Instead, the rules treat poor internal controls as a matter that must be disclosed to investors. The SEC also provides a grace period for newly-public companies: the first annual report on Form 10-K a company files after its IPO need not include management's attestation on whether internal controls were effective.

137.    When it became a public company, GGS was required to develop and implement a system of internal controls over financial reporting. However, because of the SEC's grace period, GGS was not required to attest to its evaluation until the first period report after its 2011 10-K.

2. Defendants' actionable statements concerning internal controls.

138.    On May 4, 2012, GGS filed its 10-Q for the first quarter of 2012 (the "Q1 2012 10-Q").

139.     Beginning with the Q1 2012 10-Q, Defendants were required to attest to the effectiveness of its internal controls.

140.     The Q1 2012 10-Q provided:
Item 4. Controls and Procedures

> Under the supervision and with the participation of our management, including our principal executive officer, principal financial officer, and principal accounting officer, we have evaluated the effectiveness of the Company disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) as of March 31, 2012. **Based on that evaluation, the Company's principal executive, principal financial officer, and principal accounting officer have concluded that these controls and procedures were effective as of March 31, 2012.**

> There were no changes in the Company's internal control over financial reporting that occurred during the Company's last fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

> [Emphasis added].

141.     The Q1 2012 10-Q was signed by Defendants Verghese and Degner. The Principal executive officer was identified as Degner, and the principal financial officer was identified as Defendant Verghese.

142.     The Q1 2012 10-Q was accompanied by SOX certifications filled out by Defendants Verghese (principal financial officer) and Degner (principal executive officer) which certified that:

3.
> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

4.
> The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

[…]

b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; [and]

[…]

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.

The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

143.   Substantially identical statements were made in:

a. The Q2 2012 10-Q, filed August 3, 2012 (signed by Degner and Verghese, and certified by both) (stating that there were no changes in GGS's internal controls since the previous quarter, and thus that GGS's internal controls over financial reporting were effective);

b. The Q3 2012 10-Q, filed November 2, 2012 (signed by White and Verghese, and certified by both) (same);

c. The Q1 2013 10-Q, filed May 3, 2013 (signed by White and Verghese, and certified by both) (same);

     d.   The Q2 2013 10-Q, filed August 13, 2013 (signed by White and Verghese, and certified by both)(same); and

     e.   The Q3 2013 10-Q, filed November 12, 2013 (signed by White and Verghese, and certified by both)(same).

144.    In the 2012 10-K, GGS attested that it had maintained adequate internal controls over financial reporting:

> Report of management on internal control over financial reporting
> Our management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. Internal control over financial reporting is a process to provide reasonable assurance regarding the reliability of our financial reporting for external purposes in accordance with accounting principles generally accepted in the United States of America. Internal control over financial reporting includes maintaining records that in reasonable detail accurately and fairly reflect our transactions; providing reasonable assurance that transactions are recorded as necessary for preparation of our financial statements; providing reasonable assurance that receipts and expenditures of Company's assets are made in accordance with management authorization; and providing reasonable assurance that unauthorized acquisition, use or disposition of company assets that could have a material effect on our financial statements would be prevented or detected on a timely basis. Because of its inherent limitations, internal control over financial reporting is not intended to provide absolute assurance that a misstatement of our financial statements would be prevented or detected.
>
> Management conducted an evaluation of the effectiveness of our internal control over financial reporting based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). ***Based on this evaluation, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2012***. UHY LLP has audited our internal control over financial reporting as of December 31, 2012; their report is included in the "Report of Independent Registered Public Accounting Firm" on page F-3.
>
>     (Emphasis added).

145.    Defendants White and Verghese each also attested that GGS's internal controls had been effective, with UHY also certifying GGS's internal controls:

Based on my knowledge, the consolidated financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

3.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d- 15(f)) for the registrant and have:

[…]

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; [and]

[…]

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

[]

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of Global Geophysical Services, Inc. and Subsidiaries
Houston, Texas

We have audited the internal control over financial reporting of Global Geophysical Services, Inc. and Subsidiaries (the "Company") as of December 31, 2012, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in Part II, Item 9A of this Form 10-K. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3)

provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

*In our opinion, Global Geophysical Services, Inc. and Subsidiaries maintained, in all material respects, effective internal control over financial reporting as of December 31, 2012, based on criteria established in Internal Control - Integrated Framework issued by COSO.*

[]

/s/ UHY LLP

Houston, Texas
March 4, 2013

145.   The statements were false because, for the reasons outlined below, GGS did not develop and maintain adequate controls over financial reporting, and it failed to enact substantial internal controls until the second half of 2013.

