**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| BRITT MILLER AND BRET GOULD ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, | ) ) ) | Civil Action No. 14-cv-0708 |
| | ) | |
| Plaintiffs, | ) ) | **OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |
| v. | ) ) | |
| | ) | **CLASS ACTION** |
| GLOBAL GEOPHYSICAL SERVICES, INC., RICHARD A. DEGNER, P. MATHEW VERGHESE, RICHARD C. WHITE, JESSE PEREZ, III, DAMIR SKERL, MICHAEL C. FORREST, GEORGE E. MATELICH, STANLEY DE JONGH OSBORNE, KARL F. KURZ, MICHAEL S. BABORICH, and JOSEPH P. MCCOY. | ) ) ) ) ) ) ) ) ) ) ) | District Judge Vanessa D. Gilmore |
| | ) | |
| Defendants. | ) ) ) | |

TABLE OF CONTENTS

NATURE AND STATE OF PROCEEDINGS .................................................................. 1

I.   PRELIMINARY STATEMENT ................................................................................ 1

II.  FACTS ..................................................................................................................... 2

    A.   Claims. ............................................................................................................... 2

    B.   Defendants. ........................................................................................................ 3

    C.   Witnesses. .......................................................................................................... 4

    D.   GGS suffers from persistent and worsening liquidity deficiencies which it fraudulently conceals from the market ................................................................................ 4

       1.   GGS routinely violates payment terms of its contracts with its vendors. ........... 4

       2.   Item 303 requires GGS to disclose liquidity deficiencies. ................................. 5

       3.   The 2011 10-K omits to disclose material liquidity deficiencies and planned steps to address them in violation of Item 303 and misleadingly states that management believed operating cash flows and working capital were sufficient to pay obligations as they came due. 6

       4.   GGS goes back to living hand to mouth, and forces Degner to resign. .............. 6

       5.   The 2012 10-K omits to disclose material liquidity deficiencies and planned steps to address them in violation of Item 303 and misleadingly states that management believed operating cash flows and working capital were sufficient to pay obligations as they came due. 7

       6.   The Q3 2013 10-Q omits to disclose material liquidity deficiencies and management's plans to address them. ................................................................................... 10

       7.   The Registration Statement omits to disclose material liquidity deficiencies and management's plans to address them, which included the Offering itself. .............. 11

    E.   GGS's financial statements understate its net loss by 9% for its entire existence as a public company. ................................................................................................. 12

    F.   GGS has deficient internal controls over financial reporting. ............................ 13

    G.   Through a series of partial disclosures, the market learns that GGS's liquidity is materially deficient, that it has defective internal controls, and that its net income is overstated.14

    H.   GGS's allegedly cautionary disclosures. ........................................................... 15

III.  ISSUES TO BE RULED ON ................................................................................... 15

IV.  THE EXCHANGE ACT CLAIMS ARE WELL PLED. ........................................... 17

    A.   Defendants had a duty to disclose the material liquidity deficiencies they had discovered and the steps they had proposed to address them. ...................................... 17

       1.   Item 303(a) required disclosure that GGS was unable to pay its obligations as they came due. 17

       2.   Because Defendants chose to speak about GGS's liquidity, they had an obligation to disclose information necessary to make their statements non-misleading. ............... 18

    B.   Because Item 303 and Defendants' other statements required disclosure of material liquidity deficiencies and managements' plan to address them, the 2011 10-K contained false and misleading statements. ....................................................................... 19

i

1.   Item 303(a) requires that a company disclose that it is unable to pay its obligations as they come due. ................................................................................................. 19

2.   GGS's attempt to raise $50 million through a debt offering, ongoing at the time it filed the 2011 10-K, was an attempt to address its material liquidity deficiencies and was thus required to be disclosed. ................................................................................................... 23

3.   Defendants' statements that GGS would meet its operating cash needs from existing cash and operating cash flows was misleading or false because GGS was not meeting its operating cash needs and in fact planned an offering to address this deficiency ...................................... 25

C.   Because Item 303 and Defendants' other statements required disclosure of material liquidity deficiencies and managements' plan to address them, the 2012 10-K contained false and misleading statements. ................................................................................................ 26

1.   Late paying vendors ..................................................................................... 26

2.   The $50 million March 2012 debt offering ....................................................... 26

3.   The second, third, and fourth one-time tricks were attempts to address material liquidity deficiencies, and GGS was required to disclose them. .............................................. 27

4.   Defendants' statements that GGS would meet its operating cash needs from existing cash and operating cash flows was misleading or false because GGS was not meeting its operating cash needs and in fact planned three separate steps to address them ....................................... 27

D.   Defendants' miscellaneous arguments seeking to excuse their false statements are without merit.   27

1.   That GGS managed to stay afloat by selling off long-term capital assets and raising cash from selling securities is not evidence that the 2012 and 2013 Liquidity Claims were true. .... 27

2.   Defendants' unsupported claim that UHY authorized their false statements is not in the complaint and would not absolve them even if it were true. ..................................... 28

3.   Defendants' disclosures were inadequate. ...................................................... 29

4.   That the SEC purportedly chose not to charge Defendants is irrelevant. .................... 31

E.   White, Verghese, and Degner made the false statements with scienter ........................... 31

F.   The internal controls statements were false and made with scienter ............................. 34

V.   THE SECTION 11 CLAIMS ARE ADEQUATELY ALLEGED. ....................................... 35

A.   Because Item 303 and Defendants' other statements required disclosure of material liquidity deficiencies and managements' plan to address them, the Q3 2013 10-Q contained false and misleading statements. ................................................................................................ 36

B.   The Registration Statement contained materially false statements because the financial statements incorporated into the Registration Statement materially overstated GGS's net income. 37

C.   The Registration Statement contained materially false statements because it falsely claimed that GGS had adequate internal controls. ...................................................... 38

VI.   THE CLAIMS AGAINST UHY ARE WELL PLED ................................................. 39

ii

# TABLE OF AUTHORITIES

**Cases**

*Abrams v. Baker Hughes Inc.*,
    292 F.3d 424 (5th Cir. 2002) .................................................................. 33

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................. 16

*Beaver Cnty. Employees' Ret. Fund v. Tile Shop Holdings, Inc.*,
    No. CIV. 14-786 ADM/TNL, 2015 WL 927456 (D. Minn. Mar. 4, 2015) ................................ 18

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .............................................................................. 16

*Campton v. Ignite Rest. Grp., Inc.*,
    No. CIV.A. 4:12-2196, 2014 WL 61199 (S.D. Tex. Jan. 7, 2014) ............................ 16, 17, 21, 38

*Colony Ins. Co. v. Peachtree Constr., Ltd.*,
    647 F.3d 248 (5th Cir. 2011) .................................................................. 16

*Cornwell v. Credit Suisse Grp.*,
    689 F. Supp. 2d 629 (S.D.N.Y. 2010) .......................................................... 35

*Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*,
    454 F.3d 1168 (10th Cir. 2006) ............................................................... 41

*Dronsejko v. Thornton*,
    632 F.3d 658 (10th Cir. 2011) ................................................................ 41

*Dutton v. Harris Stratex Networks, Inc.*,
    270 F.R.D. 171 (D. Del. 2010) ................................................................ 40

*Endo v. Arthur Andersen & Co., S.C.*,
    163 F.3d 463 (7th Cir. 1999) (Posner, J.) .................................................... 40

*Escott v. BarChris Const. Corp.*,
    283 F. Supp. 643 (S.D.N.Y. 1968) ............................................................. 40

*Firefighters Pension & Relief Fund of City of New Orleans v. Bulmahn*,
    No. CIV.A. 13-3935, 2014 WL 6638793 (E.D. La. Nov. 21, 2014) ................................ 23

*Florida State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) .................................................................. 31

*Gebhardt v. ConAgra Foods, Inc.*,
    335 F.3d 824 (8th Cir. 2003) .................................................................. 38

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir.1999) ................................................................... 24

*Growe v. Bedard*,
    No. CIV.03-198-B-S, 2004 WL 2677216 (D. Me. Nov. 23, 2004) ................................... 28

*Harden v. Raffensperger, Hughes & Co.*,
    65 F.3d 1392 (7th Cir. 1995) .................................................................. 29

*Herman & MacLean v. Huddleston*,
   459 U.S. 375, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983) .................................................. 17

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000).............................................................................................. 34

*In re Am. Apparel, Inc. S'holder Litig.*,
   No. CV 10-06352 MMM JCGX, 2013 WL 174119 (C.D. Cal. Jan. 16, 2013) ........................ 31

*In re Baker Hughes Sec. Litig.*,
   136 F. Supp. 2d 630 (S.D. Tex. 2001) ................................................................................. 34

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
   763 F. Supp. 2d 423, 498 (S.D.N.Y. 2011) ......................................................................... 22

*In re Data Access Sys. Sec. Litig.*,
   103 F.R.D. 130 (D.N.J. 1984) .............................................................................................. 40

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
   235 F. Supp. 2d 549 (S.D. Tex. 2002) ........................................................................ 31, 40

*In re Global Crossing, Ltd. Sec. Litig.*,
   322 F. Supp. 2d 319 (S.D.N.Y. 2004) ................................................................................. 40

*In re LDK Solar Sec. Litig.*,
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) .............................................................................. 31

*In re Lehman Bros. Sec. & Erisa Litig.*,
   799 F. Supp. 2d 258 (S.D.N.Y. 2011) ................................................................................. 41

*In re MF Global Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013) .......................................................................... 22, 35

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014)............................................................................................. 18

*In re Pac. Gateway Exch., Inc., Sec. Litig.*,
   No. C-00-1211 PJH, 2002 WL 851066 (N.D. Cal. Apr. 30, 2002) ...................................... 23

*In re S. Pac. Funding Corp. Sec. Litig.*,
   83 F. Supp. 2d 1172 (D. Or. 1999)...................................................................................... 40

*In re Wachovia Equity Sec. Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011) ................................................................................. 40

*In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*,
   259 F.R.D. 490 (W.D. Wash. 2009)..................................................................................... 40

*In re WorldCom, Inc. Sec. Litig.*,
   352 F. Supp. 2d 472 (S.D.N.Y. 2005) ................................................................................. 40

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*,
   537 F.3d 527 (5th Cir. 2008)............................................................................................... 23

*J & R Mktg., SEP v. Gen. Motors Corp.*,
   No. 06-10201, 2007 WL 655291 (E.D. Mich. Feb. 27, 2007)............................................. 38

*Kunzweiler v. Zero.Net, Inc.*,

No. CIV.A.3:00-CV-2553-P, 2002 WL 1461732 (N.D. Tex. July 3, 2002) ................................. 17

*Litwin v. Blackstone Grp., L.P.,*
   634 F.3d 706 (2d Cir. 2011) ............................................................................................. 21

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,*
   416 F.3d 940 (9th Cir. 2005) ........................................................................................... 29

*Lormand v. US Unwired, Inc.,*
   565 F.3d 228 (5th Cir. 2009) ............................................................................... 18, 25, 30

*Lovick v. Ritemoney, Ltd.,*
   378 F.3d 433 (5th Cir. 2004) ........................................................................................... 15

*Matrixx Initiatives, Inc. v. Siracusano,*
   131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011) ........................................................... 16, 18, 21

*Meyer v. Jinkosolar Holdings Co.,*
   761 F.3d 245 (2d Cir. 2014) ............................................................................................ 30

*Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.,*
   523 F.3d 75 (1st Cir. 2008) ............................................................................................. 26

*Nordstrom, Inc. v. Chubb & Son, Inc.,*
   54 F.3d 1424 (9th Cir. 1995) ........................................................................................... 16

*Novak v. Kasaks,*
   216 F.3d 300 (2d Cir. 2000) ...................................................................................... 31, 33