146.   In addition, GGS voluntarily adopted a Code of Business Conduct and Ethics (the "Code"). The Code was an element of GGS's internal compliance program, as contemplated by the Federal Sentencing Guidelines for corporations. GGS required all employees to read and understand the Code, which provided in relevant part:

RECORDING TRANSACTIONS
The integrity of the Company's record-keeping and reporting systems is of the utmost importance. The Company shall make and keep books, invoices, records and accounts that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company. Each employee shall maintain accurate and fair records of transactions, time reports, expense accounts, and other Company records. Employees, officers and directors must use special care to make sure that records are accurately and completely prepared and reviewed, whether they are intended for internal use or for an external party, including any governmental authorities. The Company shall devise and maintain a system of internal controls sufficient to provide

reasonable assurances that transactions are properly authorized, executed, and recorded.

Company Records

All Company books, records, accounts, funds and assets must be maintained to reflect fairly and accurately the underlying transactions and disposition of Company business in reasonable detail. No entries will be made that intentionally conceal or disguise the true nature of any Company transaction.

In this respect, the following guidelines must be followed:

- No unrecorded or "off the books" funds or assets should be established for any purpose;

- No false, misleading or fictitious invoices should be paid or created;

- No false or artificial entries should be made or misleading reports issued;

- Assets and liabilities of the Company shall be recognized and stated in accordance with the Company's standard practices and GAAP;

- No material failure to make entries should be permitted; and

- The documentation evidencing each transaction and each payment on behalf of the Company shall fairly represent the nature of such transaction or the purpose of such payment.

If an employee believes that the Company's books and records are not being maintained in accordance with these requirements, the employee should immediately report the matter directly to their supervisor or to the Chief Financial Officer.

147.    The Code also provided that:
WAIVER

Waivers of any provision of this Code shall be made by the Audit Committee, provided that such committee may defer such matters to the full board. Persons seeking a waiver should be prepared to disclose all relevant facts and circumstances, respond to inquiries for additional information, explain why a waiver is necessary, appropriate or in the best interest of the Company and comply with any procedures that may be required to protect the Company in connection with the waiver. ***If a waiver of this Code is granted for an executive officer or director, appropriate disclosure will promptly be made in accordance with applicable laws, rules and regulations***

*(including the listing standards of the New York Stock Exchange).*

(Emphasis added).

148.    The text of the Code represented that GGS's senior financial officers, including White and Verghese, were required to sign an undertaking that they read and agreed to comply with the Code.

149.    Marc Lawrence reports that nepotism, particularly around Defendant Degner, "ran rampant" at GGS. For example, Mr. Lawrence reports Degner's sister Heidi Brown was made VP of Corporate Systems. Brown managed the GGS employees responsible for its financial systems.

150.    Similarly, Degner's brother was a GGS employee, and given a GGS credit card that allowed him to spend thousands of dollars in expenses with absolutely no oversight.

151.    Mr. Lawrence reports that employees would be fearful of raising issues at high levels. If employees raised issues in meetings with Defendant Degner, he would immediately dress them down, "talk[ing] down" to them, during the meeting.

152.    The results were predictable. Speaking of his own project, Mr. Lawrence reports that "we didn't get a lot accomplished, but we spent a lot of money".

### 3.  GGS did not have substantial internal controls.

153.    GGS's operations were substantial:

| As of December | 2013 | 2012 | 2011 | 2010 |
|---|---|---|---|---|
| Number           of | 1,500 | 1,200 | 1,300 | 1,667 |

154.    GGS's internal controls over financial reporting and its compliance with its own code take on heightened importance because so much of GGS's operations are in

far flung places. For example, the 2012 10-K lists twenty-two countries in which GGS did business, including some with business climates very different from that in the U.S.: Libya (according to Transparency International's 2013 World Corruption Perception Index, perceived to be the world's 172th most corrupt country, out of 175), Iraq (171), Venezuela (160), Nigeria (144), Russia (127), Argentina (106), Algeria (94, tied), Colombia (94, tied), and India (94, tied).