*Oran v. Stafford,*
   226 F.3d 275 (3d Cir. 2000) ............................................................................................ 18

*Payne v. DeLuca,*
   433 F. Supp. 2d 547  (W.D. Pa. 2006) ....................................................................... 23, 34

*S. E. C. v. Arthur Young & Co.,*
   590 F.2d 785 (9th Cir. 1979) ........................................................................................... 41

*S.E.C. v. Conaway,*
   698 F. Supp. 2d 771, (E.D. Mich. 2010) .................................................................. passim

*S.E.C. v. Goldstone,*
   952 F. Supp. 2d 1060 (D.N.M. 2013) ....................................................................... 22, 24

*Shaw v. Digital Equip. Corp.,*
   82 F.3d 1194 (1st Cir. 1996) ................................................................................. 24, 29, 34

*Solow v. Citigroup, Inc.,*
   827 F. Supp. 2d 280 (S.D.N.Y. 2011) .............................................................................. 24

*Spitzberg v. Houston Am. Energy Corp.,*
   758 F.3d 676 (5th Cir. 2014) ........................................................................................... 33

*Steiner v. Southmark Corp.,*
   734 F. Supp. 269 (N.D. Tex.) .......................................................................................... 40

*Stratte-McClure v. Morgan Stanley,*
   776 F.3d 94 (2d Cir. 2015) ........................................................................................ 17, 18

v

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) ........................... 16

*Williams v. WMX Techs.*,
   112 F.3d 175 (5th Cir. 1997).................................................................... 16

*Yang v. Tibet Pharm., Inc.*,
   No. CIV. 14-3538 FSH, 2015 WL 730036 (D.N.J. Feb. 20, 2015) ............................. 40

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
   No. 13-2370, 2015 WL 1137142 (4th Cir. Mar. 16, 2015)........................... 34

**Statutes**

15 U.S.C. §78u-4 (b)(1)(B) .................................................................... 16

15 U.S.C.A. § 77k(a)(4) ........................................................................ 39

17 C.F.R. § 229.303(a)(1) ..................................................................... 19

AU §110.02 ....................................................................................... 29

**Other Authorities**

*In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*,
   Release No. 8350 , 2003 WL 22996757 (Dec. 19, 2003) ........................... 19

*Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures*,
   Release No. 6835, 1989 WL 1092885 (May 18, 1989) ............................. 19

**Rules**

FED. R. CIV. P. 9(b) ........................................................................... 16

## NATURE AND STATE OF PROCEEDINGS

This is a securities class action on behalf of (a) investors who bought GGS's common stock between February 22, 2012, and March 26, 2014, who bring claims under Section 10(b) of the Exchange Act; and (b) investors who bought GGS Preferred Stock in or traceable to GGS's Registration Statement, who bring claims under Section 11 of the Securities Act. All Defendants have filed pre-discovery motions to dismiss

## I.   PRELIMINARY STATEMENT

Some of Defendants' statements were forward-looking, and thus are only false if Defendants had actual knowledge that their statements were false, but others were not. For example, Defendants' omission of liquidity deficiencies identified by management and the steps management was taking to address them at the very moment they claimed the deficiencies did not exist was a misstatement of historical fact.

Defendants knew of GGS's material liquidity deficiencies, and of the steps it was taking to address them.  As set out below, the Complaint pleads seven different sources that informed them, including daily cash reports, reports from Todd Smith, a GGS executive responsible for accounts payable, reports of board meetings specifically convened to discuss and address GGS's liquidity deficiencies, and a transaction on terrible terms entered into solely to avoid a liquidity default on GGS's lending facility. Scienter is also clear because of the lengths Defendants went through to avoid disclosing their cash flow deficiencies, including falsely claiming that a desperate financing arrangement was a licensing deal, and then misstating that contract's purpose to a lending syndicate from which GGS sought financing.

Defendants make two arguments in response. First, they claim that their scienter is inadequately pled, claiming that the Complaint does not plead any communications or reports drawing their attention to GGS's liquidity deficiencies. As the paragraph above shows, their claim is false. Second, Defendants argue that their general disclosures adequately warned investors of GGS's liquidity deficiencies. But the law is clear that warnings that an event *might*

happen are not adequate if the event has *already* happened. Further, GGS's disclosures are anemic, amounting to no more than the disclosure that (a) GGS had a lot of debt, and (b) as a general matter, companies that cannot pay their debt "could" suffer a variety of bad consequences. GGS never disclosed that it was *already* unable to pay its obligations when they came due and was surviving only through the forbearance of its creditors.

During the Class Period, GGS sold $8.0 million in Preferred Shares to unsuspecting investors. The financial statements provided to these investors had three errors: (a) they did not disclose that GGS had overstated net income and pretended a 2011 year-end loss was a profit; (b) they understated GGS's net loss for the entire period from 2009 through 2013 by 9%; and (c) they claimed that GGS had adequate internal controls. All a plaintiff must show to recover under Section 11 is a materially false statement, yet Defendants concede that their claim that GGS's internal controls were adequate was materially false. The Section 11 claim must survive.

UHY certified both GGS' false financial statements and its misstatements about internal controls . UHY was acting in its role as an "accountant [] who has with his consent been named as having [] certified" the financial statements. 15 U.S.C. § 77k(a)(4). Section 11 punishes an auditor for any and all misstatements in the financial statements, not for its false audit opinions. UHY, however, claims that its "certification" – the term Congress chose to use – is no such thing, but only its opinion. UHY's novel reading thumbs its nose at Congress, and would reverse more than 50 years of cases that have held auditors liable for the false statements in GGS's financial statements (i.e., overstatements of net income) – and not merely for their false certification of those financial statements. In support of its dramatic and self-serving reinterpretation of the law governing its liability, UHY cites one single out-of-circuit district court opinion. Because it conflicts with every other district court decision – and there are many – other courts have ignored that decision; so should this Court.

## II. FACTS

### A. Claims.

This action is brought on behalf of: (a) all persons who bought GGS common stock

between February 22, 2012 and March 26, 2014, who bring claims under Section 10(b) of the Securities and Exchange Act (the "Exchange Act"); and (b) all persons who bought GGS Series A preferred stock (the "Preferred Stock") in or traceable to GGS's December 3, 2013 registration statement (the "Registration Statement") in an underwritten offering (the "Offering"), who bring claims under the Securities Act of 1933 (the "Securities Act"). ¶1.[1]

### B. Defendants.

GGS provides seismic data services to oil and gas companies. ¶25. GGS has two product lines: it offers non-exclusive licenses either from its existing library or from new seismic research (collectively, the "Multi-Client Library"), and it conducts seismic exploration for paying clients, providing them an exclusive license (the "Proprietary Services"). ¶41.

Defendant White was GGS's CEO, beginning October 2012, and Chair of GGS's board beginning January 2013. ¶27. Beginning 2009, Defendant Verghese was GGS's CFO until January 2014, when he was demoted to Chief Operating Officer. Verghese was a partner in Arthur Andersen's Houston Office until 2000, when he left it to work for one of that office's clients, the Enron Corporation, as a high level employee. ¶26. Verghese stayed at Enron until 2003. Verghese joined Lehman Brothers in May 2007, and stayed until December 2008, through its collapse amidst accusations of widespread fraud. ¶26. Defendant Degner was GGS's CEO until January 2013, and would have been fired had he not resigned. ¶87. Defendants Skerl, Forrest, Matelich, Osborne, Bahorich, Kurz, and McCoy were GGS directors, and signed the Registration Statement. ¶¶31-37. Defendant UHY was GGS's auditor, and certified its financial statements from 2009 to 2014. ¶39.

---

[1] Citations to ¶__ are to paragraphs of the Consolidated Amended Class Action Complaint for Violation of Securities Laws (the "Complaint"), Dkt. # 91. Citations to Stokes Dec. Ex. __ are to Exhibits to the Declaration of Peter Stokes, Dkt. # 94-1. Citations to GGS Def. __ are to pages of the GGS Defendants' Motion to Dismiss Amended Complaint, Dkt. # 94. Citations to Degner __ are to pages of the Motion to Dismiss All Claims in the Amended Complaint Against Defendant Richard A. Degner and Memorandum of Law In Support, Dkt. # 93. Citations to UHY _ are to pages of Defendant UHY LLP's Motion to dismiss Amended Complaint and Brief in Support, dkt. # 92.

### C.  Witnesses.

Initially hired by GGS as a full-time consultant in or around February/March 2011, soon after his hiring, Todd Smith was made Finance Manager of GGS's North American operations. ¶55. Mr. Smith's responsibilities included the North American accounts payable department and he was personally involved in approving payments to vendors. ¶56. He spoke with Verghese daily, with Degner regularly, and regularly made presentations at GGS Board of Directors meetings. ¶56. He remained at GGS until January 2013. ¶56. From September 2010 to August 2013, Marc Lawrence was a GGS Vice President, managing GGS's Gulf of Mexico project. ¶64. Bill Menger was Director of High Performance Computing with GGS from November 2010 to May 2013. ¶69.

### D.  GGS suffers from persistent and worsening liquidity deficiencies which it fraudulently conceals from the market

> *1.  GGS routinely violates payment terms of its contracts with its vendors.*

During Mr. Smith's tenure, GGS was almost continuously unable to pay its obligations as they came due. ¶58. GGS did not pay obligations to its vendors according to the terms of its contracts accounting for about 60-75% of its accounts payable. ¶60. Instead, GGS pushed off vendors while it scrambled to find the cash to pay them. Messrs. Smith, Lawrence, and Menger all report that vendors were typically paid several months late. ¶¶58, 67, 70. Every single day, Mr. Smith received between 20 and 40 calls from vendors demanding to be paid. ¶59. GGS's violation of contractual terms was so brazen that vendors continued to call Mr. Smith on his personal phone number after he resigned. ¶59. GGS never disclosed that it routinely violated the payment terms of its agreements with most of its vendors in order to remain afloat.

At any given time, GGS owed these vendors about $22-23 million in violation of contractual terms. ¶60. In the meantime, GGS would scramble to find the cash to satisfy its obligations, whether through collecting accounts receivable or through various one-off tricks like selling company assets, taking on additional debt, or selling GGS securities. ¶60. GGS had so

stretched its U.S. borrowing that it no longer had any credit, and its subsidiaries had to borrow in foreign jurisdictions to transfer money back to the GGS parent to pay its U.S. expenses. ¶61.

According to Mr. Smith, Verghese, White, and Degner each received daily cash reports. ¶62. The reports listed, among other things, balances on all accounts, including accounts payable. ¶62. Further, Mr. Smith and Jesse Perez dropped by Verghese's office at least daily, where they regularly discussed GGS's inability to pay its obligations as they came due. ¶63. Only Defendant Verghese could withdraw money from GGS's revolving credit facility. ¶63.

Mr. Lawrence also reports that GGS routinely broke its contractual obligations. ¶65. To conduct its business, GGS relied on vendors' forbearance of their legal rights to sue to enforce contracts. ¶65. When an invoice had been pushed off for as long as possible, Mr. Lawrence would hand carry the invoice to GGS accounts payable, and would cajole or beg the clerks to pay it. ¶65. A cash shortage once kept several of GGS's ships under Mr. Lawrence's command stranded until GGS paid an overdue invoice. ¶66. Mr. Menger confirms that vendors were typically paid late. Many vendors stopped providing goods or services to GGS entirely, including Staples, Inc. ¶70. Defendants were informed of the existence of the late-paying campaign, and they were the cause of it: for example, in a company-wide email sent January 8, 2013, White ordered all employees to "delay necessary spending until required." ¶71. GGS's overdue accounts payable stretched back years, and GGS owed $572,535.27 in *interest* on its franchise taxes owed to the State of Texas. ¶¶71-80. One creditor exchanged 197 emails with GGS, mostly about unpaid invoices, and called a GGS executive every month for almost two years to discuss overdue invoices. ¶74. GGS never disclosed to investors the true state of its liquidity deficiencies.