155.   Notwithstanding these important risks, Defendants did not develop internal controls over financial reporting.

156.   Because of the complexity of the financial complexity of their operations, public companies of GGS's size must have a well-developed internal audit function.

157.   Unbeknownst to investors, for most of its existence – until late 2013, in fact – GGS did not have an Internal Audit Department. Nor did it have any dedicated internal audit staff. As reported in the 2013 10-K:

> ***During the last half of 2013, we hired an Internal Audit Director to establish the Internal Audit Department***.   Moreover, we intend to significantly upgrade the accounting and finance staff by hiring additional professionals with experience in designing, implementing and managing global accounting and finance organizations with effective policies, procedures and processes as described below under "Remediation of the Material Weakness in Internal Control over Financial Reporting."
>
> Remediation of the Material Weaknesses in Internal Control over Financial Reporting
>
> Management has already begun to implement a program to remediate the material weaknesses identified. In early 2014, we initiated role and responsibility changes in our accounting and finance group, commencing with the appointment of a new Chief Financial Officer. In addition, during the last half of 2013, we hired an Internal Audit Director to begin to establish the Internal Audit Department. These personnel have extensive experience in the design, implementation and enforcement of an effective control environment. ***We also have plans to enhance our corporate accounting function by creating and filling several positions to support our global business operations. This includes an industry sector Chief Accounting Officer, a Financial Reporting Manager, a Tax Director, and other supporting staff in various finance and/or accounting departments***.

In addition, we have plans to expand and strengthen our processes, procedures and controls surrounding various areas impacting financial reporting and which required adjustments to the 2013 Consolidated Financial Statements as further discussed in Note 21 to the Notes to Consolidated Financial Statements in Item 8. We are implementing and strengthening clear policies and procedures designed to improve transparency in global financial and operational transactions and also support business continuity to allow a sustainable and effective control environment.

Management believes that these actions and resulting improvement in controls will strengthen our disclosure controls and procedures and, over time, remediate the material weaknesses that the Company identified in its internal control over financial reporting as of December 31, 2013.

Source: 2013 10-K (emphasis added).

158.     Similarly, GGS did not establish substantial internal controls until the last half of 2013. Indeed, on October 23, 2013, Defendant Verghese sent a firm-wide email noting that GGS had just established its substantive internal controls:

To all [GGS] Employees

To ensure adequate internal control over financial reporting and our financial statements are free of material misstatements, GGS has implemented a set of internal controls to help us accomplish this goal. The controls are designed to cover areas that are critical and can have significant impact on our financials, including but not limited to revenue, expenditures, assets, etc.

To facilitate execution and compliance of the internal controls. GGS has also established and distributed the delegation of authority (DOA) policy, which has been approved by Sr. management. The DOA specifies the types of significant transactions affecting our financial statements that require management approval(s), as well as the personnel with the designated authority to approve those transactions.

***As part of the SEC reporting process, GGS Sr. management will need to certify that GGS has established and maintained adequate internal control over financial reporting. As a result, on an annual basis the controls will be tested to assist management with the assessment on the effectiveness of internal controls.*** Exceptions, if any, identified from the control testing will critically affect:

1.  The conclusion made by GGS Management on whether the company has maintained adequate internal controls over financial reporting

2.  The external auditor's overall opinion on the effectiveness of GGS internal control

over financial reporting.

Depending on the level of non-compliance, if the external auditor determines that GGS has a *material* weakness regarding any of the control or area affecting financial statements, it will be disclosed within the GGS annual SEC filing as part of the external auditor's opinion.

As such, it is critical for all of us to ensure that the established internal controls are being performed and more importantly, we have adequate supporting documentation to substantiate the performance of these controls. I strongly encourage each one of you to:

1. Understand the controls within your responsible process area(s)
2. Review and follow the DOA policy to obtain approvals on relevant transactions as applicable
3. Document the approvals obtained for the purpose of internal control testing by both internal and external auditors

If you have questions or require further interpretation regarding the DOA or other accounting policies, please contact Brett Lamensky. If you have questions or concerns regarding internal controls and the consequences /impact on the company due to non-compliance, please contact Betty Chi.