### 2.   *Item 303 requires GGS to disclose liquidity deficiencies.*

Item 303 of Regulation S-K ("Item 303") mandates disclosure of (among other things) liquidity deficiencies. ¶48 (*quoting* Item 303(a)(1)).[2] Item 303 also requires disclosure of the

---

[2] Regulation S-K, including Item 303, mandates disclosure in annual reports on Forms 10-K and quarterly reports on forms 10-Q. 51.

steps the company took or proposes to take to address the deficiency, if any, or that it has not decided on a remedy or is currently unable to address the deficiency. ¶50 (*quoting* Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures, Release No. 6835, 1989 WL 1092885 (May 18, 1989). To benefit companies, the SEC provides representative examples indicating necessary disclosure under Item 303; one of them is of a company that, like GGS, cannot pay its obligations as they come due. ¶51.

> 3. *The 2011 10-K omits to disclose material liquidity deficiencies and planned steps to address them in violation of Item 303 and misleadingly states that management believed operating cash flows and working capital were sufficient to pay obligations as they came due.*

When GGS filed the 2011 10-K, Defendants had identified material liquidity deficiencies, in that GGS was unable to pay its obligations as they came due. Indeed, Defendants had even planned steps to address it. On March 30, 2012, the same month it filed its 2011 10-K, GGS announced that it had closed a $50 million debt offering – i.e., the first one-time trick. ¶83. According to Mr. Smith, the true purpose of this offering was to get cash for GGS to pay its obligations as they came due – that is, address its material liquidity deficiencies. ¶83. But GGS did not disclose these liquidity deficiencies nor the steps it was taking to address them, and falsely represented that "[w]e believe that our current working capital and projected cash flow from operations will be sufficient to meet our capital requirements for our existing operations for the next 12 months." ¶52. These statements were false and misleading because, among other things, (a) they omitted information Item 303 required to be disclosed; and (b) they omitted material information necessary to make the affirmative statement non-misleading, namely that GGS was not paying its obligations as they came due.

> 4. *GGS goes back to living hand to mouth, and forces Degner to resign.*

GGS had spent the whole $50 million by June 2012, and was back to being unable to pay

its debts as they came due. ¶85. The board held a meeting to prepare an alternative plan to address GGS's liquidity deficiencies. ¶85. The Board hired Defendant White to draft a report to determine what had gone wrong. ¶86. White concluded that Degner had spent too much money and had lost control over GGS. ¶86. The board initially decided to fire Degner, but instead allowed him to resign. ¶87. Mr. Smith was fired, but chose his own replacement, Wade Hopwood. ¶88. Mr. Smith stayed in touch with Mr. Hopwood. ¶106.

      5.   *The 2012 10-K omits to disclose material liquidity deficiencies and planned steps to address them in violation of Item 303 and misleadingly states that management believed operating cash flows and working capital were sufficient to pay obligations as they came due.*

Like the 2011 10-K, GGS' 2012 10-K neither disclosed material liquidity deficiencies nor the steps GGS had taken or planned to take to address them, and falsely stated that "[w]e believe that our current working capital and projected cash flow from operations will be sufficient to meet our capital requirements for our existing operations for the next 12 months." ¶52. These statements were false and misleading because, among other things, (a) they omitted information Item 303 required to be disclosed; and (b) they omitted material information necessary to make the affirmative statement non-misleading, namely that GGS was not paying its obligations as they came due; and (c) Defendants White and Verghese did not believe, and had no reasonable grounds to believe, that GGS's working capital and projected cash flow would be sufficient to meet its capital requirements for the next 12 months. ¶54.

By this time, GGS's liquidity deficiencies had worsened, and Defendants proposed more drastic steps to meet GGS's deficiencies. At the time the 2012 10-K was published, GGS was actively negotiating the second, third, and fourth one-time tricks, one of which was necessary to allow GGS to survive through the end of March 2013.

      i.   GGS plans to sell Autoseis (second one-time trick).

After his termination, Degner was made CEO of Autoseis, Inc., a GGS subsidiary from

which it sources a key piece of hardware used in seismic mapping. ¶89; Stokes Exh. 4 at 9. The parties contemplated that Degner would try to buy Autoseis from GGS. Mr. Smith left GGS with Degner and assisted in his planned purchase of Autoseis. ¶89. To prepare the bid, Degner and Mr. Smith formed Geophysical Technology, Inc. ("GTI"), signed an NDA, and obtained backing from prominent private equity firm Silver Lake, which has more than $23 billion in assets under management. ¶89.

The parties negotiated a sale price of $200 million, but the agreement also provided that GGS would buy $80 million of equipment from Autoseis over the next four years. ¶90. For GGS, the purpose of the agreement was to provide it with enough cash to fund its operations, particularly over the next year. ¶90. As part of their final due diligence, GGS provided Silver Lake and GTI with non-public information about GGS's actual cash flows and liquidity, and cash flow projections until the end of 2015. ¶91. This non-public information made it obvious to Silverlake that even with an extra $200 million, GGS would not survive for long, much less for the next four years, and would not survive long enough to buy anything close to $80 million of product from Autoseis. ¶91. Silver Lake provided a letter to GGS explaining that GGS's precarious financial condition called into question the basis of the deal, and fruitlessly sought to renegotiate. ¶92.

ii. GGS obtains $25 million in financing from sale of interest in Multi-Client Library which Defendants' public statements disguise as a licensing and marketing joint venture (third one-time trick).

In early 2013, GGS determined that it did not have enough cash to survive past March 28 or 29, 2013. GGS thus decided to sell off its assets for immediate cash. GGS offered a 43%, 40-year interest in GGS's Multi-Client Library North American revenues. ¶97. The interest survived bankruptcy and could not be terminated. *Id*. GGS offered the interest to a joint venture created by Seismic Exchange, Inc., and Geophysical Pursuit, Inc. ("SEI-GPI"), the eventual buyer. ¶93. But GGS also offered the same interest to GTI, which had no complementary multi-client

library, nor any ability to cross-sell or promote GGS's Multi-Client Library. ¶98. According to Mr. Smith, GGS's only concern in the transaction was to secure a large amount of money by March 28 or 29, 2013. ¶98. Mr. Menger confirms that Defendant White was the driving force behind the SEI-GPI agreement, which he reports was a "creative" agreement whose purpose was to provide GGS with liquidity. ¶70. Indeed, in the bankruptcy proceeding, GGS admitted that the purpose of the sale was to "raise cash necessary to meet maturing borrowing commitments." ¶96.

To conceal its precarious financial condition from investors, GGS issued a press release representing that the agreement was a licensing deal whose purpose was to enhance marketing of GGS's Multi-Client Library. ¶93. On a conference call taking place on April 15, 2013, GGS also stated that the SEI-GPI deal "[is] a licensing a distribution deal, kind of combining their network with our assets." ¶95.

 GGS's press release misstated its purpose, and also concealed two material terms: that GGS received an immediate $25 million payment, and that the "licensing" rate was 43% of all future revenue, or at least 28 percentage points above market rate, as well as the 40 year duration of the interest and its survival in bankruptcy – which is equivalent to a sale. ¶97.

GGS also omitted to file the SEI-GPI Agreement with the SEC, in violation of SEC regulations. ¶¶99-102. Investors were alarmed when the above-market rate licensing fees were partially disclosed on August 5, 2013 and GGS's share price declined 19%. ¶11. And even GGS's auditors were alarmed by the deal, as they could discern no economic purpose for the agreement as a licensing agreement, since the customer had no need for the data. ¶103.

      iii. GGS attempts to purchase a competitor's unprofitable division so it can double dip on financing (fourth one-time trick).

A GGS competitor, CGG, had for years maintained an unprofitable land division. It sought to sell it. ¶104. GGS and CGG began negotiations in early 2013. ¶105. GGS was not interested in CGG's land division's operations, and indeed, did not believe it could turn a profit from the operations. ¶106. What attracted GGS was that CGG was willing to finance GGS'

acquisition. ¶106. GGS planned to both obtain CGG's $120 million of financing for the acquisition and issue $120 million of new debt, falsely claiming the new debt proceeds would be used to finance the acquisition. ¶106. GGS would thus effectively secure $120 million in new financing to fund its general operations. ¶106. Negotiations fell apart in December 2013/January 2014. ¶106.

6.   *The Q3 2013 10-Q omits to disclose material liquidity deficiencies and management's plans to address them.*

As 2013 progressed, GGS's liquidity continued to deteriorate. Yet none of GGS's 10-Qs disclosed any liquidity deficiencies, or any of the many plans GGS undertook to address them. ¶51. By the time the 2013 10-Q was filed on November 12, 2013, there had been two more. The 2013 10-Q was false and misleading for all the reasons disclosed above, but was also misleading for failing to disclose the following two attempts to address liquidity deficiencies – the two one-time tricks.

i.   GGS obtains the Tennenbaum Facility by making false and misleading statements to the lenders (fifth one-time trick).

On September 30, 2013, GGS entered into a financing agreement with lenders led by Tennenbaum Capital Partners, LLC, a sophisticated provider of debt financing with about $5 billion in assets under management (the "Tennenbaum Facility"). ¶¶107-108. Tennenbaum has claimed in court filings that GGS made misrepresentations in obtaining the financing: (a) GGS falsely told Tennenbaum that it paid market rates under the SEI-GPI agreement (second one-time trick), though it actually paid at least 28 percentage points more than market; (b) having learned its lesson from Silver Lake, GGS provided Tennenbaum with materially overstated cash flow projections. ¶110.

ii.   GGS sells assets to obtain an advance on funds it was owed solely to avert a default (sixth one-time trick).

The Tennenbaum facility imposed liquidity covenants. In October 2013, GGS determined that if it made its legally obligated debt payments on November 1, it would not have enough cash

left to meet the Tennenbaum facility's liquidity covenants. ¶112. So GGS contributed additional valuable Multi-Client Library assets to SEI-GPI in return for an immediate $5 million *advance* on payments under the SEI-GPI agreement. ¶112.  This was equivalent to a sale of 43% of those additional assets merely for an advance on monies that would ultimately be paid to GGS under the agreement anyway. Without this desperate "sale" of its assets at loan-shark prices, GGS would have defaulted on its debt. *Id*. GGS never disclosed either the advance or what it had to pay to get it. ¶113.

The October 2013 "sale" was at such a fire-sale price that it drove GGS to impair the value of its Multi-Client Library by $75.2 million in Q4 2013. Stokes Dec. Ex. E at 5.

> 7. *The Registration Statement omits to disclose material liquidity deficiencies and management's plans to address them, which included the Offering itself.*

In mid-December 2013, GGS sold $8.0 Preferred Shares pursuant to the Registration Statement. ¶114. The Registration Statement incorporated by reference the 2011 10-K, the 2012 10-K, and each of the Q1-3 2013 10-Qs, including the financial statements found therein. ¶46. Every Defendant except UHY and Degner signed the Registration Statement. ¶46. UHY certified the financial statements contained in or incorporated by reference into the Registration Statement. ¶39. UHY also certified its evaluation of GGS's internal controls over financial reporting which was incorporated into the Registration Statement. ¶39. UHY consented to the incorporation of both. *Id.* The Preferred Shares sold in the offering were junior to the Tennenbaum facility on which GGS had nearly defaulted slightly more than a month earlier. The purpose of the Offering was to raise enough money to avoid an event of default at year's end.

The Registration Statement did not disclose any material liquidity deficiencies, nor any plans of GGS's to address them. The Registration Statement was thus false and misleading for all the same reasons as the Q3 2013 10-Q, but was also required to disclose that GGS's efforts to address material liquidity deficiencies included the Offering in which investors bought preferred shares. The Registration Statement was also false because the financial statements understated

the magnitude of its net loss, as described below.