Your support and cooperation is very much appreciated in this important matter.
With regards,
Mathew Verghese
[Emphasis added].

159.   GGS's poor internal controls were a cause of its bankruptcy.

160.   Unbeknownst to investors, during the Class Period, when it was bidding for projects, GGS did not determine whether it had the capital necessary to meet its obligations on the project it was bidding for:

> Q And in that context, did -- were you involved at all in the project bidding process, the terminations on making capital commitments to projects, assessing liquidity to satisfying obligations of those contracts?
> A Previously?
> Q Previously.
> A I was not.
> Q To your knowledge before you became CFO [in January 2014], did that ever happen?
> A Not to my knowledge.[5]

161.   Thus, if its bid was successful, GGS would take on obligations it had no reasonable basis to believe it would be able to keep:

---

[5] Motions Hearing Dated March 27, 2014, testimony of Sean Gore, at 88.

Q Now, in your declaration, you principally attribute the liquidity issues to commitments related to new projects. Some might characterize it as a victim of your success. You've overcommitted yourself and don't have liquidity to satisfy it. Is that fair to say how your declaration reads?

A That's a fair assessment. We've gone out and we've made it quite clear that we were attempting to exhibit the company to a proprietary stance internationally and we were quite successful here recently in signing up a number of large awards around the world.

Q And in [recently signing significant contracts], is it fair to say that the company did not take account of its actual capability to finance those commitments when it signed up those contracts and it committed itself to perform?

A I believe better analysis could have been done to get ahead of that issue, yes.[6]

162.    To make matters worse, as Mr. Lawrence reports, GGS's business was very cash-intensive. GGS would front the cost of obtaining proprietary seismic data, hoping to sell it to a future customer. GGS would occasionally receive an upfront payment from a supplier, but rarely if ever enough to cover its costs. There were long delays between the date it paid the expenses for its projects and the date it recouped its costs.

### 4.   The restatement and bankruptcy

163.    In February 2014, on the eve of its bankruptcy, GGS awarded $3.5 million in cash bonuses to employees.

164.    On March 17, 2014, after close of trading, GGS announced:

a.   That its financial statements going back to 2009 would need to be restated;

b.   That its internal controls over financial reporting had been inadequate as of at least December 31, 2013;

c.   That it would be unable to timely file its annual report on Form 10-K, breaching a covenant in its debt agreements; and

d.   That it had retained "financial advisors to assist [it] in reviewing financial and strategic alternatives" and that it was "committed to exploring an orderly resolution of our liquidity situation, including any necessary restructuring".

(collectively, the "Restatement and Liquidity Announcement").

165.    On April 29, 2014, GGS filed its annual report on Form 10-K for the year ended

---

[6] Motions Hearing Dated March 27, 2014, testimony of Sean Gore, at 90.

December 31, 2013 (the "2013 10-K"). The 2013 10-K provided further information about the specific false statements that had lead to the need to restate its financial statements:

a. In Latin America, GGS recognized revenues and expenses at times other than when performance of the seismic services. This revenue recognition violated not only GAAP but GGS's own revenue recognition policy.

b. Between 2010 and 2013, GGS capitalized costs totaling about $4.9 million, though the amounts should have been incurred as expenses in accordance with ASC 730 "Research and Development."

c. GGS did not accrue sales taxes due to the State of Texas totaling $1.9 million for the periods from 2008 to 2011.

d. GGS did not record a $1.2 million gain from excess insurance proceeds from a fire at a GGS warehouse in Colombia in May 2013.

e. Unsupported amounts were included in the balance of property and equipment, inflating GGS's pre-tax income by $0.1 million in each of 2011 and 2012, and by $0.3 million in the first nine months of 2013.

f. Capitalized costs relating to GGS's Multi-Client Library were not properly expensed, thus understating operating costs in 2011 and 2012 by $0.2 million in the aggregate.