**E.  GGS's financial statements understate its net loss by 9% for its entire existence as a public company.**

In October 2013, Defendant Verghese sent all GGS employees alerting them that GGS had instituted internal controls. ¶158. In the very next audit, it uncovered six separate material errors in its financial statements dating back to 2009 – GGS's entire history as a public company (the "Restatement"). ¶165. The errors included such simple and obvious items as recording revenue in violation of company policy and accruing for taxes paid. ¶165. The Restatement showed that GGS had overstated net income and understated its net loss by material amounts each period from 2009 to 2012:

| PERIOD | AS REPORTED | AS RESTATED | Amount Overstated/ (Understated) | Percentage Overstated/(Understated) |
|---|---|---|---|---|
| YEAR ENDED DEC. 31, 2012 | $ (13,331) | $ (15,586) | $ (2,255) | (16.92%) |
| YEAR ENDED DEC. 31, 2011 | $ 5,662 | $ 4,933 | $ (729) | (12.88%) |
| YEAR ENDED DEC. 31, 2010 | $ (39,716) | $(42,161) | $ (2,445) | (6.16%) |
| YEAR ENDED DEC. 31, 2009 | $ 445 | $ (5,331) | $ (5,776) | (1297.98%) |
| THREE MONTHS ENDED SEPTEMBER 30, 2013 | $ (24,199) | $ (28,443) | $ (4,244) | (17.54%) |
| THREE MONTHS ENDED JUNE 30, 2013 | $ (15,786) | $ (15,367) | $ 419 | 2.65% |
| THREE MONTHS ENDED MARCH 31, 2013 | $ (11,542) | $ (11,086) | $ 456 | 3.95% |
| Cumulative | $ (98,192) | $ (107,710) | $ (9,673) | (9.78%) |

*Source:  ¶133.*

### F.  GGS has deficient internal controls over financial reporting.

Both GGS's Proprietary Services and its Multi-Client Library are cash intensive, and it faces long delays between expenditures and recoupment of its costs. ¶162. Yet when GGS bid for contracts, it did not take into account its actual capability to fund the working capital needed to perform the contracts. ¶161. Indeed, GGS never assessed liquidity to determine whether it had enough cash to satisfy its obligations. ¶160. GGS thus did not know whether it would have enough cash to live up to its commitments if its bids were successful. ¶161.

GGS's other internal control deficiencies were substantial. GGS had between 1,200 and 1,667 employees between 2013 and 2010. ¶153. Further, GGS's operations take place throughout the world, including in places that have business climates very different from those of the United States, including Libya, Iraq, Venezuela, Nigeria, and Russia. ¶154. Unusually among public companies, until late 2013, GGS did not have an internal audit department or dedicated internal audit staff.  ¶157. And GGS only hired a Chief Accounting Officer or Financial Reporting Manager after it was forced to restate its financial statements at the close of the Class Period. ¶157.

Degner and Verghese certified in the Q1 and Q2 2012 10Q that GGS's internal controls over financial reporting were adequate. Both also filed SOX certifications attached to each of the 10-Qs, claiming under penalty of perjury that they had (a) designed and (b) evaluated internal controls over financial reporting, and that based on their evaluations, the internal controls were adequate. ¶¶142, 143a. White and Verghese made substantially identical statements and SOX certifications in connection with the Q3 2012 and Q1-3 2013 10-Qs. ¶143. White and Verghese also claimed that the internal controls were adequate. ¶145.

In the 2012 10-K, Defendants GGS, White, and Verghese, among others, claimed that they had designed and evaluated internal controls over financial reporting, and that the controls were adequate. ¶144. For its part, UHY claimed it had audited GGS's internal controls over financial reporting, and that it "maintained, in all material respects, effective internal control over financial reporting as of December 31, 2012, based on criteria established in Internal

13

Control – Integrated Framework issued by COSO." ¶145.

These statements were false because GGS did not maintain adequate internal controls. GGS received much of its Proprietary Services revenues from competitive bidding projects. GGS never determined whether it had enough cash to follow through on the bids before making them. ¶160. Thus, if its bid was successful, GGS would take on obligations it would not be able to keep. ¶161.

> **G. Through a series of partial disclosures, the market learns that GGS's liquidity is materially deficient, that it has defective internal controls, and that its net income is overstated.**

On August 5, 2013, after close of trading, GGS issued a press release announcing its Q2 2013 results (the "Q2 2013 PR"). ¶168. The Q2 2013PR revealed to the market that GGS had recorded commissions of $5.9 million from the third one-time trick for the three months ended June 30, 2013, against total revenues from the Multi-Client Library of $36.6 million.[3] ¶168. This news shocked the market, as it suggested that GGS's commission rates were in excess of market rates. ¶168. Over the next two trading days, GGS's stock price fell from $4.21 to $3.41, or about 19.0%, damaging investors. ¶169.

On November 18, 2013, after close of trading, GGS issued a press release announcing that it had filed a registration statement on Form S-3 to sell up to $300 million of securities. ¶170. The markets were dismayed that GGS sought new funds so soon after closing the Tennenbaum Facility. ¶170. GGS's stock price fell from $1.91 to close at $1.50, or 21.5%, damaging investors. ¶170.

In February 2014, GGS awarded $3.5 million in cash bonuses to employees. ¶163.

On March 17, 2014, after close of trading, GGS announced: (1) that its financial statements going back to 2009 needed to be restated, eventually resulting in the Restatement; (b) that its internal controls over financial reporting had been inadequate as of at least December 31,

---

[3] $36.6 million includes revenues from Multi-Client Library assets not covered in the third one-time trick – everything outside North America.

2013; (c) that it would be unable to timely file it 2013 10-K, breaching a covenant in the Tennenbaum Facility; and (d) that it had retained "financial advisors to assist [in] strategic alternatives [for] an orderly resolution of our liquidity situation, including any necessary restructuring." ¶164. The next trading day, GGS's stock price fell from $1.17 to $0.46, or about 61%, damaging investors. ¶172. Then, on March 25, after close of trading, GGS announced that it had filed for bankruptcy. ¶173. The next trading day, its stock price fell from $0.47 to $0.21, or about 55%. ¶173.

### H. GGS's allegedly cautionary disclosures.

In the 2011 and 2012 10-Ks, GGS disclosed that it had substantial long-term debt. Stokes Dec. Ex. C at 22-23; Ex. D at 23-25. GGS then stated that substantial debt in general can have a variety of bad consequences, and then listed them - for example putting it at a competitive disadvantage to those of its competitors with less debt, require it to make large interest and principal payments, limit its ability to borrow funds, and increase its vulnerability to economic conditions. Ex. C at 22; Ex. D at 23-24. GGS also disclosed restrictive covenants in its Revolving Credit Facility, and that if lenders foreclosed on it, they will have the right to sell the assets foreclosed on. Ex. C at 22-23; Ex. D at 24. Finally, GGS disclosed that it needed to produce cash from its operations to service its debt, which would depend on factors beyond its control. Ex. C at 23; Ex. D. at 25. GGS made no negative disclosures about any of: (a) its short-term debt; (b) its ability to pay its obligations as they came due; (c) its liquidity over the 12 months following issuance of the 2011 and 2012 10-Ks; or (d) its past material liquidity deficiencies, and what management had done to remedy them. Most importantly, GGS never disclosed that it could not pay its obligations as they came due and was only able to stay afloat through the forbearance of its creditors.

### III.      ISSUES TO BE RULED ON

On a motion to dismiss, all allegations in the complaint must be accepted as true and construed in the light most favorable to the non-moving party, including drawing all reasonable inferences in the plaintiff's favor. *Lovick v. Ritemoney, Ltd.,* 378 F.3d 433, 437 (5th Cir. 2004).

"To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). In making this determination, the Court should "liberally construe the complaint in favor of the plaintiff." *Colony Ins. Co. v. Peachtree Constr., Ltd.,* 647 F.3d 248, 252 (5th Cir. 2011). A complaint need not "plead evidence" without the benefit of discovery in order to survive a motion to dismiss. *Nordstrom, Inc. v. Chubb & Son, Inc.,* 54 F.3d 1424, 1433 (9th Cir. 1995). Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556. "[M]otions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Campton v. Ignite Rest. Grp., Inc.*, No. CIV.A. 4:12-2196, 2014 WL 61199, at *4 (S.D. Tex. Jan. 7, 2014).

The elements of a §10(b) claim for securities fraud are "(1) a material misrepresentation or omission by the defendant ["falsity"]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317, 179 L. Ed. 2d 398 (2011) (internal quotation omitted). Defendants only contest falsity and scienter.

Claims sounding in fraud must comply with the pleading requirements under Federal Rule of Civil Procedure 9(b).  Fed. R. Civ. P. 9(b).  Averments of fraud must state the "who, what, when, where, and how" of the misconduct charged.  *Williams v. WMX Techs.*, 112 F.3d 175, 178 (5th Cir. 1997). Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), to allege an actionable misrepresentation or omission under § 10(b) of the Exchange Act, a plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. §78u-4 (b)(1)(B).

On scienter, first, the Court accepts all well-pled facts as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 2510, 168 L. Ed. 2d 179 (2007). Second, the Court considers the complaint holistically in its entirety as well as matters of which a

court may take judicial notice. *Id.* at 322-23. Third, the Court determines whether the pleaded facts give rise to a strong inference of scienter - that is, an inference that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

"[Section 11] was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381, 103 S. Ct. 683, 687, 74 L. Ed. 2d 548 (1983). The elements of a claim for violation of Section 11 of the Securities Act, which are "light," are "(1) an omission or misrepresentation of (2) a material fact required to be stated or necessary to make other statements made not misleading." *Campton v. Ignite Rest. Grp., Inc.*, No. CIV.A. 4:12-2196, 2014 WL 61199, at *5 (S.D. Tex. Jan. 7, 2014).

## IV. THE EXCHANGE ACT CLAIMS ARE WELL PLED.

### A. Defendants had a duty to disclose the material liquidity deficiencies they had discovered and the steps they had proposed to address them.

A defendant's omission is misleading if the defendant has a duty to disclose the information that was omitted. A duty to disclose arises when (1) a corporate insider trades on material information; (2) the information is necessary to make other disclosures not misleading; or (3) statutes or regulations demand disclosure. *Kunzweiler v. Zero.Net, Inc.*, No. CIV.A.3:00-CV-2553-P, 2002 WL 1461732, at *10 (N.D. Tex. July 3, 2002).

#### 1. *Item 303(a) required disclosure that GGS was unable to pay its obligations as they came due.*

The Circuit courts "have long recognized that a duty to disclose under Section 10(b) can derive from statutes or regulations that obligate a party to speak." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015). "Item 303 of Regulation S–K imposes disclosure requirements on companies filing SEC-mandated reports, including quarterly Form 10–Q reports." *Id.* at 101. Therefore, the Second Circuit held, "[i]tem 303's affirmative duty to disclose in Form 10–Qs can serve as the basis for a securities fraud claim under Section 10(b)."*Id.*; *accord Beaver Cnty. Employees' Ret. Fund v. Tile Shop Holdings, Inc.*, No. CIV. 14-786

17

ADM/TNL, 2015 WL 927456, at *7 (D. Minn. Mar. 4, 2015) (considering opposing opinion, and finding *Stratte-McClure* persuasive). A mere violation of Item 303 does not establish material falsity, because the SEC's interpretation of some parts of Item 303 requires companies to disclose information that is not material under Section 10(b). *Id.* at 102. But this just means that the plaintiffs must show that the information whose disclosure is required by Item 303 "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318, 179 L. Ed. 2d 398 (2011) (internal quotation omitted).[4]

> ### 2. Because Defendants chose to speak about GGS's liquidity, they had an obligation to disclose information necessary to make their statements non-misleading.