166.   GGS also concluded that its internal controls over financial reporting were materially deficient:

*Entity Level Controls (Control Environment)*

***Management concluded that during 2013, we did not maintain an effective control environment***. The control environment, which is the responsibility of management, sets the tone of the organization, influences the control consciousness of its employees, and is the foundation for all other components of internal control over financial reporting. The deficient control environment was reflected in our inability to properly account for certain operational processes and transactions which were not supportive of an effective and efficient internal control environment. Management has determined that this was primarily attributable to the following:

43

1. ***A financial reporting structure with clearly established responsibilities was not maintained to support the pursuit of business objectives.*** We experienced significant turnover in key accounting and finance positions during the year. Transition plans and clear business processes and procedures were not in place to establish accountability and allow continuity.

2. Our lack of resources, in terms of personnel, technical expertise and institutional knowledge to address certain of the financial and tax reporting aspects of our multi-national operations, was not assessed timely to address the resource shortages in certain areas requiring expertise.

[Emphasis added].

167. Though GGS did not conclude that past periods' internal controls over financial reporting were materially deficient, it restated financial statements for every year from 2009 to 2013. Thus, there is no basis to conclude that internal control deficiencies only began in 2013. Indeed, the facts show GGS's internal controls have been materially deficient since 2009.

### C. Loss causation and damages.

168. On August 5, 2013, after close of trading, GGS issued a press release announcing its Q2 2013 results (the "Q2 2013 PR"). The Q2 2013 PR revealed to the market that because of the SEI-GPI Agreement, GGS had recorded commissions of $5.9 million for the six months ended June 30, 2013, against total revenues from the Multi-Client Library of $36.6 million. This partial disclosure revealed that the SEI-GPI Agreement's payment rates were much higher than expected and that it impaired a substantial portion of GGS's expected revenue from its Multi-Client Library. The announcement also revealed that Multi-Client Library sales had decreased from the same quarter the previous year even before paying commissions pursuant to the SEI-GPI Agreement. These revelations called into question GGS's claim that the SEI-GPI Agreement had truly been about increasing revenues rather than

obtaining financing.

169.    On August 6, 2013, GGS's stock price fell from a previous close of $4.21 to close at $3.57, and on August 7, it fell again to $3.41, for a total loss of $0.80, or about 19.0%, on heavy volume, damaging investors.

170.    On November 18, 2013, after close of trading, GGS issued a press release announcing that it had filed a registration statement on Form S-3 to sell, from time to time, up to $300 million of securities. The markets were dismayed that GGS was seeking new funds so soon after the Tennenbaum Facility. On November 19, GGS's stock price fell from its previous close of $1.91 to close at $1.5, a loss of $0.41, or 21.5%, on heavy volume, damaging investors.

171.    GGS completed the Offering on December 16, 2013 by means of a prospectus dated December 3, 2013. At that time, both because of the material errors in its financial statements and because it was running out of one-time tricks to find cash, its bankruptcy was a certainty. Thus, the Preferred stock's only value was the few small payments GGS could make before bankruptcy. Accordingly, the damage caused by Defendants' false statements is the entire value of the Preferred stock investors bought.

172.    On the first trading day after the Restatement and Liquidity Announcement, March 18, 2014, GGS's stock price fell from $1.17 to $0.46, or a b o u t  61%, on heavy volume, damaging investors. That day, the Preferred stock's price fell from $16.95 to $4.06, or about 76%, on heavy volume, damaging investors.

173.    On March 25, after close of trading, GGS announced that it had filed for bankruptcy. On March 26, 2014, its stock price fell from $0.47 to $0.21, or about 55%, damaging investors. Meanwhile, the Preferred stock's price continued to tumble after March 18, reaching $2.00 by April 17, 2014.

### D.  Plaintiffs' Class Action Allegations.

174.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise

acquired the common stock of GGS during the Class Period and who suffered damages (the "Open Market Class"), or who acquired the Series A preferred stock of GGS (the "Offering Class").  Excluded from the Classes are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

175.   The members of the Classes are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Classes may be identified from records maintained by GGS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

176.   Plaintiffs' claims are typical of the claims of the members of the Classes as Messrs. Rinn, Norris, and Stanley purchased GGS stock during the Class Period. Messrs, Gould, and Rink purchased GGS stock traceable to the Registration Statement and all members of the Classes are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

177.   Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class and securities litigation.