Disclosure is also necessary "to make ... statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx*, 131 S. Ct. at 1321. "Once the defendants engage[s] in public discussions concerning [a subject], they have a duty to disclose a 'mix of information' that is not misleading." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248-49 (5th Cir. 2009) (internal quotations omitted). A fact is material if it significantly alters the "total mix" of information available. *Matrixx*, 131 S. Ct. at 1318. Thus, by speaking on a subject, Defendants undertake an obligation to disclose all material facts that relate to it. *Lormand*, 565 F.3d at 248. "The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action." *Lormand*, 565 F.3d at 248.

Here, Defendants stated "We believe that our current working capital [and] projected

---

[4] The Third Circuit similarly held that (a) Item 303 creates an obligation to disclose information but (b) plaintiffs must show that the information is material under Section 10(b), not merely that Item 303 requires its disclosure. *Oran v. Stafford*, 226 F.3d 275, 287 (3d Cir. 2000). Misreading *Oran*, the Ninth Circuit held that Item 303 does not create a duty to disclose. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014). The *NVIDIA* court never explained why Item 303 *- alone among the SEC's rules* – did not create a duty to disclose, even though background law provides that the SEC's rules create a duty to disclose.

cash flow from operations will be sufficient to meet our capital requirements for our existing operations for the next 12 months." They were obligated to disclose that GGS was not able to pay its obligations as they came due.

> **B. Because Item 303 and Defendants' other statements required disclosure of material liquidity deficiencies and managements' plan to address them, the 2011 10-K contained false and misleading statements.**

>> *1. Item 303(a) requires that a company disclose that it is unable to pay its obligations as they come due.*

Item 303(a) requires disclosure of any material liquidity deficiencies, coupled with "the course of action that the registrant has taken or proposes to take to remedy the deficiency." 17 C.F.R. § 229.303(a)(1). The SEC's guidance expressly provides that "[w]here a material deficiency in short[5] or long-term liquidity has been identified, the registrant should disclose the deficiency, as well as disclosing either its proposed remedy, that it has not decided on a remedy, or that it is currently unable to address the deficiency." *Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures*, Release No. 6835, 1989 WL 1092885, at *7 (May 18, 1989) (quoted in ¶50).[6] Further, "[m]erely stating that a company has adequate resources to meet its short-term and/or long-term cash requirements is insufficient unless no additional more detailed or nuanced information is material." *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*, Release No. 8350 , 2003 WL 22996757, at *13 (Dec. 19, 2003). The SEC's sample of necessary disclosure shows that GGS's

---

[5] In the same release, the SEC defines "short-term liquidity" to mean "liquidity over the next 12 months." *Id.*

[6] Courts interpreting Item 303 regularly cite this particular release. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012); *S.E.C. v. Conaway*, 698 F. Supp. 2d 771, 816 n. 19 (E.D. Mich. 2010).

inability to pay its obligations as they come due must be disclosed:

> The Company frequently has not been able to make timely payments to its trade and other creditors. As of year-end and as of February 29, 1988, the Company had past due payables in the amount of $525,000 and $705,000, respectively. Deferred payment terms have been negotiated with most of these vendors. However, certain vendors have suspended parts deliveries to the Company. As a result, the Company was not always able to make all shipments on time, although no orders have been cancelled to date. Were significant volumes of orders to be cancelled, the Company's ability to continue to operate would be jeopardized. The Company is currently seeking sources of working capital financing sufficient to fund delinquent balances and meet ongoing trade obligations.

*Id.* (quoted in ¶51).

Evidence that the management discussion and analysis section ("MD&A") of a quarterly report failed to disclose "a material liquidity deficiency that involved the delay of vendor payments to remedy that deficiency" supports a finding that executives committed securities fraud in violation of Section 10(b). *S.E.C. v. Conaway*, 698 F. Supp. 2d 771, 797-98, 870 (E.D. Mich. 2010) (denying motion to set aside jury verdict that MD&A section was misleading because company did not disclose that it was slow-paying vendors). And Item 303 requires disclosure not just of future liquidity deficiencies, but also of historical liquidity deficiencies. *Id.* at 816, 818-19.

During the Class Period, as a matter of course, GGS delayed payments to vendors for several months beyond their due date. ¶¶58, 67, 70. GGS's vendors, like Ms. Radulic, definitely did not consent, and in fact sent GGS numerous emails and phone calls demanding payment. Todd Smith received 20-40 such calls daily. At any given time, GGS would pay about 60-75% of its vendors late in breach of its agreements, amounting to something like $22-23 million per month during Mr. Smith's tenure. The late payments hurt its relationship with vendors, many of whom – including Staples, Inc. – cut it off. Others withheld services until they were paid, like the ship refuelers who left GGS's fleet stranded until it paid its bills. The late payments existed throughout 2011, and so had to be disclosed as historical material liquidity deficiencies in the 2011 10-K.

Item 303 required Defendants to disclose GGS's practice of slow-paying vendors. *Conaway*, 698 F. Supp. 2d at 797-98. GGS, just like Kmart in *Conaway*, could not timely pay its vendors, and concealed the liquidity deficiency and slow-paying of vendors as a means of obtaining additional financing. *Id.* at 878. But Item 303 required disclosure of the liquidity deficiency, as well as the means GGS was using to address that deficiency, e.g. slow-paying vendors and the seven one-time tricks.

A fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318, 179 L. Ed. 2d 398 (2011). Courts should only dismiss complaints on materiality if the statements are "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." *Campton v. Ignite Rest. Grp., Inc.*, No. CIV.A. 4:12-2196, 2014 WL 61199, at *7 (S.D. Tex. Jan. 7, 2014).

To determine materiality, courts look at both qualitative and quantitative factors. Courts will presume materiality if the misstatement is above a 5% threshold. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 713 (2d Cir. 2011). At any given time in 2011, about $22-23 million of GGS's accounts payable were overdue – about 18.3% of GGS's total liabilities of $120 million as of December 31, 2011. Stokes Dec. Ex. C at F-5. The amount is thus presumptively material.

Defendants claim that the late pay disclosures required by Item 303 were immaterial because GGS's financial statements purportedly accurately set out the dollar amount of its whole accounts payable. GGS Def. at 14; Degner at 9. In fact, though, GGS's payables did not increase during the Class Period:

| 2010 (as originally filed) | 2011 (as originally filed) | 2012 (as originally filed) | 2013 |
|---|---|---|---|
| $44.1 million | $55.8 million | $42.6 million | $48.7 million[7] |

---

[7] Source: 2011, 2012, and 2013 10-Ks.

This nicely illustrates the problem with GGS's disclosures. The dollar amount of GGS's accounts payable does not let investors determine whether GGS is paying them according to their terms or if GGS' delayed payment strategy amounts to a material change in an internal source of liquidity, e.g. GGS was using the slow-pay practice as an undisclosed, yet precarious, financing mechanism. *Conaway*, 698 F. Supp. 2d at 878. The issue was not the level of payables, it was that GGS never could pay them.

Further, the reason for the level of GGS's payables is indecipherable from its financial statements. Perhaps GGS's contracts had long payment terms. Perhaps GGS renegotiated contracts with its vendors. Investors' view of GGS as an investment would have been significantly altered if GGS had disclosed the real reason: that it was only able to stay afloat by delaying payments to its vendors by 2-3 months, i.e., it was cash-flow insolvent, threatening to disrupt GGS' operations. Companies that are insolvent can, like GGS, end up in bankruptcy, wiping out shareholders. Even if they avoid bankruptcy, they must sell valuable assets or take on debt to do so, compromising their long-term success to stay in business in the short term. In the meantime, angry vendors withhold shipments until their invoices are paid, like the ship refuelers who stranded GGS's fleet, or cut the company off entirely, like Staples and others did to GGS. Thus, courts routinely hold that liquidity – separate and apart from the accuracy of financial statements – is material. *Conaway*, 698 F. Supp. 2d at 878 (holding that defendants had violated Section 10b(5) in scheme "[a] central pillar [which] was to mask the fact that [the company] did not have the cash it needed to pay debts as they came due"); *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013) (claim that company had "strong liquidity position" materially misleading in light of "strain" on liquidity, even though financial statements accurately set out its financial position); *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 498 (S.D.N.Y. 2011) (similar); *S.E.C. v. Goldstone*, 952 F. Supp. 2d 1060, 1245 (D.N.M. 2013) ("[a] reasonable person would consider [] important whether [company's] operating cash was sufficient to meet continued margin calls.")

Defendants cite three cases, none of which are apposite. GGS Def. 13-14. Applying Ninth Circuit law, the first decided that Item 303 did not impose a duty to disclose, an argument Defendants do not pursue here, and which is anyway addressed at IV. A. 1. above. *In re Pac. Gateway Exch., Inc., Sec. Litig.*, No. C-00-1211 PJH, 2002 WL 851066, at *13 (N.D. Cal. Apr. 30, 2002).[8] In the second, the plaintiffs ignored the defendants' argument that even if Item 303 required disclosure, Section 10(b) did not, and thus the court dismissed because plaintiffs failed to plead there was a duty to disclose under Section 10(b). *Payne v. DeLuca*, 433 F. Supp. 2d 547, 574 n.25 (W.D. Pa. 2006). In addition, the *Payne* court held that company had no duty to disclose because it actually had not broken any contractual agreements. *Id.* at 597-98. Plaintiffs here demonstrate an independent duty to disclose for two reasons, see Section IV. A. 1. and 2., above, and also that GGS was in breach of its contractual agreements. The third case is a district-level opinion from the Fifth Circuit, and it explicitly held that Item 303 creates a duty to disclose for which investors can seek redress under Section 10(b). *Firefighters Pension & Relief Fund of City of New Orleans v. Bulmahn*, No. CIV.A. 13-3935, 2014 WL 6638793, at *19 (E.D. La. Nov. 21, 2014). But that case held that the defendants had discharged their duty by ***disclosing*** that the company was "work[ing] with certain vendors to extend out the timing of certain payments to preserve cash," and the plaintiffs had not even alleged that the company was breaking its contractual agreements with these vendors (rather than paying late with the vendors' consent, exactly as it disclosed). *Id.* at *19. In *Shaw*, the issue was scienter – the plaintiffs had not pled facts suggesting that defendants knew of the slow pay. *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 542 (5th Cir. 2008). Thus, it has nothing to say to falsity.

*2. GGS's attempt to raise $50 million through a debt offering,*

---

[8] *Pacific Gateway* is additionally distinguishable because the court ruled that all the challenged statements were forward-looking statements and that they were not actionable even if they were knowingly false, applying Ninth Circuit law contrary to the Fifth Circuit. *Id.* at *9-10. The *Pacific Gateway* court also found relevant that the company in fact disclosed that it would not have enough cash unless it secured additional financing. *Id.* at *16.

> *ongoing at the time it filed the 2011 10-K, was an attempt to*
> *address its material liquidity deficiencies and was thus required to*
> *be disclosed.*

As shown in Section IV.B.1., above, both the text of Item 303(a) and the SEC's interpretive guidance demand that companies disclose not just material liquidity deficiencies but also any steps they have proposed or undertaken to address them. Courts have, in turn, found defendants liable under *Section 10(b)* if they failed to make these required disclosures. *Conaway II*, 698 F. Supp. at 798, 874-75; *see also Solow v. Citigroup, Inc.*, 827 F. Supp. 2d 280, 288 (S.D.N.Y. 2011) (statement that liquidity was "strong" was misleading in light of fact that company had borrowed from "lender of last resort", though finding that loss causation was not adequately pled). Thus, Defendants were required to disclose any steps they planned to undertake to address their material liquidity deficiencies.