178.   Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes. Among the questions of law and fact common to the Classes are:

   a.   whether the federal securities laws were violated by defendants' acts as alleged herein;

   b.   whether defendants misrepresented material facts and omitted to state

material facts necessary to prevent the statements made to the investing public from being misleading during the Class Period or in the Registration Statements concerning its financial statements;

c.  whether defendants have proved their affirmative defenses;

d.  whether the market prices of the Company's common stock was artificially inflated or distorted during the Class Period because of defendants' conduct complained of herein; and

e.  whether the members of the Classes have sustained damages and the proper measure of such damages.

179.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**E.  Applicability Of Presumption Of Reliance Under Fraud-On-The-Market Doctrine**

180.   In advancing claims on behalf of the Open Market Class, Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

a.  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.  The omissions and misrepresentations were material;

c.   The Company's common stock traded in an efficient market;

d.   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e.  Plaintiffs and other members of the Open Market Class purchased GGS common

stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

181.    At all relevant times, the market for GGS common stock was efficient for the following reasons, among others:

i).    As a regulated issuer, GGS filed periodic public reports with the SEC;

ii).    GGS's stock was listed on the NYSE, creating a presumption that its stock trades on an efficient market;

iii).    GGS regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

iv).    On average, 1.4 million shares of GGS shares were traded on a weekly basis, or over 3.4% of GGS's outstanding shares, demonstrating a strong presumption of an efficient market;

v).    GGS was eligible to file a short-form registration statements with the SEC on Form S-3 and did so on December 3, 2013;

vi).    GGS was followed by at least 4 analysts, including from Barrington Research, Dougherty & Co., MLV & Co., and Tudor Pickering, that issued reports about it;

vii).    New company specific information was rapidly reflected in GGS's stock price; and

viii).    A designated market maker made a market in GGS's stock.


## NO SAFE HARBOR

182.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this

48

complaint. The specific misrepresentations of defendants pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Global who knew that those statements were false when made.

**COUNT I**

**Violation Of Section 11 Of The Securities Act**

**Against the Individual Offering Defendants, GGS, and UHY**

183.    Offering Plaintiffs repeat and reallege each and every allegation contained above.  This Count is asserted by Messrs. Gould and Rink on behalf of the Offering Class against the Individual Offering Defendants, GGS, and UHY.

184.    This count is predicated upon these Defendants' strict liability for making false statements of material fact in the Registration Statement.

185.    These Defendants were sellers, offerors, and/or solicitors of the purchasers of the common stock offered pursuant to the Registration Statement. These Defendants issued or caused to be issued the Registration Statement in connection with the Offering.

186.    The Registration Statement contained untrue statements of material fact. These Defendants' actions included soliciting Offering Plaintiffs and the Class by means of these Defendants' participation in the preparation of the Registration Statement containing the false statements

187.    GGS is the registrant for the Offering. The Individual Offering Defendants are

responsible for the contents of the Registration Statement based upon their status as directors of the Company or because they signed or authorized the signing of the Registration Statement on their behalf pursuant to Sections 11(a)(1)-(3) of the Securities Act. UHY certified the financial statements and report on internal controls included in the Registration Statement pursuant to Section 11(a)(4) of the Securities Act.

188.    These Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there were no material omissions of facts required to be stated therein in order to make the statements contained therein not misleading. None of these Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects.

189.    Offering Plaintiffs and the other members of the Offering Class did not know, nor could they have known, of the untruths or omissions contained in the Registration Statement.

190.    This claim is brought within one year after discovery of the untrue statements and omissions in the Registration Statement and within three years of the effective date of the Registration Statement.

191.    By virtue of the foregoing, Offering Plaintiffs and the other members of the Class are entitled to damages from the Defendants and each of them, jointly and severally.

## COUNT II

### Violations Of Section 15 Of The Securities Act

### Against Individual Offering Defendants

192.    Plaintiffs repeat and re-allege each and every allegation contained above.

193.    This count is asserted by the Offering Plaintiffs on behalf of the Offering Class against the Individual Offering Defendants, each of whom was a control person of GGS at the time of the Offering.