In late 2011 and early 2012, GGS formed a plan to raise $50 million by selling GGS debt. The purpose of the proceeds was to give GGS a cushion to be able to pay its obligations as they came due – i.e., to address their material liquidity deficiencies. The 2011 10-K was filed on February 22, 2012, after GGS had formed its plan, and while negotiations were underway. Thus, Item 303 required Defendants to disclose that it planned to raise $50 million to address its liquidity deficiencies. That they did not created a misleading omission.

Nor is there any merit to Defendants' claim that disclosure of any steps Defendants then planned were forward-looking. GGS Def. 14, 17-18; Degner 17. Item 303 requires disclosure of steps Defendants currently planned to undertake to address GGS's material liquidity deficiencies. Current plans are ***not*** forward-looking statements. *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1213 (1st Cir. 1996) (statement that a company would not take further reserves "represents that as of [the date of the statement], [the company] has no current intent to undertake [the] activities"); *superseded by statute on other grounds as stated in Greebel v. FTP Software, Inc.,* 194 F.3d 185 (1st Cir.1999); *see also S.E.C. v. Goldstone*, 952 F. Supp. 2d 1060, 1248 (D.N.M. 2013) (plaintiff can recover if it shows that statement that "we have liquidity and

cash available to continue to support the portfolio" was made recklessly, and accordingly the statement cannot be a forward-looking statement.)

> *3. Defendants' statements that GGS would meet its operating cash needs from existing cash and operating cash flows was misleading or false because GGS was not meeting its operating cash needs and in fact planned an offering to address this deficiency.*

In the 2011 10-K, signed by Degner and Verghese (among others), also stated that "[w]e believe that our current working capital and projected cash flow from operations will be sufficient to meet our capital requirements for our existing operations for the next 12 months [i.e., through the end of 2012]" (the "2012 Liquidity Claim"). The only qualification Defendants offered was that "unforeseen events" might dash its expectations. But the 2012 Liquidity Claim was both false and misleading. In fact, GGS's working capital and operating cash flows were not sufficient to fund its operations, and GGS only survived by routinely breaking its contracts with its vendors. As of the filing of the 2011 10-K, Defendants did not believe that GGS's cash flows from operations would be sufficient for its liquidity over the next twelve months. In fact, Defendants knew that GGS's cash flows from operations would not be enough to meet its liquidity needs, and had decided to conduct a $50 million debt offering to meet its liquidity needs before it filed its 2011 10-K. Thus, GGS needed to raise cash even if there were no unforeseen intervening events.

Defendants concede that in this Circuit, forward-looking statements that are knowingly false are actionable. GGS Def. at 17; Degner at 17; *Lormand*, 565 F.3d at 244. The Complaint pleads that Degner and Verghese both attended an early 2012 GGS board meeting in which GGS decided to raise $50 million as a way to address its persistent inability to pay its obligations as they came due. ¶83. The entire premise of the offering was that GGS's cash flows from operations, combined with its existing cash, were not sufficient. Having attended a meeting and decided on a plan to supplement GGS's insufficient cash flows, Degner and Verghese had actual knowledge that GGS did not subjectively believe the 2012 Liquidity Claim. In any case, it would

be absurd to suggest that the CEO and CFO of a company that raised $50 million to address its cash flow deficiencies knew of neither the deficiencies nor of the debt offering's purpose. Finally, the temporal proximity between February 22 and the $50 million offering is further evidence that Degner and Verghese knew that projected cash flows were not sufficient to meet its requirements for 2012 when the 2011 10-K was filed. *Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 90 (1st Cir. 2008).

Accordingly, Degner and Verghese made the 2012 Liquidity Claim with actual knowledge that GGS did not believe it.

### C. Because Item 303 and Defendants' other statements required disclosure of material liquidity deficiencies and managements' plan to address them, the 2012 10-K contained false and misleading statements.

#### 1. Late paying vendors

GGS's inability to pay its vendors pursuant to the terms of their contracts persisted throughout 2012, except for a two-month period after the March 2012 $50 million offering. Thus, in the 2012 10-K, as in the 2011 10-K, Defendants were required to disclose GGS's continuous and persistent inability to pay its debts as they came due. Because they did not, for the same reasons as in the 2011 10-K, they omitted to state material facts necessary to make the statements made not misleading.

#### 2. The $50 million March 2012 debt offering

The 2012 10-K was required to disclose material liquidity deficiencies GGS ran into in 2012, as well as the steps it took to address them. *See Conaway*, 698 F. Supp. 2d at 816, 818-19. GGS never disclosed that the purpose of the March 2012 debt offering was to address its liquidity deficiencies, but that within two months, GGS was unable to pay its obligations as they came due. Thus, investors would have inferred, the capital raise failed.

That GGS raised $50 million and still failed to address its liquidity deficiencies was material. Indeed, in response, GGS fired Degner. ¶¶85-86. Accordingly, GGS was required to

disclose that the purpose of the $50 million raise was to address its material liquidity deficiency, but that GGS was still unable to pay its obligations as they came due.

> 3. *The second, third, and fourth one-time tricks were attempts to address material liquidity deficiencies, and GGS was required to disclose them.*

The 2012 10-K was filed on March 5, 2013. At that time, GGS was negotiating the second, third, and fourth one-time tricks: the *second* trick, the sale of Autoseis to raise cash to fund GGS's operations; the *third* trick, the sale of the rights to 43% of the revenues of a portion of the Multi-Client Library to raise the cash GGS needed to make it through the end of March; and the *fourth* trick, negotiations to acquire a subsidiary GGS expected would be unprofitable just to double-dip on financing. Thus, Defendants had identified specific steps GGS would take to address its material liquidity deficiencies. Item 303 required them to disclose the steps.

> 4. *Defendants' statements that GGS would meet its operating cash needs from existing cash and operating cash flows was misleading or false because GGS was not meeting its operating cash needs and in fact planned three separate steps to address them.*

The 2012 10-K, signed by Defendants White and Verghese, stated: "We believe that our current working capital, [sic] projected cash flow from operations will be sufficient to meet our capital requirements for our existing operations for the next 12 months [i.e., through December 2013]" (the "2013 Liquidity Claim").  But GGS did not believe it. In fact, even as they signed the 2012 10-K, Defendants were desperately seeking funding to take GGS through March 29, 2013, less than a month later, using the third trick. Accordingly, White and Verghese made the 2013 Liquidity Claim with actual knowledge that GGS did not believe it.

> ### D. Defendants' miscellaneous arguments seeking to excuse their false statements are without merit.
>
> > 1. *That GGS managed to stay afloat by selling off long-term capital assets and raising cash from selling securities is not evidence that*

27

*the 2012 and 2013 Liquidity Claims were true.*

Throughout their motions to dismiss, Defendants maintain that the 2012 and 2013 Liquidity Claims (collectively, the "Liquidity Claims") turned out to be true because GGS only filed for bankruptcy in March 2014. E.g. GGS Def. 14; Degner 17. But Defendants confuse the internal sources of cash referenced in the Liquidity Claims with GGS's obtaining external funding from selling off long-term capital assets or selling more debt that actually kept it afloat.

The Liquidity Claims provide that "current working capital" and "projected cash flow from operations" are sufficient. "Cash flow from operations" is an accounting term referring to the cash generated by or used in normal business operations. "Current working capital" is also an accounting term, meaning current assets minus current liabilities, and "current" assets are those that will be consumed in the fiscal year. Thus, the Liquidity Claims mean that the company will not need to resort to outside source of funding – whether selling off its long-term assets or raising new debt – to fund its operations in the coming years. *Cf. Growe v. Bedard*, No. CIV.03-198-B-S, 2004 WL 2677216, at *4 (D. Me. Nov. 23, 2004) (similar statement related to company's cash flows over the coming year).

GGS only survived through 2011 and 2012 by periodically obtaining new cash – from the $50 million debt raise, from the sale of revenues from portions of the Multi-Client Library assets for $25 million, from the sale of further Multi-Client Library assets to raise an emergency $5 million advance, and from the Offering. Its survival through outside funding is no evidence that inside funding was sufficient. That GGS resorted to outside funding on increasingly poor terms shows that inside funding was not sufficient.

> 2. *Defendants' unsupported claim that UHY authorized their false statements is not in the complaint and would not absolve them even if it were true.*

Item 303 disclosures are made in the section of SEC filings called Management's Discussion & Analysis ("MD&A"), as was Defendants' statements that working capital and projected cash flow would suffice to fund its operations. Auditors audit financial statements.

28

MD&A, though, is not a part of the financial statements. Thus, GGS's auditors did not express an opinion on GGS's MD&A disclosures, including its Item 303 disclosures.[9] Thus, Defendants' claim that they could not have committed fraud because their auditor certified their judgment, GGS Def. at 16 and n.28; Degner at 16-17, is wrong on the facts; the auditor had nothing to do with GGS's Item 303 disclosures. Defendants further claim that GGS's auditors "vetted" all of their disclosures. GGS Def. at 16. The claim appears nowhere in the Complaint, and Defendants cite nothing for it. Nor do they cite any law suggesting how a third party's review of statements defendants drafted and chose to make could conceivably absolve them of all liability because the statements were fraudulent ***on a motion to dismiss***.

### 3. *Defendants' disclosures were inadequate.*

Throughout, Defendants seek dismissal because they claim they provided investors with sufficient warnings. E.g. GGS Def. at 4-7; Degner 18. The warnings, which they characterize as robust, are nothing of the sort.

Many of GGS's false statements and omissions were of present or historical fact. For example, Defendants omitted to disclose GGS had been and continued to be unable to pay its obligations as they came due. There is no safe harbor protection for statements of present or historical fact. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005); *Shaw*, 82 F.3d at 1213; *Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1404-1405 (7th Cir. 1995).

Thus, cautionary disclosures could only conceivably apply to failure to disclose the risks that GGS's 2012 and 2013 operating cash flows and working capital would not be enough to meet its obligations for those years. But even on this point, though GGS's cautionary statements were long, they were nothing more than a "litany of generally applicable risk factors." In *Meyer*, the company warned (a) that it employed dangerous chemicals and waste, (b) was subject to extensive regulations, and (c) that a failure to comply would be very costly. *Meyer v. Jinkosolar*

---

[9] In any case, "[m]anagement is responsible for preparing financial statements that conform to GAAP." Not its outside auditors. AU §110.02.

*Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014). The Second Circuit held that "[a]lthough this statement warned of a financial risk to the company from environmental violations, the failure to disclose then-ongoing and serious pollution violations would cause a reasonable investor to make an overly optimistic assessment of the risk." *Id.*

First, GGS warned that it had a lot of debt. Debt is disclosed on a company's financial statements, so GGS's "warning" was superfluous. But taking on large amounts of debt does not necessarily lead to the conclusion that the company has a liquidity deficiency or is otherwise in danger. Obtaining a large loan is more often than not a positive event for stockholders. The company's present or anticipated inability to service its debt or meet its other obligations is the relevant question that Item 303 and §10(b) requires management to address in the MD&A.

Second, GGS warned that this debt "could" have "important consequences". It then cited a laundry list of debt's possible consequences that are familiar to anyone who has ever run a company or household. Debt "increases vulnerability", "reduces the availability of [] cash flow", "limit[s] flexibility", "places [one] at a competitive disadvantage compared to our competitors that have less debt", and "limits [] ability to borrow additional funds." Disclosing that debt has consequences is exactly the kind of "vague and general warning" that is insufficient to obtain the safe harbor's protection. *Lormand*, 565 F.3d at 246. Particularly as GGS's problem was not ***debt***, but ***liquidity***.

Third, GGS warned that its loans included restrictive covenants. The loans' covenants are not at issue in this case.

Fourth, and finally, GGS points to statements that are no more than statements of generally applicable law. These include that if GGS is foreclosed on, the assets could be sold, and that if GGS breaches its loan covenants, it "could" be in default. These disclosures contain literally no company-specific information, and are thus inadequate.