194.     For the reasons set forth above in the First Count, GGS is liable to Offering Plaintiffs and the members of the Offering Class who purchased GGS preferred shares in the Offering based on the untrue statements of material fact contained in the Registration Statement, pursuant to Section 11 of the Securities Act, and were damaged thereby.

195.     The Individual Offering Defendants were control persons of GGS by virtue of, among other things, their power and influence and exercised the same to cause GGS to engage in the acts described herein; their positions as senior officers of the Company; their day-to-day control of GGS's business affairs; their responsibility or control over the contents of the Registration Statement; and/or their control over the inaccurate statements of material fact contained in the Registration Statement.

196.     None of the Individual Offering Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they could have known of the material misstatements alleged herein.

197.     This claim was brought within one year after the discovery of the untrue statements and omissions in the Registration Statement and within three years after GGS Preferred Shares were sold to the Class in connection with the Offering.

198.     By reason of the misconduct alleged herein for which GGS is primarily liable, as set forth above, the Individual Offering Defendants are jointly and severally liable with and to the same extent as GGS pursuant to Section 15 of the Securities Act.

**COUNT III**

**Violation Of Section 10(b) Of The Exchange Act**

**And Rule 10b-5 Promulgated Thereunder**

**Against the Section 10(b) Defendants**

199.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

200.     This claim is brought on behalf of all persons who bought GGS stock at

artificially inflated prices, and suffered damages as a result, against the Section 10(b) Defendants.

201. Throughout the Class Period, the Section 10(b) Defendants, individually and in concert, directly or indirectly, engaged in a common plan, scheme and course of conduct described herein, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon plaintiff and the other members of the Class; made various false statements of material facts and omitted to state material facts to make the statements made not misleading to plaintiff and the other members of the Class; and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of GGS common stock.

202. The purpose and effect of these defendants' plan, scheme and course of conduct was to artificially inflate and maintain the price of GGS's common stock.

203. These defendants, who are GGS and its top officers, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other GGS personnel to members of the investing public, including Plaintiffs and the Class, and the securities analysts.

204. As a result of the foregoing, the market price of GGS's securities was artificially inflated during the Class Period. In ignorance of the falsity of these defendants' statements Plaintiffs and the other members of the Class relied, to their damage, on the statements described above and/or the integrity of the market price of GGS securities during the Class Period in purchasing GGS common stock at prices which were artificially inflated as a result of these Defendants' false and misleading statements.

205. Had Plaintiffs and the other members of the Class known of the material adverse information which these defendants did not disclose, they would not have purchased GGS common stock at the artificially inflated prices that they did.

206.   By virtue of the foregoing, these Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

207.   As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

208.   This action was brought within two years after the discovery of the untrue statements and omissions and within five years after their issuance.

## COUNT IV

### Violation Of Section 20(a) Of The Exchange Act

### Against the Officer Defendants and Degner

209.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

210.   This second claim under §20(a) of the Exchange Act is alleged against the Officer Defendants and Degner only, based on the primary violation of §10b and Rule 10b-5 by GGS.

211.   These Defendants acted as controlling persons of GGS within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading information disseminated to the investing public, these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. These Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

212.   In particular, each of these Defendants had direct and supervisory involvement

in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same,

213. As set forth above, GGS violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of GGS, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.

214. As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

215. This action is being brought within two years after the discovery of the untrue statements and omissions and within five years after their issuance.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(A) Determining that this action is a proper class action, certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(B) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(C) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(D) Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.

Dated: February 12, 2015

**THE ROSEN LAW FIRM, P.A.**

<u>/s/ Phillip Kim, Esq.</u>
Phillip Kim, Esq. (pro hac vice)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com

-and-

PAYNE MITCHELL LAW GROUP
R. Dean Gresham, Esq. (State Bar No. 24027215)
2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
Tel: (214) 252-1888
Fax: (214) 252-1889
Email: dean@paynemithcell.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed with the Court's electronic case filing (ECF) system on February 12, 2015, which sent notification of such filing to all counsel of record.

/s/ Phillip Kim