GGS thus offers no more than "generic warning[s] of a risk [that] will not suffice [because] undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Meyer*, 761 F.3d at 251.

4. *That the SEC purportedly chose not to charge Defendants is irrelevant.*

Defendants make much of the fact that GGS filed with the SEC a report on Form 8-K representing that the SEC considered, and rejected, filing a regulatory proceeding against them in connection with the Restatement. GGS Def. at 10. First, Defendants have offered no more than their say so in support of their claim that the SEC has not proceeded against them. Nor is the claim encompassed within the Complaint, which does not even mention the purported SEC proceeding. Second, courts regularly treat the SEC's discretionary decision not to proceed with enforcement as "irrelevant." *In re Am. Apparel, Inc. S'holder Litig.*, No. CV 10-06352 MMM JCGX, 2013 WL 174119, at *12-13 (C.D. Cal. Jan. 16, 2013) (and cases cited therein). *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1240 (N.D. Cal. 2008). The SEC is its own litigant, and brings or declines to bring cases for its own reasons, which can include its resources, its institutional focus, or other factors that do not bear on the merits.

### E.  White, Verghese, and Degner made the false statements with scienter.

Degner and Verghese made the 2012 Liquidity Claim, and White and Verghese the 2013 Liquidity Claim, with actual knowledge that they were false – that is, with scienter. Scienter is also adequately alleged with respect to the other claims.

A plaintiff can plead scienter by showing that a defendant "knew facts or had access to information suggesting that their public statements were not accurate." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (scienter present if defendants "knew facts or had access to information suggesting that their public statements were not accurate"); *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001) (same); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 761 F. Supp. 2d 504, 561 (S.D. Tex. 2011) (same).

Defendants acknowledge as much when they declare, falsely, that the Complaint is devoid of allegations that Defendants were aware of information alerting them to their company's persistent inability to meet its obligations as they came due. But saying it does not make it so. The Complaint pleads many such pieces of information:

- The Complaint pleads that the Board held at least two meetings specifically to discuss GGS's inability to meet its obligations as they came due, including one held in early 2012, and therefore before the 2011 10-K, attended by both Verghese and Degner;

- The Complaint pleads that GGS received a detailer letter from private equity fund Silver Lake warning them of their looming bankruptcy;[10]

- The Complaint pleads that Todd Smith received between 20 and 40 calls from vendors demanding payment per day, spoke with Verghese every day, and needed Verghese's authority to withdraw cash from GGS's revolver;

- The Complaint pleads that even as the 2012 10-K was filed, GGS was negotiating with two separate counterparties to sell a division for money it needed to make it through March 29;

- The Complaint pleads that White, Degner, and Verghese received daily cash reports, setting out (for example) the balance on GGS's accounts payable, which would have shown them that they were not current;[11]

- The Complaint pleads that on January 7, 2013, White himself sent a firmwide email claiming that GGS's top priority was to "eliminate all unnecessary spending and delay necessary spending until required;"

- The Complaint pleads that GGS entered into a disadvantageous undisclosed

---

[10] Defendants assert that the fact that Silver Lake sought to reopen negotiations does not suggest that Defendants were insolvent. Def. Br. at 17 n. 36. But if Silver Lake buys Autoseis and does not receive as consideration a promise to buy Autoseis's products, then it does not care if GGS goes out of business.

[11] Citing *Abrams*, Defendants claim that these specific internal reports are not sufficiently alleged. In *Abrams*, the plaintiffs pled that the defendants received unspecified internal reports, and nothing more. The false statements related to internal controls, yet the plaintiffs did not explain how these daily reports gave the defendants knowledge of these problems (or even what they contained). Here, the Complaint pleads the contents (for example, balance on outstanding accounts payable), and corroborating details – the source (Todd Smith), and the recipients (Verghese and Degner) – exactly the information missing in Abrams. *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002).

transaction contributing valuable assets in exchange for a $5.0 million advance on receivables it had already earned solely to avoid a default under the Tennenbaum Facility.

An inference of scienter also arises if a defendant gives false explanations to investors or deliberately conceals material facts. *Novak*, 216 F.3d at 311. For example, in a case where plaintiffs alleged a company fraudulently refused to mark down obsolete inventory, the Second Circuit found especially probative that the company falsely told investors that inventory was under control and gave false explanations for its growth on the company's financial statements. *Id.* at 311-12. *Cf. Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 433 (5th Cir. 2002) (distinguishing *Novak* on this ground).

GGS raised $25 million by selling 43% of the future revenues from the Multi-Client Library, one of its two primary revenue streams. But at the time, White and Verghese claimed that the transaction was a "strategic licensing, marketing and data distribution relationship", with Verghese adding that the deal "fundamentally [is] a licensing and distribution deal". ¶¶93, 95. GGS and its officers White and Verghese also tried to prevent investors from discovering the truth on their own, for example by refusing to file the contract with the SEC, as they acknowledge they were required to do. GGS now admits, as it must, that the purpose of the transaction was to finance its operations past March 29, 2013, likely in part because their auditors forced them to acknowledge that the transaction does not have an economic purpose as a licensing agreement. ¶103. Then, when they sought a loan, GGS falsely told Tennenbaum the "licensing" transaction was at market rates. This is exactly the kind of furtive conduct that establishes that White and Verghese were, at best, reckless.

Defendants also note that the Complaint does not plead any stock sales, and then claim that a lack of stock sales weighs against scienter. But the Fifth Circuit recently reiterated that while motive allegations "meaningfully enhance the strength of the inference of scienter," but they are not necessary. *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 685 (5th Cir. 2014). Defendants also claim that their only transactions were to buy shares, citing their Forms

4, but as the Fourth Circuit recently held, it is reversible error to consider Forms 4 as evidence that the defendants did not make stock sales unless the plaintiff first raises the point. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, No. 13-2370, 2015 WL 1137142, at *8 (4th Cir. Mar. 16, 2015). The only facts before the Court are that Plaintiffs do not allege any stock sales.

Moreover, the Complaint pleads that Defendants received other benefits from the fraud – for example, in February 2014, GGS awarded $3.5 million in cash bonuses to employees. And the motive to avoid bankruptcy supports, without by itself creating, a strong inference of scienter. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1063 (9th Cir. 2000).

The cases Defendants cite are distinguishable. In *Shaw*, plaintiffs had pled no facts suggesting that the defendants knew about or sanctioned the slow pay of vendors. *Shaw Group*, 537 F.3d at 542. The *Payne* court, on which Defendants base much of their opposition, actually found scienter, citing the fact that the CEO received daily liquidity reports. *Payne*, 433 F. Supp. at 572. The *Payne* court instead dismissed on falsity, and its holding is addressed above.

And this case is nothing like *Baker Hughes*. There, the plaintiffs set out motive allegations that this Court ultimately ruled were insufficient. But when it came to alleging what the defendants knew, how they knew it, and when they knew it, the plaintiffs fell back on boilerplate allegations that the defendants were senior officers, and therefore **must have** received internal reports, communications, and the like, and these communications **must have** shown the defendants the true facts. *In re Baker Hughes Sec. Litig.*, 136 F. Supp. 2d 630, 648 (S.D. Tex. 2001). Here, Plaintiffs cite specific communications, meetings, reports, and furtive conduct that show that Defendants knew GGS was unable to pay its obligations as they came due and that it was undertaking various steps to address this material liquidity deficiency. Further, in *Baker Hughes*, the defendant disclosed the false statement before it was to obtain the financing it needed, *id.* at 644, and the funding was available to the defendants anyway, only at worse rates, eviscerating any fraudulent motive. *Id.* at 643.

### F.  The internal controls statements were false and made with scienter

The 2012 10-K represented that White and Verghese, among others, had designed and

tested GGS's internal controls over financial reporting, and that the controls were effective. In fact, they were not. Most strikingly, in its Proprietary Services, GGS received the bulk of its revenues from bids on contracts. But when it made its bids, it never first determined whether it would have the capital to follow through and perform the contracts if its bids were successful. But GGS also had several other systematic defects. For example, nepotism ran rampant, and it had no internal audit director or department. It is thus no surprise that the first audit after Verghese's October 2013 email informing staff of internal controls, GGS found six separate errors in its financial statements going back to 2009.

Defendants claim these errors are small errors characteristic of negligence, rather than recklessness. GGS Def. 11-12. Hardly. The internal control failings include that Defendants ***did not make a budget***. Household heads understand that they must make a budget to manage their finances. GGS was a public company with at least 1200 employees spread throughout the world at all times during the class period. If White and Verghese were not reckless when they said that GGS's internal controls were effective, then no one is.

With such weak defenses on the facts, it is no wonder that Defendants resort to declaring that their statements that GGS's internal controls were adequate was just their opinion (a running theme in the various Defendants' motions). GGS Def. 12. Defendants' claim has never been endorsed by a court, or they would have cited it. Indeed, courts regularly adjudicate statements that internal controls are adequate as statements of fact. *E.g. In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 317 (S.D.N.Y. 2013); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 638 (S.D.N.Y. 2010) (inferring that statement that internal controls were adequate is false because defendants would have had access to contrary information). Defendants' claim is so bizarre that, to Plaintiffs' knowledge, in all of the opinions discussing internal controls over financial reporting, none even discusses whether the statement is fact or opinion. Courts, and litigants, simply accept that it is a statement of fact.

### V.  THE SECTION 11 CLAIMS ARE ADEQUATELY ALLEGED.

Defendants claim that the Registration Statement and the documents it incorporates by

reference do not contain materially false statements. The Registration Statement incorporated by reference the 2012 10-K. Therefore, for the reasons set out in sections IV. above, the Registration Statement made materially false statements and omissions.

Nonetheless, for two further reasons, even if the Court dismisses the Section 10(b) claims, it should not dismiss the Section 11 claims. First, by the time the Q3 2013 10-Q was filed, GGS's third, fifth, and sixth one-time tricks were historical events, and inarguably received no protection as forward-looking statements. Yet the Q3 2013 10-Q was incorporated into the Registration Statement by reference. Second, there is no scienter requirement for Section 11 claims, and all that Plaintiffs must allege is a materially false statement. Thus, if the Court were to find that the omissions of liquidity deficiencies and steps to address them were not made with scienter, the Court should nonetheless uphold the Section 11 claims, because the statements were nonetheless false and misleading. Finally, the Registration Statement also incorporated false and misleading statements about GGS's net income and internal controls, which independently ground liability.

### A. Because Item 303 and Defendants' other statements required disclosure of material liquidity deficiencies and managements' plan to address them, the Q3 2013 10-Q contained false and misleading statements.

The $5 million advance was particularly material. The Preferred Stock is junior to the Tennenbaum Facility, and, in a bankruptcy, would get nothing unless that facility was first paid off. Yet GGS was cannibalizing its assets to stay in compliance with the Tennenbaum Facility. Thus, in bankruptcy, it was overwhelmingly likely that the Preferred Stock would get nothing. GGS was required to disclose the true state of its liquidity position and its desperate need for cash. Reasonable investors would only buy GGS's preferred stock if it offered a commensurately high payoff to compensate for this probable loss. GGS's concealment of its desperate financial condition misled Preferred Stock investors.

The $5 million advance was such a low price to receive compared to the book value of

the assets GGS gave in return for it, that GGS recorded a $75.2 million impairment charge against the Multi-Client Library assets in Q4 2013. Stokes Dec. Ex. E, at 4. GGS should have disclosed the desperate $5 million advance transaction, as well as the resulting impairment to the Multi-Client Library, in the Registration Statement, rather than wait until it filed its annual report on April 29, 2014, after it had declared bankruptcy.

Defendants claim their disclosures were adequate, and for the reasons set out above in IV. D. 3, they were not. That the Offering happened at all is further evidence. The purpose of the Offering was to stave off bankruptcy for a few months; nothing short of a miracle would have happened in those few months to avoid bankruptcy. Yet the Preferred Stock was junior to most of GGS's debt, and would be wiped out in a bankruptcy. Preferred Stock financing would not have been available at any price if investors knew GGS's true dire condition. That GGS slid into bankruptcy just 3 months following the public offering shows how bad its financial condition was at the time of the Offering.

## B. The Registration Statement contained materially false statements because the financial statements incorporated into the Registration Statement materially overstated GGS's net income.

The Restatement revealed that GGS had understated its net loss by 9.8% for the period between 2009 and 2012, its entire life as a public company, and for 2009 misleadingly turned a significant loss into a profit. For 2009, GGS's financial statements falsely reported a $450,000 profit, though in truth it had lost $5.8 million (a 1,298% overstatement); for 2011 net loss was understated by 12.9%; and for 2012 net loss was understated by 16.9%. For the most recent quarter ended September 31, 2013, GGS understated net loss by 17.5%. ¶133.

In *Campton*, a plaintiff brought a Section 11 claim, alleging that he bought stock pursuant to a registration statement that contained a materially false statement, in that it overstated the company's net income before taxes. The plaintiff pointed to a later restatement. The defendants claimed the restatement, and therefore the error it restated, was not material. In that case, the Court held that "most investors would consider it significant, no matter what the mix of

information available, that a company was not earning as much as it was claiming to earn." *Campton*, 2014 WL 61199, at *9. The Court cited a case in which an 8% overstatement of net income was material. *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 (8th Cir. 2003). Here, net loss was understated by 9.8%. The Court also took into account the 20.5% and 13.5% stock drops on the days following two disclosures. *Id.* at *8. Here, GGS's stock price fell by 61% the day after it announced the Restatement. ¶172.

Defendants claim context as an excuse, as they claim investors would have cared more about GGS's cash flows and debt, tan net income. GGS Def. at 10-11. The only case they cite in support is *J & R Mktg., SEP v. Gen. Motors Corp.*, No. 06-10201, 2007 WL 655291 (E.D. Mich. Feb. 27, 2007). But that case supports Plaintiffs. There, the plaintiffs were debt holders, not equity holders like the Preferred Stock purchasers. *Id.* at *10. After a two-page discussion of the governing law, the *J&R Marketing* court held that misstatements of net income had a tendency to be immaterial to debt investors, because the value of "debt securities depend on an issuer's credit rating and market interest rates." *Id.* at *11. But the court observed that "equity securities [like the Preferred Stock here] derive their value primarily from the issuer's future earnings potential". *Id.* That is, *J&R* suggests that investors in the Preferred Stock would care **much more** about net income than about debt and cash position. Further, the *J&R* errors were tiny, with misstatements of net income over three quarters of 2.8%, 1.6%, and 5.5%. *Id.* at *10.

Defendants attempt to distinguish its *Campton* on grounds that here, GGS's disclosures were "robust". GGS Def. 10-11. But they cite disclosures about GGS's **liquidity**, not the **accuracy of its financial statements**. Those disclosures are thus irrelevant. Indeed, it is hard to imagine any type of cautionary disclosures sufficient to warn that an issuer is overstating net income by material amounts.

### C. The Registration Statement contained materially false statements because it falsely claimed that GGS had adequate internal controls.

The 2012 10-K, incorporated by reference into the Registration Statement, claimed that GGS had effective controls over financial reporting as of December 31, 2012. 144. Each of the

38

Q1-Q3 2013 10-Qs claimed that there had been no changes in GGS's internal controls over financial reporting in the relevant periods, and their internal controls were therefore still effective. ¶143c.-e.

In fact, GGS's internal controls were grossly inadequate, and this deficiency led directly to its bankruptcy. When it bid for contracts, GGS never assessed its liquidity to ensure that it would have enough cash to satisfy its obligations. According to a declaration provided by its CFO, it then collapsed because it did not have enough cash to meet its obligations after several of its bids were successful. ¶161. Thus, at least according to its CFO, GGS's material deficiencies in its internal controls led directly to its bankruptcy.

Defendants do not even dispute that the internal control certifications were materially false, instead simply arguing that they did not make these concededly false statements with scienter. GGS Def. 11-12; Degner 11-12. Since a Section 11 claim does not require scienter, they effectively concede that the claim is well pled. Indeed, it was poor internal controls that precipitated GGS's bankruptcy, as GGS's Restatement rendered it unable to timely file its 2013 10-K, an event of default under the Tennenbaum Facility. Stokes Dec. Ex. J.

Defendants also argue that their certification of internal controls were just their opinion. For the reasons set out in IV. F. above, they are wrong.

## VI. THE CLAIMS AGAINST UHY ARE WELL PLED

Section 11 imposes liability on "every accountant [] who has with his consent been named as having prepared or certified any part of the registration statement [] with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him." 15 U.S.C. § 77k(a)(4).

GGS obtained UHY's consent to its designation as an accounting "expert" as well as its designation as an "expert" on GGS' internal controls over financial reporting. ¶39. The certified financial statements were then incorporated into the Registration Statement in reliance on UHY's

audit. ¶46.[12]

Since at least the seminal case of *Escott v. BarChris Construction Corporation*, courts throughout the country have consistently and frequently held that auditors who have provided audit reports on a company's financial statements incorporated with their consent into registration statements are liable ***if the financial statements contained materially false statements.***[13] Courts in the Fifth Circuit agree with this consensus.[14] Thus, auditors are liable for any portion of the Registration Statement that they certify, whatever particular language they use to couch their certification.

Without even acknowledging this fifty years' consensus, UHY declares that its audit certification was just its opinion, and that it is only liable if it subjectively disbelieved it. *E.g.* UHY 8. Courts have rejected UHY's argument. *Yang v. Tibet Pharm., Inc.*, No. CIV. 14-3538 FSH, 2015 WL 730036, at *3, n.6, and n.7 (D.N.J. Feb. 20, 2015) ("[The auditor] argues that it cannot be held liable under Section 11 for the misrepresentations alleged above in the registration statement because an auditor may only be held liable for its own audit report—in other words, that Plaintiffs must allege that [the auditor's] audit report itself contained material misrepresentations. Section 11, however, expressly imposes liability for misrepresentations in

---

[12] *See also* Stokes Dec. Ex. A at 16 (noting that GGS's financial statements were included "in reliance upon the reports of UHY LLP").

[13] *Escott v. BarChris Const. Corp.*, 283 F. Supp. 643, 684 (S.D.N.Y. 1968); *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 145 (D.N.J. 1984) ("Section 11 imposes liability on [] accountants who certified any part of a registration statement if the registration statement contained material misrepresentations or omitted material information"); *Endo v. Arthur Andersen & Co., S.C.*, 163 F.3d 463, 466 (7th Cir. 1999) (Posner, J.) (holding that auditors are liable for misstatements in registration statements, but declining to impose liability on previous years' auditor); *In re S. Pac. Funding Corp. Sec. Litig.*, 83 F. Supp. 2d 1172, 1176 (D. Or. 1999); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 348 (S.D.N.Y. 2004); *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 492, 493 (S.D.N.Y. 2005); *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 505 (W.D. Wash. 2009); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 379 (S.D.N.Y. 2011); *Dutton v. Harris Stratex Networks, Inc.*, 270 F.R.D. 171, 177 (D. Del. 2010)

[14] *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 611 (S.D. Tex. 2002); *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 278 (N.D. Tex.) *opinion clarified,* 739 F. Supp. 1087 (N.D. Tex. 1990).

the financial statement on auditors who "prepare[ ] or *certify* [ ]" the [financial statements included in the] registration statement, and Plaintiffs have alleged that [the auditor] certified the financial statements"); *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 399-400 (S.D.N.Y. 2013) (Scheindlin, J.) ("Defendants argue that the entire Audit Opinion is a statement of belief or opinion under *Fait* because it contains the word 'opinion' in its title, and prefaces its conclusions with the phrase 'in our opinion.' [footnote omitted]. However, it would render Section 11 meaningless to find that an accountant's liability turns on this semantic choice.")

UHY only cites four cases in support of its position. UHY 8-9. The first involves claims under Section 18 (which imposes liability based on statements) rather than Section 11 (which imposes liability based on certifications). *Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*, 454 F.3d 1168, 1174 n.6 (10th Cir. 2006). Indeed, as the *Tibet* court noted, the *Deephaven* court explicitly found that "Section 11, unlike Section 18(a), imposes liability on accountants for certifying financial statements containing material misrepresentations." *Tibet*, 2015 WL 730036, at *3, n.6 (*citing Deephaven*, 454 F.3d at 1174 n.6). Two of the remaining three opinions were brought pursuant to Section 10(b), which like Section 18 only imposes liability for false statements. *S. E. C. v. Arthur Young & Co.*, 590 F.2d 785, 786 (9th Cir. 1979) (Section 10(b)); *Dronsejko v. Thornton*, 632 F.3d 658, 661 (10th Cir. 2011) (Section 10(b)).

The fourth, *Lehman Brothers*, quickly noted in passing that because the plaintiffs had not alleged that the auditor had made a false statement for which it could be liable under Section 10(b), they had not alleged that the auditor was liable under Section 11. *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 318-319 (S.D.N.Y. 2011). That case, though decided in the Southern District of New York, did not cite any of the numerous cases from that district holding that an auditor is liable for materially false statements in financial statements certified by the auditor.[15] *See* n. 12, above, and cases cited in *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 400 n.

---

[15] The *Lehman Brothers* court also correctly stated the law: "Accounting firms like E & Y are subject to Securities Act Section 11 liability **only if the alleged misstatement or omission occurs in a portion of a registration statement, or a report or valuation used in connection with the registration statement, prepared or certified by it**." *Lehman Brothers*, 799 F. Supp. 2d at 318

87 (S.D.N.Y. 2013). That the judge cited none the many opinions decided in the Southern District suggests he simply wasn't aware of the issue. Thus, courts have ignored this part of the *Lehman Brothers* decision. *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 400 n. 87 (S.D.N.Y. 2013) (holding, after *Lehman Brothers* was decided, that "[c]ourts in [the Southern District of New York] have **consistently** found that accountants bear Section 11 liability for the portions of a Registration Statement that they audited") (emphasis added).

Moreover, Section 11 specifies that the auditor's subjective state of mind will be considered as an affirmative defense, allowing it to escape liability only if the auditor carries the burden of proving    that it had conducted a reasonable investigation, and ***reasonably and subjectively believed that all the statements in the portions of the registration statement were true***. 15 U.S.C. § 77k(b)(3)(A). It makes no sense for Congress to make subjective belief an element of an affirmative defense if proving subjective disbelief is an element of a plaintiff's cause of action.

Thus, the only thing the Complaint needs to allege is that there was a materially false statement in GGS's 2010-2012 annual financial statements or a material deficiency in GGS's internal controls as of December 31, 2012.  That the Complaint meets this threshold UHY hardly bothers to dispute. In any case, Section V B-C, above, establish that it does. UHY's motion to dismiss should be denied.

---

(emphasis added).

Dated: March 23, 2015                    **THE ROSEN LAW FIRM, P.A.**

<u>/s/ Phillip Kim, Esq.</u>
Phillip Kim, Esq. (pro hac vice)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: <u>pkim@rosenlegal.com</u>

-and-

PAYNE MITCHELL LAW GROUP
R. Dean Gresham, Esq. (State Bar No. 24027215)
2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
Tel: (214) 252-1888
Fax: (214) 252-1889
Email: <u>dean@paynemitchell.com</u>

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed with the Court's electronic case filing (ECF) system on March 23, 2014, which sent notification of such filing to all counsel of record.

/s/ Phillip Kim